Nos. 26-1277 & 26-1328

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

JOSEPH AMATO, et al.

*Plaintiffs-Appellees,*

v.

SUBARU OF AMERICA, INC. and SUBARU CORPORATION,

*Defendants-Appellants.*

RICARDO AQUINO, et al.

*Plaintiffs-Appellees,*

v.

SUBARU OF AMERICA, INC. and SUBARU CORPORATION,

*Defendants-Appellants.*

Appeal from the United States District Court
For The District of New Jersey, Camden Vicinage
Hon. Karen M. Williams
Case Nos. 1:18-cv-16118 and 1:22-cv-00990

# APPELLANTS' BRIEF

Neal Walters
Casey Watkins
BALLARD SPAHR LLP
700 East Gate Drive, Suite 330
Mount Laurel, New Jersey 08054-0015
(856) 761-2400
(856) 761-1020 fax
waltersn@ballardspahr.com
watkinsc@ballardspahr.com

*Attorneys for Defendants-Appellants Subaru of America, Inc. and Subaru Corporation*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit 26.1, Defendants-Appellants Subaru of America, Inc. and Subaru Corporation make the following disclosures:

1.    Subaru of America, Inc. is a wholly owned subsidiary of Subaru USA Holdings, Inc.;

2.    Subaru USA Holdings, Inc. is a wholly owned subsidiary of Subaru Corporation;

3.    Subaru Corporation owns 100% of the stock of Subaru of America, Inc., and Toyota Motor Corporation owns more than 10% of Subaru Corporation's stock. No other publicly held companies own 10% or more of Subaru Corporation's stock;

4.    Subaru Corporation is a Japanese corporation that is publicly traded on the Tokyo Stock Exchange.

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ...............................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ..............3

STATEMENT OF RELATED CASES AND PROCEEDINGS.................4

CONCISE STATEMENT OF THE CASE ............................................6

    A.    Class Counsel Files Three Identical Lawsuits Yet Cannot Find Plaintiffs to Support Their Claims................................6

    B.    Plaintiffs Delayed Certification to Pivot to an Undisclosed "Lay" Witness After Subaru Challenged Their Experts. .....10

        1.    Subaru moved to exclude Mr. Muhammad's undisclosed expert testimony and opposed class certification. ..............................................................14

        2.    The district court administratively terminated Subaru's pending motions............................................16

    C.    The District Court Granted Certification Without Resolving Pending Expert Exclusion Motions, Addressing Subaru's Evidence, or Defining the Classes. ......................................16

    D.    This Court Granted Subaru's 23(f) Petition. ........................18

SUMMARY OF ARGUMENT ...........................................................20

STANDARD OF REVIEW..................................................................24

ARGUMENT .......................................................................................27

    A.    The District Court's Failure to Address Article III Standing Was an Abuse of Discretion. ...............................................27

        1.    No named Plaintiff has standing to represent FA-series engine owners.................................................................27

        2.    The subclasses must be limited to the models owned by their respective representatives. .................................29

    B.    The District Court Abdicated Its Gatekeeping Function while Relying on Challenged Experts and an Undisclosed Lay Witness..........................................................................30

C.     The Certification Order Fails to Define the Class and Violates Rule 23(c)(1)(B). .......................................................38

D.     The District Court Failed to Conduct a Rigorous Rule 23 Analysis. ................................................................................41

      1.     The district court failed to grapple with the undisputed differences among the Subject Vehicles' engines. .......41

      2.     The district court failed to analyze individual questions of causation and defect manifestation. ........................43

      3.     The district court failed to analyze material conflicts in state law. ...........................................................................45

      4.     The district court failed to analyze a fundamental disconnect between Plaintiffs' damages model and their liability theory. ..........................................................48

      5.     This Court should expressly adopt the element-by-element requirement for analysis recently characterized by the Sixth Circuit. ..............................50

E.     The District Court's Typicality Analysis Was Cursory and Erroneous. ............................................................................54

F.     This Court Must Vacate the Certification Order and Remand with Explicit Instructions. ...............................................55

CONCLUSION ..................................................................................57

CERTIFICATION OF BAR MEMBERSHIP ..........................................59

CERTIFICATION OF WORD COUNT..................................................59

CERTIFICATION OF SERVICE ..........................................................59

CERTIFICATION THAT E-BRIEF AND HARD COPY ARE IDENTICAL ......................................................................................60

CERTIFICATION THAT E-BRIEF HAS BEEN VIRUS CHECKED....60

JOINT APPENDIX VOL. I OF XIX.......................................................61

# TABLE OF AUTHORITIES

## Federal Cases

*Allen v. Ollie's Bargain Outlet, Inc.*,
   37 F.4th 890 (3d Cir. 2022)......................................................24, 27, 42

*In re Am. Med. Sys., Inc.*,
   75 F.3d 1069 (6th Cir. 1996)................................................................23

*Amato v. Subaru of America, Inc.*,
   No. 1:18-cv-16118-KMW-AMD (D.N.J.) ....................................*passim*

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..............................................................................23

*Anschutz Corp. v. Merrill Lynch & Co.*,
   690 F.3d 98 (2d Cir. 2012) ...................................................................40

*Aquino v. Subaru of Am., Inc.*,
   No. 22-cv-00990 (D.N.J.)......................................................................11

*Aquino v. Subaru of America, Inc.*,
   No. 1:22-cv-00990-KMW-AMD (D.N.J.) ....................................*passim*

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
   No. 07-MD-1871, 2025 U.S. Dist. LEXIS 97465 (E.D. Pa.
   May 22, 2025), *appeal argued*, No. 25-2278 (3d Cir. Feb.
   26, 2026) ................................................................................................46

*Beck v. Maximus, Inc.*,
   457 F.3d 291 (3d Cir.2006) ..................................................................46

*In re Blood Reagents Antitrust Litig.*,
   783 F.3d 183 (3d Cir. 2015) ............................................................*passim*

*Broussard v. Meineke Disc. Muffler Shops*,
   155 F.3d 331 (4th Cir. 1998).................................................................42

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)........................................................23, 28, 41, 42

*Doddy v. Oxy USA,*
   101 F.3d 448 (5th Cir. 1996)................................................................30

*Drummond v. Progressive Specialty Insurance Co.,*
   142 F.4th 149 (3d Cir. 2025)..............................................................45

*DZ Rsrv. v. Meta Platforms, Inc.,*
   96 F.4th 1223 (9th Cir. 2024) ............................................................46

*Elcock v. Kmart Corp.,*
   233 F.3d 734 (3d Cir. 2000) ...............................................................28

*Fisher v. Ciba Specialty Chems. Corp.,*
   238 F.R.D. 273 (S.D. Ala. 2006)........................................................40

*In re Folgers Coffee Marketing,*
   No. 24-2830 (8th Cir. Nov. 26, 2025).................................................45

*Frank v. Gaos,*
   586 U.S. 485 (2019)............................................................................25

*Gen. Tel. Co. of the Sw. v. Falcon,*
   457 U.S. 147 (1982)......................................................................23, 26

*Gonzalez v. Owens Corning,*
   885 F.3d 186 (3d Cir. 2018) ...............................................................24

*Grandalski v. Quest Diagnostics Inc.,*
   767 F.3d 175 (3d Cir. 2014) ...............................................................39

*In re Hydrogen Peroxide Antitrust Litig.,*
   552 F.3d 305 (3d Cir. 2008) .......................................... 21, 23, 37, 44

*In re Lamictal Direct Purchaser Antitrust Litig.,*
   957 F.3d 184 (3d Cir. 2020) .........................................................23, 36

*Leavitt v. Jane L.,*
   518 U.S. 137 (1996) (per curiam).......................................................23

*Marcus v. BMW of N. Am., LLC,*
   687 F.3d 583 (3d Cir. 2012) ...................................................... *passim*

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ................................................................ 40

*McNair v. Synapse Grp. Inc.*,
    672 F.3d 213 (3d Cir. 2012) ...................................................... 25, 27

*Naiman v. Alle Processing Corp.*,
    No. CV20-0963, 2020 U.S. Dist. LEXIS 218549 (D. Ariz.
    Nov. 23, 2020) ........................................................................................ 40

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d Cir. 2015) ............................................................. 25

*Neri v. Nissan N. Am. Inc.*,
    122 F.4th 239 (6th Cir. 2024) .......................................................... 27

*Oddo v. Arcoaire Air Conditioning & Heating*,
    No. 8:15-cv-01985, 2019 U.S. Dist. LEXIS 63428 (C.D.
    Cal. Mar. 22, 2019) ............................................................................. 40

*Prado–Steiman ex rel. Prado v. Bush*,
    221 F.3d 1266 (11th Cir.2000) .......................................................... 26

*Reinig v. RBS Citizens, N.A.*,
    912 F.3d 115 (3d Cir. 2018) ................................................. 20, 24, 34

*Sauer v. Subaru of Am., Inc.*,
    18-14933, 2020 U.S. Dist. LEXIS 55592 (D.N.J. Mar. 31,
    2020) .............................................................................................. 25, 36, 37

*Schellenbach v. GoDaddy.com, LLC*,
    321 F.R.D. 613 (D. Ariz. 2017) ................................................... 39, 40

*Schroeder v. Progressive Paloverde Insurance Co.*,
    No. 24-1559 (7th Cir. July 24, 2025) .......................................... 44, 45

*Simmons v. Ford Motor Co.*,
    592 F. Supp. 3d 1262 (S.D. Fla. 2022) ........................................... 27

*Speerly v. Gen. Motors, LLC*,
    143 F.4th 306 (6th Cir. 2025) ..................................... 21, 43, 44, 46

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) ............................................................... 39

*Thompson v. Subaru of Am., Inc.*,
    No. 1:18-cv-03736 (D.N.J.) ............................................................. 8, 10

*Wachtel v. Guardian Life Ins. Co.*,
    453 F.3d 179 (3d Cir. 2006) .......................................................... 24, 33

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................................... 23, 24

*Weidman v. Ford Motor Co.*,
    86 F.4th 723 (6th Cir. 2023) ......................................................... 27, 36

*Wysocki v. Zoom Techs. Inc.*,
    3:22-CV-05453-DGE, 2024 WL 1139094 (W.D. Wash. Mar.
    15, 2024) ............................................................................................. 27

## State Cases

*Solomon v. Bell Atl. Corp.*,
    9 A.D.3d 49 (N.Y. App. Div. 2004) .................................................... 40

## Federal Statutes

28 U.S.C. § 1292(e) .................................................................................. 6

28 U.S.C. § 1332(d) .................................................................................. 6

RICO ....................................................................................................... 46

## State Statutes

Arizona Consumer Fraud Act ............................................................... 39

Indiana Deceptive Consumer Sales Act ............................................... 40

Michigan Consumer Protection Act ..................................................... 34

## Rules

Fed. R. Evid. 701(c) ................................................................................ 30

Federal Rule of Civil Procedure 23 ................................................ *passim*

Federal Rule of Civil Procedure 23(f) ............................................ *passim*

Federal Rule of Evidence 701 ......................................................... 30, 31

Federal Rule of Evidence 702 ......................................................... *passim*

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

**Subject-Matter Jurisdiction.** The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(d). Plaintiffs brought these consolidated actions as putative class actions under Federal Rule of Civil Procedure 23 on behalf of purchasers and lessees of 2009–2018 Subaru WRX and STI vehicles in four states, alleging an engine piston ringland defect (the "alleged Piston Ringland Defect"). At least one proposed class member is a citizen of a state different from Defendants Subaru of America, Inc., a New Jersey corporation, and Subaru Corporation, a Japanese corporation. The putative class comprises more than 100 members—approximately 21,071 purchasers and lessees across New York, Arizona, Indiana, and Michigan. The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

**Appellate Jurisdiction.** This Court has appellate jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). On November 24, 2025, the district court entered an order granting in part and denying in part Plaintiffs' motion for class certification, certifying four statewide subclasses for statutory consumer protection claims and three statewide subclasses for negligent misrepresentation claims. Defendants Subaru of America, Inc. and Subaru Corporation filed their Petition for Permission to Appeal under Rule 23(f) on December 8, 2025, within fourteen days of the certification order, as required by Rule 23(f).

This Court granted the Petition on January 27, 2026, conferring appellate jurisdiction over the district court's interlocutory class certification order.

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.      Whether the district court erred by certifying classes that include owners of vehicles with FA-series engines and models that no named Plaintiff owned, consistent with Article III's requirement that a named plaintiff have standing as to each product or subclass they seek to represent.

2.      Whether the district court erred by administratively terminating Subaru's Expert Exclusion Motions without determining admissibility but nonetheless relying on the challenged expert opinions to certify the classes.

3.      Whether the district court abused its discretion in holding that common questions predominate under Rule 23(b)(3) where the required elements of manifestation, causation, reliance, and damages each require individualized proof.

4.      Whether the certification order must be vacated because the court failed to define facially problematic classes with the specificity Rule 23(c)(1)(B) requires, and because it certified a subclass on a claim previously dismissed with prejudice.

**STATEMENT OF RELATED CASES AND PROCEEDINGS**

In accordance with Third Circuit Local Appellate Rule 28.1(a)(2), Defendants-Appellants Subaru of America, Inc. and Subaru Corporation state as follows:

1.     **Prior Third Circuit Proceedings.** This case was previously before this Court in connection with Defendants' Petition for Permission to Appeal Under Federal Rule of Civil Procedure 23(f), docketed at No. 25-8041. On December 8, 2025, Defendants filed the Rule 23(f) petition seeking interlocutory review of the district court's November 24, 2025 order certifying class in the underlying consolidated actions. On January 27, 2026, this Court granted the petition. The present appeal, docketed at No. 26-1277, was opened on February 11, 2026.

2.     **Related Cases and Proceedings.** Defendants are aware of the following related cases and proceedings:

*Amato v. Subaru of America, Inc.*, No. 1:18-cv-16118-KMW-AMD (D.N.J.), and *Aquino v. Subaru of America, Inc.*, No. 1:22-cv-00990-KMW-AMD (D.N.J.), are the consolidated district court actions from which this appeal arises. A companion appeal from the same class certification orders is pending before this Court at No. 26-1328, and has been consolidated with this appeal for all purposes.

*Thompson v. Subaru of America, Inc.*, No. 1:18-cv-03736 (D.N.J.), was a prior putative class action filed by Class Counsel alleging the

same Piston Ringland Defect in 2009 through 2014 Subaru WRX and STI vehicles. That action was dismissed with prejudice by stipulation while Subaru's motion to dismiss was pending. *Thompson* was never before this Court.

Defendants are not aware of any other case or proceeding that is completed, pending, or about to be presented in any state or federal court or agency that is related to this appeal.

3.    **Prior or Pending Third Circuit Appeals From the Same Proceeding.** Other than the Rule 23(f) petition at No. 25-8041 and the companion appeal at No. 26-1328, both identified above, Defendants are not aware of any other previous or pending appeal before this Court arising out of the same case or proceeding.

## CONCISE STATEMENT OF THE CASE

### A.    Class Counsel Files Three Identical Lawsuits Yet Cannot Find Plaintiffs to Support Their Claims.

This consolidated litigation involves two high-performance vehicle models produced over a decade: the 2009–2018 Subaru WRX and STI (collectively, the "Subject Vehicles"). These models encompass four design generations and feature three mechanically distinct engines— the EJ255, EJ257, and FA20. A2244 (Kuhn Report). The EJ- and FA-series engines rely on different architectures, run on unique software, and have disparate piston dimensions visible to the naked eye. *Id.* at A2253–58. Class Counsel alleges these three distinct engines share one common alleged Piston Ringland Defect, where the metal partition between the piston rings fractures. A697 (Br. in Supp. Class Cert. ("Pls.' Br.")) But the engines' design differences have forced Plaintiffs to shift their theories of causation throughout, alternatively blaming the metallurgical casting of the pistons, the Positive Crankcase Ventilation (PCV) system, and the Engine Control Unit (ECU) software at different times. *See, e.g., id.* at A697 n.4.

Lacking actual engineering evidence, they tether their case to a May 2018 press release (the "May 2018 Press Release") where Subaru announced numerous improvements to the upcoming 2019 STI, including stronger pistons. *Id.* at 699, 709–10; *see* A1599 (May 2018 Press Release). Plaintiffs characterize this as admitting the existence of the alleged Piston Ringland Defect. But the May 2018 Press Release

merely informed customers of design changes driven by increased horsepower and new emissions requirements.[1] A1599–1603. Subaru never admitted a defect in the STI because no such defect exists. Further, the May 2018 Press Release did not apply to WRX models, which comprise more than half of the putative class vehicles. *Id.*

The contemporaneous press release for the WRX confirms this limited scope: the 2019 WRX press kit did not describe upgraded engine internals, increased power, stronger pistons, or a retuned ECU—because the 2019 WRX was not receiving them. A1940–42 (2019 WRX Press Kit). By 2015, the WRX had already transitioned from EJ-series to FA-series engines, specifically the FA20. A2253 (Kuhn Report).

The history of the named Plaintiffs reveals what Subaru and its enthusiast community have long known to be true: engine failures in these vehicles are generally the result of owner abuse and modification—not a uniform design defect. In March 2018, Class Counsel filed the first of three nearly identical lawsuits. *See Thompson v. Subaru of Am., Inc.*, No. 1:18-cv-03736 (D.N.J.); A112 (*Thompson* Compl.). That first putative class action lasted just six months. Class Counsel voluntarily dismissed the complaint in September 2018 after

---

[1] Plaintiffs single out 13 words from the May 2018 Press Release: "A retuned ECU and stronger pistons also contribute to the increased engine performance." A1601 (May 2018 Press Release).

Subaru moved to dismiss it. A160 (Order); *see also* A107 (*Thompson* docket).

Two months later, Class Counsel filed *Amato* on behalf of plaintiffs from four states, asserting essentially the same claims. A161 (*Amato* Compl.). The court narrowed the case to consumer fraud and negligent misrepresentation claims. A224–25 (Order). In the second amended complaint, Class Counsel added Plaintiff Hinshaw from Michigan (whose consumer protection claim the court later dismissed (A285 (Order)) and voluntarily dismissed Plaintiff Lall from New York, whose engine failed not because of some alleged defect, but because of an improper oil change. *See* A226 (Second Am. Compl.); A2387 (Field Report of Lall's Vehicle).

This troubling pattern continued as discovery progressed. Once discovery revealed Plaintiff Amato's (NJ) engine failed due to aftermarket modifications ("tuning") and improper maintenance, Class Counsel voluntarily dismissed his claims with prejudice. A286 (Stip.); A2383 (Nov 10, 2021 email). Counsel then dismissed Plaintiff Connolly (CA) for the same reason. A288 (Stip.); A2349–51; A2352–54 (Connolly Dep. Tr.); A2356 (Connolly Instagram post); A2358–62 (Connolly Service Request).

Running out of plaintiffs and facing the close of fact discovery, Class Counsel filed their own copycat action. *See Aquino v. Subaru of Am., Inc.*, No. 22-cv-00990 (D.N.J.); *see* A290 (Compl.). They filed the

*Aquino* matter on behalf of four new Plaintiffs, four years after filing the original complaint, and after the time to add new parties to the *Amato* action expired. *Id.* The court consolidated *Aquino* with *Amato*, marking the third putative class action asserting identical claims against Subaru. A79 (*Amato* ECF 111).

But the *Aquino* Plaintiffs told the same story. When discovery yet again revealed that tuning, improper maintenance, and abusive driving caused most of the named Plaintiffs' engine failures, Class Counsel once again voluntarily dismissed three of the four new Plaintiffs with prejudice. A336 (Order); A338 (Order); A340 (Order); A2296–98 (Aquino Facebook Posts); A2300–47 (Aquino Vehicle Report); A2363 (Klag Decl.); A2369–74 (Crumpecker Interrogatory Responses). All told, Class Counsel voluntarily dismissed seven of eleven Plaintiffs because owner conduct—not a design defect—caused their engine failures.

Plaintiffs' own briefing confirms as much. In opposing Subaru's Rule 23(f) petition, Class Counsel admitted they withdrew these representatives to "ensur[e] the matter could be litigated without the potential for Defendants to raise unique defenses." A3202. That admission is a stunning concession that individual defenses predominate. When the "best" representatives—hand-picked by Class Counsel—were subjected to individual scrutiny revealing modifications, abusive driving, and neglect, their claims crumbled. If 63% of the hand-picked class representatives faced fatal individual defenses, then the

absent class faces the same predominance hurdles. By strategically pruning these plaintiffs to hide individualized defenses—a strategy Class Counsel admit in their briefing to this Court—Counsel sought certification based on a sanitized fiction rather than the factual record.

Of the four remaining Plaintiffs, Tresco (NY), Sandoval (AZ), and Moore (IN) assert claims for negligent misrepresentation and their respective state's consumer fraud statutes, while Hinshaw (MI) asserts a single claim for negligent misrepresentation. Critically, Tresco, Sandoval, and Hinshaw own STIs with EJ257 engines. A2267 (Kuhn Report); A297 (Aquino Compl.). Moore owns a third-generation WRX with an EJ255 engine. A2267 (Kuhn Report). No remaining plaintiff owns a fourth-generation WRX equipped with the unique FA20 engine. Despite seeking to represent owners of vehicles with three distinct engines, the remaining plaintiffs own only two of them. *Id.* at A2268–69.

### B. Plaintiffs Delayed Certification to Pivot to an Undisclosed "Lay" Witness After Subaru Challenged Their Experts.

A long-standing scheduling order required the parties to file their summary judgment, *Daubert*, and class certification motions simultaneously. A397–98 (Order). Subaru complied. On April 1, 2024, Subaru filed its summary judgment motion and two *Daubert* motions as directed. A85 (*Amato* docket ECF Nos. 169, 170, 172). Class Counsel did

not. Instead of moving for class certification, Class Counsel requested an extension of time that same day, citing Subaru's "voluminous and complex motion." A401 (Letter). The court granted a 30-day extension while Subaru's *Daubert* motions remained pending. A399 (Order).

Subaru's *Daubert* motions exposed fatal flaws in Plaintiffs' case. In its motion to exclude Plaintiffs' damages expert, Dr. Sharp, Subaru demonstrated that his diminished-value model did not fit Plaintiffs' theory of liability. A629–31 (Mot. to Exclude Sharp). Specifically, Dr. Sharp admitted that his model neither calculated damages for lessees who suffered no resale loss, nor applied to buyers—like Tresco and Hinshaw—who purchased their vehicles after the May 2018 press release.[2] A595:25–96:24, A597:13–18, A600:14–21,  A615:23–16:4 (February Sharp Dep. Tr.); *see also* A297 (*Aquino* Compl.); A492 (Hinshaw Interrogatory Responses).

In the motion to exclude Plaintiffs' defect expert, Dr. Bower, Subaru underscored that he never inspected a Subject Vehicle, conceded that vehicles with aftermarket engine modifications should be excluded from the class, and failed to identify the root cause of the alleged engine failure. A543:15–46:7; A576; A583; A533:21–34:1; A561:8–66:3 (Bower

---

[2] Dr. Sharp's theory relies entirely on the May 2018 Press Release announcing the new 2019 STI model. A1161 (Am. Sharp Report). He claims—without supporting evidence—that by indicating to the market that the 2019 engine was improved, Subaru signaled that all prior STI and WRX models were defective, thereby decreasing the value of all subject vehicles after that date. *Id.*

Dep. Tr.); A1306–08. Instead, Dr. Bower theorized, without ever testing or proving, that the root cause of the alleged defect was metallurgical casting, PCV systems, or ECU software. *Id.* Dr. Bower further admitted that owner abuse and tuning cause piston ringland failure, yet he offered no methodology to distinguish these known causes of failure from his speculative "defect" failures, nor did he offer any way to segregate class members with self-inflicted injuries or no injuries at all. A569 (Bower Dep. Tr.).

A month after the original deadline, class counsel finally sought certification under Rule 23(b)(3) of four statewide subclasses (NY, AZ, IN, MI) consisting of "[a]ll owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in the [respective state]. Excluded from any diminution of value class are class members who sold their vehicles before the SoA May 2018 press release." A709–10 (Pls.' Br.). Counsel also opposed Subaru's *Daubert* motions, relying solely on Dr. Sharp's challenged testimony to calculate supposed "diminution of value" damages for uninjured owners. *See* A1553 (Opp'n to Mot. to Exclude Sharp); A1645 (Opp'n to Mot. to Exclude Bower).

When it came to proving a common defect, however, counsel recognized Dr. Bower's vulnerabilities and the strength of Subaru's *Daubert* challenge.  As a result, counsel downplayed Dr. Bower and instead relied on a fact witness, Seven Muhammad—a mechanic who

*modified* Plaintiff Tresco's vehicle. A715, A722–27 (Pls.' Br.). Mr. Muhammad was never disclosed as an expert by Plaintiffs, he did not produce an expert disclosure as required by the Rules, and he was never deposed during expert discovery.  Nonetheless, in support of their class certification motion, Plaintiffs extensively cite his technical opinions on piston gap tolerances and turbocharger boost levels—inarguably "expert" testimony—as an alternative to the inadmissible testimony of Dr. Bower. *Id.* at A701–02, A715, A722–27 (Pls.' Br.).

Plaintiffs never identified Mr. Muhammad in Plaintiff Tresco's initial disclosures or in response to interrogatories asking who had modified or inspected Tresco's vehicle—even though weeks before the engine failure, Mr. Muhammad installed hardware enabling engine tuning and exchanged text messages with Tresco about the vehicle. A519:2–9; A522:17–25:17 (Tresco Dep. Tr.); A431 (Tresco Responses to RFPs). Plaintiff Tresco disclosed those messages for the first time at his October 2022 deposition; days later he "supplemented" his disclosures, but still did not identify Mr. Muhammad, listing only "DDA Tuned," and declared he was no longer in possession of his texts with Mr. Muhammad. A423–26 (Supplemented Initial Disclosures); A472 (Tresco Decl.); A456 (October 19, 2022 email).

Subaru was forced to subpoena DDA Tuned and Mr. Muhammad directly, which triggered a cascade of revelations. A473 (DDA Tuned Subpoena); A479 (Muhammad Subpoena). First, the subpoena

uncovered an invoice for an engine-programming modification, directly contradicting Tresco's sworn statement that he had not altered his vehicle's ECU. A427 (Invoice); *see also* A1864:14–19; A1746:20–22 (Muhammad Dep. Tr.). Second, it prompted Class Counsel to suddenly declare they represented Mr. Muhammad. A485 (December 3 email). Finally, it confirmed that Mr. Muhammad had deleted his text messages with Tresco and failed to retain a copy of the modified tuning software installed on his vehicle. *See* A472 (Tresco Decl.); A461–71 (Tresco texts). Subaru uncovered each of these facts; Plaintiffs did not volunteer them.

The record also shows that Class Counsel had engaged and paid Mr. Muhammad at his normal shop labor rate before Tresco even became a plaintiff, and arranged for him to speak with Plaintiffs' disclosed expert, Dr. Bower, before Bower issued his report—none of which appeared in Plaintiffs' initial disclosures. A1751:9–25; A1855 (Muhammad Dep. Tr.).

### 1. Subaru moved to exclude Mr. Muhammad's undisclosed expert testimony and opposed class certification.

Because Class Counsel neither disclosed Mr. Muhammad as an expert witness nor provided the mandatory Rule 26(a)(2) disclosure, Subaru immediately moved to exclude his technical opinions as an improper attempt to circumvent Federal Rules of Evidence 702 and Civil Procedure 26. *See* A2070 (Mot. to Exclude Muhammad). While

Subaru acknowledged the admissibility of Mr. Muhammad's *factual* testimony regarding the actual modifications he performed on Mr. Tresco's vehicle, it objected to Plaintiffs relying on Mr. Muhammad as an undisclosed expert in support of their class certification motion. *See, e.g., id.* at 2082.

Subaru also opposed class certification, arguing individual issues overwhelmingly predominated over common questions. A2120–27 (Opp'n to Class Cert.). Subaru highlighted the seven voluntarily dismissed former plaintiffs as evidence that engine failures routinely stem from individualized owner conduct—like tuning, racing, or improper maintenance. *Id.* at A2019–11. Subaru additionally challenged Article III standing because no remaining plaintiff owned a vehicle with the FA-series engine (found in 2015–2018 WRX models), even though Plaintiffs sought to represent thousands of such owners. *Id.* at A2113–15.

Subaru's uncontradicted warranty data underscores the absence of any class-wide defect. Only 0.76% of Subject Vehicles nationwide experienced any piston-related failure—irrespective of whether an alleged Piston Ringland Defect caused those few cases. A2294 (Warranty Data). Over 99% of the putative class suffered no injury at all. Even that low failure rate is overinclusive, as it captures not just warranty repairs but also goodwill repairs and cases where the description did "not specifically describe any ring land or piston related

failures." A2262–63 (Kuhn Report). Subaru did not track "piston failures" as a separate category—confirming the issue was too rare to warrant distinct categorization. *Id.* at 2261–62. The district court failed to address any of this evidence or explain why a failure rate below one percent constituted common evidence of a class-wide defect.

### 2.   The district court administratively terminated Subaru's pending motions.

Upon reassignment of the cases from Judge Rodriguez to Judge Williams on March 26, 2025, the court issued a *sua sponte* order without explanation stating that Subaru's fully briefed and long-pending summary judgment motion, *Daubert* challenges, and the motion to exclude Mr. Muhammad "are ADMINISTRATIVELY TERMINATED pending the Court's ruling on the Class Certification Motions." A409 (Order). Subaru objected and requested that these motions, filed a year earlier, be decided before or concurrently with class certification, particularly given the district court's obligation to address them as part of its rigorous analysis of elements of class certification. A412–13 (Letter). The district court never responded, leaving Subaru's *Daubert* challenges in administrative limbo.

### C.   The District Court Granted Certification Without Resolving Pending Expert Exclusion Motions, Addressing Subaru's Evidence, or Defining the Classes.

On November 21, 2025, the district court heard oral argument on class certification. A9 (Tr.). During the hearing, the court openly

questioned the viability of Plaintiffs' class-wide damages theory, observing that damages are where the case "all starts to fall apart for class certification." *Id.* at A41:21–42:9. Subaru's counsel also made clear, consistent with this Court's precedent, that "[the court] can deny class certification without form[ally] deciding summary judgment and the *Daubert* motions, but the Court cannot grant class certification without deciding at least the *Daubert* motions." *Id.* at A36:10–13.

Immediately following argument, the court delivered a cursory oral opinion spanning fewer than nine transcript pages and stated no written opinion would follow. A55–63; A63:12–13 (Tr.). In its brief remarks, the court acknowledged Subaru's pending summary judgment and Expert Exclusion Motions, noted they were "not actively being considered," and expressly declined to rule on them. *Id.* at A65:6–13, 14–15. Yet, the court relied on Plaintiffs' challenged expert testimony to satisfy the commonality requirement of Rule 23(a). In its oral analysis, the court noted Plaintiffs' position that common questions could be resolved with common proof "including expert testimony," *id.* at A55:18–23, and later stated that it had "reviewed these [Expert Exclusion] motions, and in some respects relied on what I read in the expert testimony," *id.* 65:9–13. The court made no threshold determination that Dr. Bower's testimony was admissible. It also entirely ignored Subaru's expert testimony rebutting those opinions.

- 17 -

The court then disposed of the critical Rule 23(b)(3) predominance inquiry in a single page of transcript text. *Id.* at A57:12–58:12. In doing so, the court disregarded dispositive individual issues. It ignored Article III standing, failed to mention the absence of an injury-in-fact for over 99% of the putative class, and overlooked that no remaining Plaintiff actually owns a vehicle equipped with the mechanically distinct FA-series engine.

The court recognized that "proof of manifestation and causation may vary significantly" among class members. *Id.* at A57:24–58:3. Nevertheless, the court certified the classes based on the conclusory assertion that liability issues were "susceptible to common proof." It did not identify what that common proof was, nor did it explain how a trial could manage the acknowledged individual variations in causation and manifestation. *Id.*

On November 24, 2025, the district court issued a summary order certifying four state subclasses for statutory consumer protection claims and three state subclasses for negligent misrepresentation claims. A3 (Amato Order); A6 (Aquino Order). Neither the court's written orders nor its oral opinion defined the classes.

### D.    This Court Granted Subaru's 23(f) Petition.

On December 8, 2025, Subaru petitioned for permission to appeal under Rule 23(f). *See* A3155. Subaru argued the district court's administrative termination of the pending Expert Exclusion Motions

presented a novel question of law and that multiple errors in the court's reasoning warranted review. *Id.*

Class Counsel opposed this Court's review, contending the district court "implicitly rejected" the Expert Exclusion Motions and "implicitly adopted" their class definition. A3208 (Opp'n to 23(f) Pet.). Plaintiffs also continued to rely on Mr. Muhammad's undisclosed expert testimony and, for the first time in this eight-year-old litigation, introduced two new damages models: a "time-of-sale price premium" and a "median cost-of-repair" calculation. *Id.* at 3201, 3202, 3204, 3210–16.

This Court granted Subaru's petition on January 27, 2026, commencing this appeal. A1.

**SUMMARY OF ARGUMENT**

A district court may not rely on challenged expert testimony critical to class certification without first deciding whether that testimony is admissible under Rule 702. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015). Here, the district court certified four statewide classes while explicitly relying on Plaintiffs' challenged expert testimony to satisfy Rule 23(a)'s commonality requirement. Subaru moved to exclude the opinions of Plaintiffs' sole liability expert, Dr. Bower, their sole damages expert, Dr. Sharp, and the technical opinions of an undisclosed lay witness, Seven Muhammad. Rather than rule on these fully briefed, year-old motions, the district court administratively terminated them upon reassignment and declined to reinstate them. This approach is not an "implicit rejection" of Subaru's Expert Exclusion Motions; it is a refusal to conduct the required gatekeeping inquiry. Permitting administrative termination to bypass *Blood Reagents* allows district courts to insulate any certification order from appellate scrutiny simply by declining to rule on pending admissibility motions.

The certification order is independently defective because it lacks a class definition and improperly certifies a dismissed claim. Rule 23(c)(1)(B) requires every certification order to include "a readily discernible, clear, and precise statement of the parameters defining the class." Fed. R. Civ. P. 23(c)(1)(B). Neither the district court's oral ruling

nor its written orders contain any class definition. This omission is a fatal structural defect. *See, e.g., Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 125–27 (3d Cir. 2018); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). Without defined classes, courts cannot determine who is bound by the judgment, whether the class representatives adequately represent the absent members, or whether common questions actually predominate. Furthermore, the order certifies a Michigan statutory consumer-protection subclass—a claim the district court had dismissed with prejudice four years earlier. These facial deficiencies alone compel vacatur.

The district court's predominance analysis was equally deficient. Rule 23(b)(3) demands a rigorous analysis of whether common questions predominate over individual ones, requiring an examination of the claims, defenses, and relevant facts in the record. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008); *see also Speerly v. Gen. Motors, LLC*, 143 F.4th 306, 317 (6th Cir. 2025). The district court devoted fewer than 200 words to predominance. Within that cursory discussion, it acknowledged that "proof of manifestation and causation may vary significantly" among putative class members and that certain state laws require individualized proof of reliance. Yet the court certified the classes by stating only that liability issues were "susceptible to common proof"—without identifying that proof or explaining how it overcomes the acknowledged individual issues.

The record confirms that individual questions overwhelm common ones. Subaru's unrebutted warranty data establishes that fewer than one percent of the subject vehicles ever experienced a piston-related warranty claim, meaning over 99% of putative class members suffered no injury. Discovery revealed that individual causes—such as aftermarket modifications, aggressive tuning, racing, or deferred maintenance—caused engine failures for seven originally named plaintiffs who voluntarily dismissed their claims. Plaintiffs' own expert conceded that owner abuse and tuning cause piston ringland failure and that those customers must be excluded from the class, yet he offered no methodology to distinguish an alleged defect-caused failure from an owner-caused failure. These unresolved individual issues of causation, defect manifestation, reliance, and damages defeat predominance. Here, the district court failed even to address them.

Additionally, Plaintiffs lack Article III standing to represent owners of vehicles equipped with FA-series engines. Article III requires that at least one named class representative have standing to raise each class subclaim before certification. No remaining representative owns a vehicle equipped with the FA-series engine. Nevertheless, Plaintiffs seek to represent thousands of owners of 2015–2018 WRX models equipped with that engine. Because the FA-series and EJ-series engines rely on different architectures and lack interchangeable parts, the

representatives cannot establish standing for the FA-series owners. The district court failed to address this threshold jurisdictional defect.

These compounding errors require reversal. By refusing to rule on Subaru's *Daubert* motions and failing to define the classes, the district court built a certification order on an untested evidentiary foundation, directed it at undefined classes, and rested it on an internally contradictory predominance finding. This Court should vacate the certification order and remand with instructions to rule on Subaru's Expert Exclusion Motions before deciding class certification, to define the classes under Rule 23(c)(1)(B), and to conduct a rigorous predominance analysis. Alternatively, this Court should direct decertification on the present record.

## STANDARD OF REVIEW

This Court reviews a class certification decision for an abuse of discretion. A district court abuses its discretion when its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact. *Hydrogen Peroxide*, 552 F.3d at 312. This deferential standard still requires rigorous scrutiny, as this Court owes no deference to a district court's adjudications of state law. *Leavitt v. Jane L.*, 518 U.S. 137, 145 (1996) (per curiam).

The district court must exercise its discretion within the framework of Rule 23. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Rule 23 demands that the court conduct a "rigorous analysis" to determine whether the prerequisites for certification are met. *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160–61 (1982). That rigorous analysis must be one of substance, not merely effort, because Rule 23 does not set forth a mere pleading standard. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). The class representatives bear the burden of affirmatively showing, by a preponderance of the evidence, that each requirement of Rule 23(a) and (b) is satisfied. *Id.* at 349–50; *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013); *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 192 (3d Cir. 2020).

The rigorous analysis requirement carries particular force in the context of Rule 23(b)(3), which tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This inquiry requires the district court to go beyond the pleadings, understand the claims, defenses, and relevant facts, and determine whether the essential elements of the cause of action are capable of proof through common evidence. *Hydrogen Peroxide*, 552 F.3d at 311. A court commits reversible error if it fails to engage with these requirements—for example, by certifying classes based on conclusory assertions without analyzing the actual elements of the claims at issue. *See Gonzalez v. Owens Corning*, 885 F.3d 186, 188–89, 202 (3d Cir. 2018).

When the rigorous analysis entails some overlap with the merits of the underlying claims, the court must not defer merits questions bearing on commonality or predominance to a later stage. *Dukes*, 564 U.S. at 351. This includes the court's critical obligation to assess the admissibility of expert testimony. A class representative cannot rely on challenged expert testimony to demonstrate conformity with Rule 23 unless the trial court definitively finds that the expert testimony satisfies Rule 702. *Blood Reagents*, 783 F.3d at 187; *see also Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 904–05 (3d Cir. 2022) (Porter, J., concurring).

Furthermore, the district court must set out its own class definition, providing a readily discernible, clear, and precise statement of the parameters defining the class. *Wachtel v. Guardian Life Ins. Co.*,

453 F.3d 179, 187–88 (3d Cir. 2006). A summary grant that forces a reviewing court to comb through multiple documents to cobble together the class parameters is an abuse of discretion warranting reversal. *Reinig*, 912 F.3d at 126; *Marcus*, 687 F.3d at 592.

Each of these principles dictates the outcome of this appeal. The district court certified seven statewide subclasses without ruling on Subaru's Expert Exclusion Motions, without defining the classes, and without conducting the element-by-element analysis of state law that predominance demands. This combination of structural and analytical failures constitutes a clear abuse of discretion warranting reversal.

## ARGUMENT

### A. The District Court's Failure to Address Article III Standing Was an Abuse of Discretion.

Article III standing is a "necessary threshold issue" for review of a class certification order. *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 n.10 (3d Cir. 2012). "[W]hen a named plaintiff's Article III standing is in question, a district court must determine whether that named plaintiff 'falls within the amended class definition and sustained an injury,'" and whether "the named representative has individual standing to raise the legal claims of the class." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 361 (3d Cir. 2015) (quoting *Hayes v. Wal–Mart Stores, Inc.*, 725 F.3d 349, 361 n.11–12 (3d Cir. 2013)); *McNair*, 672 F.3d at 222-23 (quoting *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)).

The district court never mentioned Article III standing in its oral opinion—a failure that alone requires vacatur. *See Frank v. Gaos*, 586 U.S. 485, 493 (2019). On remand, the court must make two threshold findings: (1) whether any class representative has standing to represent owners of the FA-series engine; and (2) whether each subclass must be narrowed to the models owned by its representative.

### 1. No named Plaintiff has standing to represent FA-series engine owners.

The Subject Vehicles encompass models equipped with two fundamentally different engine families: the EJ-series and the FA-

series. A2244; 2253–58 (Kuhn Report). The engines differ in piston size and geometry, fuel injection systems, turbocharger boost pressures, ECU programming, and other material respects. *Id.* at 2240, 2253–55. In *Sauer v. Subaru of America*, the District of New Jersey held these specific engine families are not "closely related" because they rely on "different architecture and do not share interchangeable parts." 2020 U.S. Dist. LEXIS 55592, at *10, 16–17 (D.N.J. Mar. 31, 2020). Plaintiffs offered no evidence to rebut these mechanical distinctions—their own expert never inspected a single Subject Vehicle—nor did they address *Sauer's* holding. *See generally* A684–739 (Pls.' Br.); A1645–1679 (Opp'n to Mot. to Exclude Bower); A543:15–46:7, 576, 582 (Bower Dep. Tr.).

Nonetheless, in granting certification, the court presumed that Plaintiffs—all of whom own EJ-series engines—suffered the same injury as the class members who own FA-series engines. *See Falcon*, 457 U.S. at 156. That presumption fails. The alleged injuries here are mechanically distinct between EJ-series and FA-series engine owners. The significant design and engineering differences between the two platforms make it inappropriate to presume a common injury. Because no class representative has standing to represent FA-series owners, the 2015–2018 WRX models must be excluded from the certified subclasses.

Standing also fails for any WRX or FA-engine subclass premised on the May 2018 Press Release. That announcement spoke only to 2019 STI updates and said nothing about WRX models or FA-series engines.

*See* A1599–603 (May 2018 Press Release). The separate WRX press kit published the same day confirms the 2019 WRX received none of those updates. A1939–1942 (Press Kit). A WRX or FA-engine owner therefore lacks an injury-in-fact traceable to the STI-only announcement, and no named STI representative can confer standing for a WRX or FA-engine subclass on that basis.

### 2.     The subclasses must be limited to the models owned by their respective representatives.

The same issue pervades each subclass. "[I]t is well-settled that prior to certification of a class, … the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman*, 221 F.3d at 1279 (cited favorably in *McNair*, 672 F.3d at 222-23, 227 n.18 (3d Cir. 2012)); *cf. Wysocki v. Zoom Techs. Inc.*, 3:22-CV-05453-DGE, 2024 WL 1139094, at *7 (W.D. Wash. Mar. 15, 2024) ("There is a fundamental requirement that the representative plaintiff must be a member of the class he represents, and of particular importance is certainty each subclass is adequately represented. In this way, the litigation as to each subclass is treated as a separate lawsuit." (cleaned up) (internal citations omitted)).

The district court made no such determination here. To illustrate, Plaintiff Hinshaw owns an STI. A349 (Amato Third Am. Compl.) He lacks standing to assert claims on behalf of WRX owners in Michigan simply because Plaintiff Moore purchased a WRX in Indiana. *Id.* at

- 29 -

A348–49; *see Simmons v. Ford Motor Co.*, 592 F. Supp. 3d 1262, 1279–80 (S.D. Fla. 2022). Significant design distinctions exist between these models, and Plaintiffs failed to rebut them. On remand, the district court must grapple with Plaintiffs' arbitrary "Class Vehicles" definition and limit each subclass accordingly. *See Weidman v. Ford Motor Co.*, 86 F.4th 723, 727–28 (6th Cir. 2023).

**B.      The District Court Abdicated Its Gatekeeping Function while Relying on Challenged Experts and an Undisclosed Lay Witness.**

The Third Circuit has an unambiguous rule regarding expert opinions and class certification: "a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*." *Blood Reagents*, 783 F.3d at 187; *Ollie's Bargain Outlet, Inc.*, 37 F.4th at 904–05 (Porter, J., concurring) (same); *Neri v. Nissan N. Am. Inc.*, 122 F.4th 239, 253 (6th Cir. 2024) (same, citing *Blood Reagents*). This rule is not discretionary. It is a mandatory prerequisite to class certification where, as here, expert testimony is critical to proving compliance with Rule 23. *Blood Reagents*, 783 F.3d at 187.

Here, the district court abdicated its "rigorous gatekeeping function," *Elcock v. Kmart Corp.*, 233 F.3d 734, 744 (3d Cir. 2000), by administratively terminating Subaru's Expert Exclusion Motions in the interest of docket management. A409. Rather than evaluating the fully

briefed challenges filed a year prior, the district court granted certification in a cursory oral ruling. Although the court acknowledged that the expert challenge motions were "not actively being considered," it noted that it "reviewed these motions, and in some respects relied on what [it] read in the expert testimony." A65:6–11 (Tr.).

This sequence of events is precisely the approach rejected by *Blood Reagents,* wherein this Court vacated a certification order after the lower court relied on challenged expert testimony that "could evolve to become admissible evidence" at trial. 783 F.3d at 186. The court noted that such a standard "did not survive *Comcast*" and a "definitive determination" of admissibility was required before certification could be granted. *Id.* at 186, 187. Here too, definitive determinations on the challenged testimony of Plaintiffs' experts were required.

In its expert motions, Subaru exposed fatal deficiencies in Plaintiffs' expert evidence—deficiencies that go to the very heart of class certification. First, Plaintiffs' sole expert on the alleged Piston Ringland Defect in the Subject Vehicles, Dr. Bower, offered opinions built not on reliable methodology or sufficient data, but on speculative, self-reinforcing conclusions rooted in little more than his own untested intuition. Despite purporting to opine on a defect supposedly affecting thousands of Subject Vehicles, Dr. Bower never inspected a single vehicle or the components at issue. A543:15–46:7, 576, 582 (Bower Dep. Tr.). His entire root cause analysis rested on a lone unauthenticated

photograph[3] and a brochure he found on Google.[4] A1304 – 07 (Bower Report). That is not expert analysis—it is guesswork dressed up as science.

Dr. Bower's lack of qualifications compounded the unreliability of his opinions. He conceded that he had no experience designing engines or component parts for mass-produced passenger vehicles, no knowledge of industry testing standards, and no basis for his claim that the less-than-one-percent failure rate was "unacceptably high"—an assertion he rested not on any recognized standard, but on informal conversations with unidentified university "alumni" during recruiting visits. That is precisely the kind of subjective, *ipse dixit* testimony that *Daubert* was designed to exclude. A540:7–9, A546–51, A552 (Bower Dep. Tr.).

---

[3] Notably, Dr. Bower could not even confirm whether the photograph depicted a stock, properly driven and maintained Subject Vehicle. A555:20–58:3 (Bower Dep. Tr.). He took no steps to verify that assumption—even after it was brought to his attention that Class Counsel lacked any evidence to support it. Plaintiffs likewise failed to present any evidence authenticating the source of the sole photograph on which Dr. Bower's entire opinion depends.

[4] The brochure Dr. Bower relied upon was one he had never previously used; it was not peer-reviewed; he was unaware of any other expert ever employing it in the manner he did; and the brochure itself was replete with express disclaimers regarding potential "errors" and the "accuracy" of its information. A555:20–58:3 (Bower Dep. Tr.). Moreover, the brochure purported to offer diagnostic guidance only for individual vehicles—not for identifying a common defect across an entire class— yet Dr. Bower extrapolated it to do precisely that without ever visually inspecting an actual vehicle. A655 (Brochure).

The unreliability of Dr. Bower's analysis extends to the very material at the heart of Plaintiffs' defect theory. Plaintiffs repeatedly characterized the Subject Vehicle pistons as made from "sintered material"—which they alleged was "a weaker methodology" than forged pistons. A702 – 04 (Pls.' Br.). But Subaru's own engineering witness, Ryutatsu Seki, testified that the pistons are cast aluminum alloy—not sintered—and that "cast material is superior than the forged materials" due to advances in piston material development. A505:11–16, A506:5–7, A506:17–507:11 (Seki Dep. Tr.). Mr. Seki expressed confusion about why sintering was even being discussed, stating: "I have no idea why we were talking about sintered metal then." *Id.* at A500:17–19. Had the district court performed its gatekeeping function, it would have been required to evaluate whether Plaintiffs' defect theory—and the class certification built upon it—rested on a factual premise contradicted by record evidence.

Recognizing Dr. Bower's glaring vulnerability, Plaintiffs then attempted a tactical pivot in their certification and Expert Exclusion briefs, significantly downplaying Dr. Bower and propping up their case with the testimony of Seven Muhammad—a lay witness and mechanic who had modified Plaintiff Tresco's vehicle. *See* A701–02 n.8 (Pls.' Br.); *see generally* A1645 (Opp'n to Mot. to Exclude Bower). The district court's handling—or lack thereof—of Mr. Muhammad's testimony is a

textbook illustration of the procedural deficiencies at issue in this appeal.

Federal Rule of Evidence 701 expressly prohibits lay opinion testimony that is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," Fed. R. Evid. 701(c), and prevents parties from "proffering an expert in lay witness clothing[,]" *id.*, Advisory Comm. Notes (2000 Amendments). Indeed, "a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *Doddy v. Oxy USA*, 101 F.3d 448, 460 (5th Cir. 1996).

Mr. Muhammad's testimony falls squarely on the wrong side of that line. He opined on a range of highly technical issues that no ordinary person could evaluate without specialized knowledge— including the Subject Vehicle's engine design, piston tolerances, and calibration deficiencies.[5] Plaintiffs' own conduct confirms as much: their

---

[5] Mr. Muhammad's testimony included, but was not limited to, the following highly technical opinions regarding the Subject Vehicles: (1) "Subaru runs a much higher boost level than most turbocharged factory vehicles. The factory Subaru WRX and STI runs over 20 pounds—20 pounds of boost, and other manufacturers, such as Mercedes runs 7 pounds of boost, Porsche runs 10 pounds of boost factory. So they don't really need to worry about ringland failure," A966; (2) "you need to make sure that you're not producing oil vapor out of the exhaust, which are why the rings are gapped so tightly on the pistons, which is what causes ringland failure," A950; and (3) "in turbocharged vehicles you need to have a certain amount of ring gap as per the diameter of the piston. And Subaru does not follow that rule," A965–66. *See* A700–02 (Pls.' Br.).

motion for class certification relies heavily on Mr. Muhammad's opinions to supply the kind of technical foundation for their defect theories that Dr. Bower failed to supply. *See* A700–02. Calling him a "lay witness" does not make him one. *See* A3210 (Opp'n to 23(f)). By administratively terminating the motion to exclude Mr. Muhammad's expert testimony, the district court permitted Plaintiffs to effectively switch experts after the close of discovery and allowed technical opinions that were never subjected to scrutiny to serve as the evidentiary backbone of its class certification order.

This case illustrates precisely why *Blood Reagents* requires conclusive admissibility rulings before certification. Plaintiffs' reliance on Mr. Muhammad's technical opinions surfaced only after Subaru exposed Dr. Bower's vulnerabilities; Plaintiffs never served the mandatory Rule 26(a)(2) disclosures for Mr. Muhammad; and the only "cure" for that failure would have been to restart expert discovery— something the Rules do not require, and that highlights why the district court's certify-first approach was an abuse of discretion. *See also* Fed. R. Evid. 701, Advisory Comm. Notes (2000 Amendments) (prohibiting parties from "proffering an expert in lay witness clothing").

The deficiencies in Plaintiffs' expert evidence extend to damages as well. As the *Daubert* motions made clear, Dr. Sharp's "diminution of value" model was legally incoherent and disconnected from Plaintiffs' theory of liability. Dr. Sharp admitted that his model does not calculate

"damages" for lessees, who suffered no resale loss, nor did it apply to any buyers—like named Plaintiffs Tresco and Hinshaw—who purchased their vehicles *after* May 2018. A595:25–96:24, A597:13–18, A600:14–21,  A615:23–616:4 (February Sharp Dep. Tr.); *see also* A297 (*Aquino* Compl.); A492 (Hinshaw Interrogatory Responses).

The model also fails Rule 702's "fit" requirement because it imputes a uniform post-announcement depreciation to WRX and FA-engine vehicles that were not part of the STI-only May 2018 Press Release, and it does not test whether WRX and STI prices actually moved differently. A587:8–91:20 (November Sharp Dep. Tr.). It further ignores confounders, including nearly identical "retuned ECU and stronger pistons" language published in June 2017 for the limited-run 2018 STI Type RA and other 2019 STI-only performance updates unrelated to any alleged defect. A679–82 (2017 Subaru Press Release).

These critical issues could have—and should have—been definitively resolved before class certification was granted. Plaintiffs attempt to sidestep this failure by suggesting that the district court "implicitly rejected" Subaru's Expert Exclusion Motions. A3208 (Opp'n to 23(f)). But implicit rejection is no substitute for the rigorous analysis that the law demands. As the Third Circuit has made clear, "[w]hen an expert's report or testimony is critical to class certification, a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class

certification." *Blood Reagents*, 783 F.3d at 187 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012)). The word "conclusive" carries real meaning: it requires an explicit, reasoned determination—not a silent acknowledgement. And merely reviewing expert testimony is a far cry from the gatekeeping analysis that Rule 702 demands.

The proper course of action was recently illustrated in *Dzielak v. Whirlpool Corp.*, where the New Jersey District Court confronted the very same procedural posture at issue here—pending *Daubert* motions alongside a pending class certification motion. No. 2:12-0089, 2017 U.S. Dist. LEXIS 39232 at *2 (D.N.J. Mar. 17, 2017). Rather than sweeping the expert challenges aside, the court "administratively terminated the class certification motion"—not the *Daubert* motions—concluding that, "although the expert and class certification issues [were] intertwined," it was "best to sort out the *Daubert* issues first" to remain "consistent with the Third Circuit's recent directive" in *Blood Reagents. Id.* at *5, n.3.  The district court here did precisely the opposite, certifying the class while leaving fundamental challenges to its evidentiary foundation entirely unresolved.

If this Court allows the lower court's approach to stand, it will reduce *Blood Reagents* to a dead letter, inviting district courts to rubber-stamp certification orders built on unvetted expert testimony while relegating *Daubert* motions to procedural limbo. And the

consequences of such precedent would extend well beyond this case, depriving parties across the Circuit of a meaningful opportunity to challenge expert opinions before those opinions are used to justify class certification. Accordingly, this Court must vacate the certification order and remand with clear instructions that the district court fulfill its gatekeeping obligation and resolve the pending Expert Exclusion Motions before any class may be certified.

### C. The Certification Order Fails to Define the Class and Violates Rule 23(c)(1)(B).

Rule 23(c)(1)(B) requires certification orders include "a readily discernible, clear, and precise statement of the parameters defining the class." *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 187 (3d Cir. 2006). A district court abuses its discretion when it merely grants certification and forces this Court to "comb through and cross-reference multiple documents in an attempt to cobble together the parameters defining the class." *Reinig*, 912 F.3d at 126; *Marcus,* 687 F.3d at 592. Even "*post hoc* clarification is no substitute for a readily discernable, clear, and precise statement." *Reinig*, 912 F.3d at 126.

Here, the Order is facially deficient. Like the court's oral opinion, it contains no class definition and merely certifies four statewide subclasses as to the statutory consumer protection claims and three statewide subclasses for the negligent misrepresentation claims. *Amato* Order, *Aquino* Order. The order is materially identical to those vacated

in *Reinig* and *Marcus*. *See Reinig* 912 F.3d at 126 (vacating because "the order summarily grants certification . . . without defining the specific subclasses"); *see also Marcus*, 687 F.3d at 592 (same).

The Order also requires *vacatur* because it certifies a class for a *dismissed* claim. Despite dismissing with prejudice Plaintiffs' Michigan Consumer Protection Act claim in 2021, the court certified a Michigan subclass "as to the statutory consumer protection claims." A4 (*Amato* Order); A7 (*Aquino* Order). These facial errors violate Rule 23(c)(1)(B) and this Court's precedent.

But even setting aside these deficiencies, Plaintiffs' proposed class definition is fraught with ambiguity:

> **New York Subclass:** All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in the State of New York ("proposed New York subclass members"). Excluded from any diminution of value class are class members who sold their vehicles prior to the SoA May 2018 press release.

A709–10 (Pls. Br.).[6] The exclusion of those who sold their vehicles before the May 2018 Press Release "*from any diminution of value class,*" renders unclear whether separate damages classes exist and whether membership shifts depending on the remedy.

Critically, the definition fails to address vehicle modifications, creating a Catch-22. If modified vehicles are included, the class

---

[6] All state subclass definitions are identical.

definition sweeps in thousands of uninjured members whose engine failures were self-inflicted. If they are excluded—as Plaintiffs' liability expert requires—the class becomes unascertainable because no records exist identifying which owners modified their vehicles. *See Marcus*, 687 F.3d at 593 (collecting cases where class definitions failed because no company database could identify members); A533:21–34:1 (Bower Dep. Tr.) ("Q: I'm trying to narrow the class of vehicles that we can focus on your analysis about. A: Okay. So the list you just said, the people that put aftermarket tuners on, I'm—they're out."). Certification would thus require Subaru to guess the class's scope and "accept as true persons' declarations that they are members of the class . . . [which] would have serious due process implications." *Id.* at 594. Remand is necessary to require the district court to define the subclasses and confront these issues.

## D. The District Court Failed to Conduct a Rigorous Rule 23 Analysis.

Rule 23(b)(3) requires a showing that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods[.]" Fed. R. Civ. P. 23(b)(3). Judges must therefore "conduct a 'rigorous analysis' of the facts, evidence, and arguments submitted at the class certification stage" to establish that the essential elements of the causes of action can be proven through common

evidence. *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 187 (2020).

Here, the district court devoted a mere 188 words to this critical inquiry in only a single page of its oral opinion. A57:12–58:12 (Tr.). Within that perfunctory review, the court acknowledged the merit of Subaru's arguments but refused to grapple with four fatal flaws that should have precluded predominance: (1) the lack of a common defect; (2) the individualized nature of causation and defect manifestation; (3) material conflicts in state law; and (4) the disconnect between Plaintiffs' diminished-value damages model and their liability theory. *Id.* at A57:25–58:1.

### 1. The district court failed to grapple with the undisputed differences among the Subject Vehicles' engines.

The premise of Plaintiffs' action, at bottom, is that all Subject Vehicles suffer from a uniform design defect in the piston ringlands, PCV systems, or engine programming. Yet notably, the Subject Vehicles span four distinct models and three different engines, each with distinct designs and operating parameters. A2253–58 (Kuhn Report). Because a "defect" in one engine design does not automatically prove a defect in another, these differences necessitated separate analyses. *See Weidman*, 86 F.4th at 727–28 (vacating certification where the district court failed to "grapple with whether the" design changes "made any material difference").

Although the district court expressly acknowledged that Subaru "emphasized the differences" in the engine designs, A56:1–4 (Tr.), it failed to explain why those differences did not defeat predominance. In doing so, the court disregarded authority from the same District holding that Subaru's FA engine cannot be conflated with EJ engines. *Sauer*, LEXIS 55592, at *10–11 (dismissing claims regarding FA engine where plaintiffs failed to show it was "substantially similar" to the EJ-series). Rather than analyzing the differences like *Sauer*, the court simply accepted Plaintiffs' generalized claim that "the pistons in each engine type share materially similar design characteristics"—a conclusion derived entirely from the challenged opinion of Plaintiffs' expert. A56:7–8 (Tr.). But this uncritical deference was improper for two reasons.

First, as discussed above, the court never ruled on the admissibility of Dr. Bower's testimony. *See supra* pp. 30–38. Second, setting aside the gatekeeping concerns, the court failed to weigh Dr. Bower's opinions against those of Subaru's expert, whose name and conflicting conclusions were never referenced by the court. This omission is precisely the kind of error the Third Circuit cautioned against in *Hydrogen Peroxide*, warning that "neglecting to resolve disputes between experts 'amounts to a delegation of judicial power to the plaintiffs, who can obtain class certification just by hiring a competent expert.'" 552 F.3d at 323, 325 (quoting *West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002)).

### 2. The district court failed to analyze individual questions of causation and defect manifestation.

Even assuming a common defect could be established, the district court failed to confront the individualized nature of causation and defect manifestation. As this Court previously recognized, vehicle components can fail for a "myriad" of "reasons completely unrelated to their [alleged] defects." *Marcus*, 687 F.3d at 604. The record confirms precisely that concern: the evidence demonstrates a wide array of individualized and unrelated causes of engine failure, none susceptible to resolution through common proof.

Discovery revealed that the causes of piston ringland failure included, but were not limited to: the use of low-octane fuel; aftermarket modifications (e.g., tuning); oil vapor contamination; incorrect spark plugs; racing and abusive driving; aftermarket blow-off valves; overboosting the turbocharger; and engine over-revving. A2252–53 (Kuhn Report). None of these causes bears any relation to the common defect alleged by Plaintiffs.

Indeed, named Plaintiffs continued to voluntarily dismiss their claims as discovery revealed that their piston failures were caused by these very external factors, underscoring the absence of commonality. The voluntary dismissals are particularly telling. Plaintiffs themselves admitted they withdrew seven of eleven class representatives to "ensur[e] the matter could be litigated without the potential for Defendants to raise unique defenses." A3202 (23(f) Opp'n). This

remarkable concession confirms that individual defenses predominate: when the hand-picked representatives were subjected to scrutiny, their claims collapsed. The district court's failure to confront this tactical evasion or to address these individual defenses warrants reversal.

Even Plaintiffs' own expert conceded that the alleged defect would only cause piston failure in a small percentage of cases, and that external factors must be considered. *See, e.g.*, A538–39, A561–64 (Bower Dep Tr.). But as this Court made clear, "[t]hese individual inquiries are incompatible with Rule 23(b)(3)'s predominance requirement." *Marcus*, 687 F.3d at 604.

*Marcus* is directly on point. There, the panel vacated class certification, noting the "undisputed, fundamental point" that the products at issue could fail for various reasons, requiring individual proof to determine the cause of each class member's damages. *Marcus*, 687 F.3d at 603–04. So too here: the myriad causes of piston failure, combined with the vanishingly low failure rate, necessitate the kind of individualized assessments that are the antithesis of classwide adjudication.

These individualized causation problems were further compounded by the district court's treatment of damages, as it improperly certified an implied "cost-of-repair" subclass without articulating any mechanism to distinguish between an engine that failed due to the alleged piston ringland defect and one of the many

- 44 -

external causes listed above. Because individualized inquiries into causation, defect manifestation, and damages pervade every aspect of Plaintiffs' claims, the district court's certification of this class was fundamentally incompatible with Rule 23(b)(3).

### 3. The district court failed to analyze material conflicts in state law.

Next, the district court's cursory oral opinion lumped together claims under New York, Arizona, Indiana, and Michigan law without rigorously analyzing the unique and differing elements of those states' consumer protection statutes and negligent misrepresentation claims. This one-size-fits-all approach expressly violates Rule 23 and the Third Circuit's directive that courts consider variations in state law when certifying multistate classes. *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175, 180 (3d Cir. 2014); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011). The district court's failure to engage in this analysis was evident in two critical respects.

First, the need for individualized proof of reliance precludes certification in Arizona, New York, and Indiana. Although the court correctly recognized that "[i]n Michigan, individualized reliance could not predominate," A58:9-10 (Tr.), it inexplicably certified the same claims for the New York, Arizona, and Indiana subclasses, despite those

states requiring proof of reliance.[7] The district court offered no explanation for this inconsistent treatment.

Second, for all claims, Plaintiffs were required to prove that class members were exposed to the alleged misrepresentation or omission. *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 52–53 (N.Y. App. Div. 2004); *Schellenbach*, 321 F.R.D. at 624 ("Plaintiffs must prove reliance by each class member, and that would require proof that each class member was exposed to the alleged omission."). Predominance is not satisfied for fraud claims based on representations that may not have been seen by all putative class members. *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 313–15 (S.D. Ala. 2006) (emphasizing that "[m]any class members may never have been aware of those misrepresentations"); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012). Here, the record shows that none of the Plaintiffs read the owner's manual or maintenance schedules that contained the purported misrepresentation

---

[7] Claims brought under the Arizona Consumer Fraud Act require proof of actual reliance that cannot be established through common evidence. *Schellenbach v. GoDaddy.com, LLC*, 321 F.R.D. 613, 623 (D. Ariz. 2017); *Naiman v. Alle Processing Corp.*, No. CV20-0963, 2020 U.S. Dist. LEXIS 218549, at *17–19 (D. Ariz. Nov. 23, 2020). The Indiana Deceptive Consumer Sales Act similarly requires "a showing of actual reliance as to each individual class member, and thus a classwide inference of reliance is not available." *Oddo v. Arcoaire Air Conditioning & Heating*, No. 8:15-cv-01985, 2019 U.S. Dist. LEXIS 63428, at *28 (C.D. Cal. Mar. 22, 2019). And New York negligent misrepresentation claims require that each plaintiff "reasonably relied on [the information] to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012).

or omission, yet this critical deficiency was never addressed below. A510:5–21 (Hinshaw Dep. Tr.); A516:2–13 (Tresco Dep. Tr.); A495:6–19, A497:11–13 (Sandoval Dep. Tr.); A513:5–7 (Moore Dep. Tr.). Because even the named Plaintiffs did not review these documents, the district court had no basis to presume that the thousands of absent class members had done so.

The content mismatch in Plaintiffs' press-release theory compounds these exposure deficiencies. The record contains no admissible evidence that market participants perceived the STI-only May 2018 announcement as applying equally to WRX or FA-engine vehicles. Without classwide proof that the market extrapolated an STI-specific statement to mechanically distinct models and engines, Plaintiffs cannot establish common exposure, causation, or reliance for the WRX and FA-engine cohorts under any of the pertinent state laws.

### 4. The district court failed to analyze a fundamental disconnect between Plaintiffs' damages model and their liability theory.

Finally, the district court failed to rigorously analyze whether Plaintiffs' damages model was consistent with their liability theory, as required by *Comcast*. Under *Comcast*, a damages model "must measure only those damages attributable to" a specific theory of harm at the certification stage. 569 U.S. at 35. Here, Plaintiffs presented the district court with Dr. Sharp's "diminished value" model, which purports to calculate the difference in value between the vehicle as represented and

the vehicle with the alleged defect, resulting in a uniform $2,094 loss per Subject Vehicle. A1164 (Am. Sharp Report); A722–26, A705 n.10 (Pls.' Br.). This model is fatally flawed for multiple reasons.

First, it calculates damages for uninjured owners, like Plaintiffs Tresco and Hinshaw, who bought their vehicles *after* the alleged defect was supposedly disclosed in 2018. A595:25–96:24, A597:13–18, A600:14–21, A615:23–16:4 (February Sharp Dep. Tr.); *see also* A297 (*Aquino* Compl.); A492 (Hinshaw Interrogatory Responses). These owners could not have paid a premium for a purchase made *after* the market had allegedly adjusted the price of the vehicles. Second, the damages model improperly aggregates the FA-series engine found in the WRX, which is mechanically distinct from the STI engine at issue in the Press Release. A587:8–91:20 (November Sharp Dep. Tr.); A2253–58 (Kuhn Report). Third, it creates a windfall, as it awards damages to owners who leased the vehicle or sold it before the alleged value diminution occurred.[8] A595:25–96:24, A597:13–18, A600:14–21, A615:23–16:4 (February Sharp Dep. Tr.).

---

[8] Dr. Sharp's model also impermissibly calculates damages based on a fictional "composite" plaintiff whose experience differs significantly from any actual named Plaintiff. A611:9–12 (February Sharp Dep. Tr.). None of the four named Plaintiffs match the hypothetical plaintiff for whom the model was designed. Courts have rejected such aggregate models as violating a defendant's due process rights. *See Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 345 (4th Cir. 1998) (decertifying class where defendant "was often forced to defend against a fictional composite [plaintiff]"). Subaru would be greatly prejudiced if forced to defend against such a damages model, which, here, advocates for an award of $2,094 paid out to tens of thousands of putative class

The district court recognized these deficiencies, stating that the individualized damages are where class certification "starts to fall apart."[9] A41:21. Yet, rather than resolving those issues, the court certified the classes based on the hope that it could be sorted out later. *Id.* at A64:9–14 ("To be clear, I think plaintiffs do have some obstacles here that may, in fact, rear their heads as we proceed"). This "certify-first-ask-questions-later" approach was error. *See Ollie's Bargain Outlet, Inc.*, 37 F.4th at 907. Without a valid damages model applicable to the entire class, "questions of individual damage calculations will inevitably overwhelm questions common to the class." *Comcast*, 569 U.S. at 34.

Plaintiffs' own conduct after certification confirms this fundamental disconnect. As noted, during the Rule 23(f) proceedings, Plaintiffs introduced two entirely new damages theories—a "time-of-sale price premium" and a "median cost-of-repair" calculation—that appear nowhere in Dr. Sharp's expert reports or testimony. A3201, 3204, 3212–16 (Opp'n to 23(f)). Dr. Sharp expressly testified during his deposition that he was not "doing a cost of repair analysis." A603:22–25 (February Sharp Dep. Tr.). That Plaintiffs felt compelled to invent new

---

members based on an entirely fictitious ownership experience, and not the actual experience of any specific named class representative.

[9] The court also noted that Subaru was "very deft at demonstrating … the individualized analysis that has to happen and how these class plaintiffs don't actually reflect members of the class if you go with the design defect theory, and then how it impacted them." A42:5-9 (Tr.).

damages models after eight years of litigation—and only after Subaru exposed the deficiencies in Dr. Sharp's actual methodology—is powerful evidence that no viable class-wide damages methodology existed at the time of certification. A class cannot be certified on a promise to develop a workable damages model later. *Blood Reagents*, 783 F.3d at 186–88.

### 5.    This Court should expressly adopt the element-by-element requirement for analysis recently characterized by the Sixth Circuit.

The Sixth Circuit's recent *en banc* decision in *Speerly* a compelling operational framework that could have prevented these mistakes. There, the court vacated certification of 26 statewide classes—approximately 800,000 vehicle owners alleging transmission design defects—concluding that a "subclass with highly individualized issues may not ride the coattails of another subclass without them." *Speerly*, 143 F.4th at 322. In doing so, the court reinforced Rule 23's "rigorous analysis" while articulating an element-by-element approach that this Circuit should embrace.

To assess commonality and predominance, the majority held that district courts "must not defer merits questions . . . until summary judgment[,]" but rather, "walk through each cause of action, identify the relevant elements, and evaluate which elements, if any, submit to common answers." *Id.* 317 (quoting *Nissan,* 122 F.4th at 247). Because an issue is not "central" to commonality "unless it affects at least one contested element in each cause of action," only "an element-oriented

analysis permits the court to identify which questions meaningfully move the lawsuit forward." *Id.*

Similarly, the majority concluded that district courts may not "ignore slight variations across state law," nor can they "lightly graft [multiple] states' class-action rules onto the federal tree." *Id.* at 321, 333. Indeed, "[t]reating [one state's law] as a stand in for everyone would pave over each State's diverse norms and betray Rule 23's requirement that the court conduct a claim-by-claim analysis." *Id.* at 328. The court therefore held that judges must "step through each element of each claim for each state," because "[c]ertifying now, winnowing later, betrays the Supreme Court's imperative that plaintiffs 'actually prove' 'that their proposed class[es] satisf[y] each requirement of Rule 23.'" *Id.* at 329 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 283 (2014)).

The district court's oral ruling below exemplifies these same deficiencies. Like the lower court in *Speerly*—which "hitch[ed] all 59 claims to a question about 'defect' in the abstract," *id.* at 318, and deferred "the hard questions for later," *id.* at 323—the district court's "analysis" here was an exercise in avoidance. It avoided ruling on expert admissibility; it avoided analyzing state law differences; and it avoided the factual record demonstrating that reliance, causation, defect manifestation, and damages all require individualized proof. Adopting an element-by-element approach could prevent this problem from

recurring and provide courts with an operational roadmap for ensuring "actual, not presumed, conformance with the Rule 23 requirements." *Hydrogen Peroxide,* 552 F.3d at 322. After all, "a rigorous analysis demands that the district court get it right, not that it get close." *Speerly*, 143 F.4th at 321.

The Seventh Circuit has already adopted this element-by-element framework. In *Schroeder v. Progressive Paloverde Insurance Co.*, No. 24-1559 (7th Cir. July 24, 2025), the court held that the predominance inquiry requires courts to "circumscribe the claims and break them down into their constituent elements," and expressly cited *Speerly* for the proposition that a court can assess commonality and predominance only after "identifying the relevant elements of each cause of action." *Id.*, slip op. at 8. Applying that element-oriented analysis to insurance breach-of-contract claims, the Seventh Circuit reversed class certification because, once the court properly parsed the breach element, whether the insurer underpaid each class member required "a host of individualized questions" that "overwhelm[ed] any common ones." *Id.* at 3. The court rejected the district court's attempt to sidestep those individualized elements by recasting the claim as challenging a uniform "method"—the same analytical shortcut the district court employed here by hitching all claims to an abstract "defect." *Id.* at 18–20. In doing so, the Seventh Circuit followed this Court's reasoning in *Drummond v. Progressive Specialty Insurance Co.*, 142 F.4th 149, 158–

61 (3d Cir. 2025), which held that whether an insurer underpaid each class member turns on individualized evidence that overwhelms common questions.

The Eighth Circuit also has reached the same conclusion. In *In re Folgers Coffee Marketing*, No. 24-2830 (8th Cir. Nov. 26, 2025), the court reversed class certification of consumer-protection and unjust-enrichment claims, emphasizing that predominance is a "demanding" standard requiring courts to "take a close look" at whether common questions predominate. *Id.*, slip op. at 3–4. The court held that individualized questions of consumer interpretation, causation, and ascertainable loss overwhelmed any common question, even where a uniform representation appeared on every product. *Id.* at 5–8. *Folgers* further held that unjust-enrichment claims "are generally inappropriate for class treatment" because whether a transaction is "inequitable or unjust turns on the specific circumstances of each transaction." *Id.* at 10.

The Ninth Circuit likewise recognizes that the rigorous predominance inquiry "begins, of course, with the elements of the underlying cause of action." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1233 (9th Cir. 2024) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). These decisions confirm that the approach *Speerly* articulates is not a novel standard but the natural outgrowth of the Supreme Court's rigorous-analysis mandate. Nor is it

foreign to this Circuit. District courts within the Third Circuit already recognize the need to move "element by element to conduct the 'rigorous analysis' required at the class certification stage." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, No. 07-MD-1871, 2025 U.S. Dist. LEXIS 97465, *12 (E.D. Pa. May 22, 2025), *appeal argued*, No. 25-2278 (3d Cir. Feb. 26, 2026) (conducting element-by-element analysis of RICO claim to assess whether common questions predominate). Expressly adopting the *Speerly* framework would thus harmonize Third Circuit law with a growing cross-circuit consensus while codifying what careful district courts in this Circuit are already doing.

### E.    The District Court's Typicality Analysis Was Cursory and Erroneous.

The court's typicality analysis was likewise erroneous. Rule 23(a)(3) requires a class representative's claims share the same legal theory and arise from the same factual circumstances as those of the class. *Marcus*, 687 F.3d at 598. The district court dispensed with this requirement by merely stating typicality was satisfied "given the overarching uniform omission claim." A57:4–5 (Tr.). This ignored various mismatches between class representatives and their subclasses (and sub-subclasses). Plaintiff Tresco, for example, purchased his vehicle two and a half years after the May 2018 Press Release— excluding him from the implied "diminution of value" sub-subclass he seeks to represent. A297 (Aquino Compl.) His claims cannot be typical

of those class members because they share neither the same legal theory nor the same factual circumstances underlying that theory. On remand, the district court must rigorously analyze whether each representative's claims are truly typical of every class they seek to represent.

### F.     This Court Must Vacate the Certification Order and Remand with Explicit Instructions.

A district court cannot selectively apply the requirements of Rule 23 and Article III. Because the district court bypassed its threshold gatekeeping obligations, this Court should vacate the certification order and remand the matter with explicit instructions. On remand, the district court must first determine whether each class representative possesses Article III standing for the specific state subclasses and mechanically distinct vehicle models—including the FA-series engines—they seek to represent. The district court must also address the standing and predominance problems created by Plaintiffs' press release-based damages theory: because the May 2018 Press Release discussed only the EJ-series engines in the STI, not the WRX or FA-series engines, representatives of WRX owners lack a common basis for their diminished-value claims, and post-May 2018 purchasers like Tresco cannot claim a price premium they never paid; and no admissible evidence establishes that the market interpreted the STI announcement as applying to any other models. The court must then

fulfill its gatekeeping duties by conclusively resolving Subaru's pending Expert Exclusion Motions before evaluating class certification. Additionally, the court must provide a readily discernible, clear, and precise class definition as Rule 23(c)(1)(B) mandates. Finally, the district court must conduct a rigorous, element-by-element analysis to determine whether common questions predominate over individualized issues of defect manifestation, causation, reliance, and damages under the laws of each relevant state.

## CONCLUSION

Class actions amplify the stakes of litigation, which is why Rule 23 demands a rigorous analysis before a class is certified, not after. Here, the district court acknowledged that individualized issues of causation and damages could cause Plaintiffs' case to "fall apart," yet it certified seven undefined subclasses without ever addressing those individualized issues. By administratively terminating Subaru's Expert Exclusion Motions and ignoring threshold questions of Article III standing, the court improperly deferred its fundamental gatekeeping duties and built a sprawling, multi-state class action on an untested evidentiary foundation.

A rigorous analysis demands that a district court resolve the hard questions—not defer them. Because Plaintiffs failed to satisfy the requirements of Rule 23, the certification order cannot stand. This Court should vacate the November 24, 2025, class certification order and remand with instructions to decertify the classes.

Dated: April 27, 2026

Respectfully submitted,

*s/ Neal Walters*

Neal Walters (020901993)
Casey Watkins (060122014)
BALLARD SPAHR LLP
700 East Gate Drive, Suite 330
Mount Laurel, New Jersey 08054
(856) 761-2400
(856) 761-1020 fax
waltersn@ballardspahr.com

watkinsc@ballardspahr.com

Attorney for Appellants, Defendants
Subaru of America, Inc. and Subaru
Corporation

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rule 46.1(e), the undersigned certifies that Neal Walters is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

## CERTIFICATION OF WORD COUNT

I certify that the following statements are true:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,308 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

## CERTIFICATION OF SERVICE

I certify that on April 27, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. All participants in this case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Pursuant to Third Circuit Local Appellate Rule 31.1 and the standing order of this Court, seven identical hard copies of this brief will be delivered to the Office of the Clerk, United States Court of

Appeals for the Third Circuit, 21400 United States Courthouse, 601 Market Street, Philadelphia, PA 19106, within five days of the date of electronic filing.

## CERTIFICATION THAT E-BRIEF AND HARD COPY ARE IDENTICAL

The text of the electronic brief is identical to the text of the paper copies.

## CERTIFICATION THAT E-BRIEF HAS BEEN VIRUS CHECKED

A virus detection program, Litera Proofpoint, was run on the file containing the electronic version of this brief and no virus was detected.

Dated: April 27, 2026

*s/ Neal Walters*

Neal Walters (020901993)
Casey Watkins (060122014)
BALLARD SPAHR LLP
700 East Gate Drive, Suite 330
Mount Laurel, New Jersey 08054
(856) 761-2400
(856) 761-1020 fax
waltersn@ballardspahr.com
watkinsc@ballardspahr.com

Attorney for Appellants, Defendants Subaru of America, Inc. and Subaru Corporation

Nos. 26-1277 & 26-1328

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

JOSEPH AMATO, et al.

*Plaintiffs-Appellees,*

v.

SUBARU OF AMERICA, INC. and SUBARU CORPORATION,

*Defendants-Appellants.*

RICARDO AQUINO, et al.

*Plaintiffs-Appellees,*

v.

SUBARU OF AMERICA, INC. and SUBARU CORPORATION,

*Defendants-Appellants.*

Appeal from the United States District Court
For The District of New Jersey, Camden Vicinage
Hon. Karen M. Williams
Case Nos. 1:18-cv-16118 and 1:22-cv-00990

## JOINT APPENDIX VOLUME I OF XIX (A1 – A66) ON BEHALF OF APPELLANTS

Neal Walters
Casey Watkins
BALLARD SPAHR LLP
700 East Gate Drive, Suite 330
Mount Laurel, New Jersey 08054-0015
(856) 761-2400
(856) 761-1020 fax
waltersn@ballardspahr.com
watkinsc@ballardspahr.com

*Attorneys for Defendants-Appellants Subaru of America, Inc. and Subaru Corporation*

## Volume I

## A1 – A66

| | |
|---|---|
| Order (Shwartz, Bove and Smith, Circuit Judges) The petition for leave to appeal under Rule 23(f) is granted Case No. 25-8041; ECF 12 | A1 |
| *Amato* Order granting in part and denying in part Motion to Certify Class ECF 226 | A3 |
| *Aquino* Order granting in part and denying in part Motion to Certify Class ECF 108 | A6 |
| Transcript of Class Certification Hearing | A9 |

## Volume II

## A67 – A289

| | |
|---|---|
| *Amato v. Subaru of America, Inc. et al* Docket Entries | A67 |
| *Aquino v. Subaru of America, Inc. et al* Docket Entries | A94 |
| *Thompson v. Subaru of America, Inc. et al* Docket Entries | A107 |
| Thompson Complaint against Subaru of America, Inc., Subaru Corporation ECF 1 | A112 |
| Thompson Order Granting Stipulation of Dismissal with prejudice ECF 27 | A160 |
| Amato Complaint against Subaru Corporation, Subaru of America, Inc. ECF 1 | A161 |
| Order granting in part and denying in part Motion to Dismiss ECF 24 | A224 |
| Amato Amended Complaint Second against Subaru Corporation, Subaru of America, Inc. ECF 41 | A226 |
| Order granting Motion to Strike as to Plaintiff Hinshaw's proposed Michigan Consumer Protection Act (MCPA) claim and denying as to Hinshaw's negligent misrepresentation claim; denying Motion to Dismiss ECF 64 | A285 |
| Stipulation Of Dismissal Of Claims Of Plaintiff Amato ECF 76 | A286 |
| Stipulation Of Dismissal Of Claims Of Plaintiff Connolly ECF 77 | A288 |

## Volume III

## A290 – A422

| | |
|---|---|
| Aquino Complaint ECF 1 | A290 |
| Aquino Stipulation Of Dismissal Of Claims Of Plaintiff Crumpecker Only ECF 49 | A336 |
| Aquino Stipulation Of Dismissal Of Claims Of Plaintiff Piperato Only ECF 50 | A338 |
| Aquino Stipulation of Dismissal with Prejudice as to named Plaintiff Ricardo Aquino only ECF 64 | A340 |
| Amended Complaint (Third Amended Complaint) against Subaru Corporation, Subaru of America, Inc ECF 65 | A342 |
| Order Adopting the Parties' proposed deadlines for class certification, summary judgment, and Daubert motions in the consolidated Amato and Aquino class actions ECF 163 | A397 |
| Letter from Gary S. Graifman to Hon. Joseph H. Rodriguez re Requested Adjournment of Date for Filing Class Certification Motion ECF 171 | A401 |
| Order: Plaintiffs' time for filing the class certification motion is extended to April 30, 2024 ECF 176 | A399 |
| Proposed Order (Amended Case Management Order) ECF 179 | A405 |
| Order Denying Without Prejudice Plaintiffs' Motion to Certify Class for failure to comply with the independent, ascertainability factor that the Court of Appeals for the Third Circuit requires to identify class membership; No later than 30 days from the date of this order, Plaintiffs may supplement and file their class certification brief; Administratively Terminating the pending Motion for Summary Judgment and Motions in Limine ECF 213 | A408 |
| Letter from Subaru Defendants re Motion to Certify Class ECF 217 | A410 |
| Letter from Gary S. Graifman, Esq. to Honorable Karen M. Williams re: Reply to Subaru Defendants' Opp. To Class Certification Ascertainability Issue ECF 218 | A414 |

| Letter from Gary S. Graifman, Esq. To Hon. Karen M. Williams Re: Response To Defendants' Submission of Supplemental Authority  ECF 221 | A418 |
|---|---|

## Volume IV: Certain Exhibits in Support of Subaru's Motion for Summary Judgment (Filed Under Seal)

### A423 – A492

| Exhibit 31: Aquino Plaintiffs' Further Initial Disclosures, dated August 4, 2022 | A423 |
|---|---|
| Exhibit 66: DDA Tuned Invoice for Stephen Tresco #1116, dated July 22, 2021 | A427 |
| Exhibit 69: Response of Stephen Tresco to Subaru of America, Inc.'s First Set of Requests for Production of Documents and Things | A428 |
| Exhibit 71: Email correspondence between Plaintiffs' Counsel and Defendants' Counsel Regarding Stephen Tresco's Texts, dated October 19, 2022 | A456 |
| Exhibit 72: Stephen Tresco's Text Messages | A461 |
| Exhibit 74: Declaration of Stephen Tresco, dated March 2023 | A472 |
| Exhibit 75: Subpoena to DDA Tuned, dated October 18, 2022 | A473 |
| Exhibit 76: Subpoena to Seven Muhammad, dated October 18, 2022 | A479 |
| Exhibit 78: Email correspondence between Plaintiffs' Counsel and Defendants' Counsel Regarding Seven Muhammed Affidavit, dated December 3, 2022 | A485 |
| Exhibit 94: Excerpted Response of Andrew Hinshaw to Defendants' First Set of Interrogatories, dated May 2021 | A490 |

## Volume V: Certain Excerpted Deposition Transcripts (Filed Under Seal)

### A493 – A617

| Excerpted Deposition Transcript of George Sandoval, dated March 25, 2021 | A493 |
|---|---|
| Excerpted Deposition Transcript of Ryutatsu Seki, dated September 30, 2021 | A498 |
| Excerpted Deposition Transcript of Andrew Hinshaw, dated October 8, 2021 | A508 |
| Excerpted Deposition Transcript of James Moore, dated October 12, 2021 | A512 |
| Excerpted Deposition Transcript of Stephen Tresco, dated October 10, 2022 | A514 |
| Excerpted Deposition Transcript of Glenn R. Bower, Ph.D, P.E., dated November 3, 2022 | A528 |
| Excerpted Deposition Transcript of David Sharp, Ph.D., dated November 17, 2022 | A585 |
| Excerpted Deposition Transcript of David Sharp, Ph.D., dated February 20, 2024 | A593 |

## Volume VI (Filed Under Seal)

### A618 – A683

| Motion in Limine to Exclude Plaintiff's Expert Glenn R. Bower ECF 170 | A618 |
|---|---|
| • Exhibit G: Excerpted Piston damage recognising [sic] and rectifying, published by MS Motor Service International GmbH | A654 |
| Motion in Limine to Exclude Plaintiffs' Expert David Sharp ECF 172 | A657 |
| • Exhibit D: Subaru's Announcement of Limited Edition WRX STI Type RA and BRZ TS® with Higher Performance for Driving Enthusiasts, dated June 8, 2017 | A677 |

## Volume VII (Filed Under Seal)

### A684 – A895

| Motion to Certify Class And Appoint Class Representatives ECF 178 | A684 |
|---|---|
| • Declaration of Gary Graifman | A740 |
| • Exhibit 1: *Amato* Third Amended Class Action Complaint and Request for Jury Trial ("*Amato* TAC") | A750 |
| • Exhibit 2: *Aquino* Class Action Complaint | A806 |
| • Exhibit 3: excerpts of the transcript of Field Quality Assurance Director, John Gray, 30(b)(6) deposition for Subaru of America Inc. ("SoA")'s | A853 |
| • Exhibit 4: confidential Subaru document regarding piston ringland schematics SUBARU006534 | A862 |
| • Exhibit 5: National Highway & Traffic Safety Administration ("NHTSA") Complaints from the NHTSA Database | A864 |
| • Exhibit 6: Subaru of America Inc.'s marketing brochure for the 2009 WRX/STi | A875 |

## Volume VIII (Filed Under Seal)

### A896 – A1145

| • Exhibit 7: transcript of the Deposition of Seven Muhammad, ("Muhammad Tr.") the owner of DDA | A896 |
|---|---|
| • Exhibit 8: email from SoA's Product Planning Analysis Manager, Garrick Goh, to his employee, Linda Scott | A1083 |
| • Exhibit 9: excerpts from the transcript excerpts of the 30(b)(6) Deposition of Subaru Corporation representative, Ryutatsu Seki | A1086 |
| • Exhibit 10: Expert Report of D.C. Sharp, Ph.D., dated March 1, 2022 | A1101 |

## Volume IX (Filed Under Seal)

### A1146 – A1356

| | |
|---|---|
| • Exhibit 11: Amended Report of D.C. Sharp, Ph.D., dated October 27, 2023 | A1146 |
| • Exhibit 12: excerpts of the transcript of the deposition of Stephen Tresco | A1200 |
| • Exhibit 13: Declaration of Stephen Tresco | A1216 |
| • Exhibit 14: excerpts of the transcript of the deposition of James B. Moore | A1219 |
| • Exhibit 15: Declaration of James B. Moore | A1228 |
| • Exhibit 16: excerpts of the transcript of the deposition of George Sandoval | A1231 |
| • Exhibit 17: Declaration of George Sandoval | A1242 |
| • Exhibit 18: excerpts of the transcript of the deposition of Andrew Hinshaw | A1247 |
| • Exhibit 19: Declaration of Andrew Hinshaw | A1264 |
| • Exhibit 20: Response of Andew Hinshaw to Subaru of America, Inc. and Subaru Corporation's First Set of Interrogatories | A1269 |
| • Exhibit 21: SoA's Class vehicle sales from 2009 to and including 2018 model year vehicles in relevant *Aquino* states [New York] | A1281 |
| • Exhibit 22: SoA's Class Vehicle Sales in the relevant *Amato* states [Arizona, Indiana, and Michigan] | A1283 |
| • Exhibit 23: Expert Report of Glenn R. Bower, Ph.D., P.E. Concerning the 2009 Through and Including 2018 Model Year Subaru Impreza WRX and WRX STi EJ255, EJ257 and FA20 Engine Piston Ring Land Failures ("Bower Report") | A1285 |
| • Exhibit 24: Rebuttal Expert Report of Glenn R. Bower, Ph.D., P.E. Concerning 2009 Through and Including 2018 Model Year Subaru Impreza WRX and WRX STi EJ255, EJ257 and FA20 ("Bower Rebuttal Report") | A1321 |
| • Exhibit 25: Firm Resume for KGG | A1328 |
| • Exhibit 26: excerpts from the transcript of the deposition of D.C. Sharp, Ph.D., dated February 20, 2024 | A1336 |

| | |
|---|---|
| • Exhibit 27: excerpts from the transcript of the deposition of D.C. Sharp, Ph.D., dated November 17, 2022 | A1340 |
| • Exhibit 28: Stephen Tresco's repair invoices, batestamp numbers TRESCO000001-04; TRESCO0065-71 | A1343 |
| • Exhibit 29: George Sandoval's repair invoice batestamp SANDOVAL DOCS_000004 | A1355 |

## Volume X (Filed Under Seal)

## A1357 – A1552

| | |
|---|---|
| • Exhibit 30: 2018 WRX STi Owner's Manual | A1357 |
| • Proposed Order Granting Motion for Class Certification | A1550 |

## Volume XI (Filed Under Seal)

## A1553 – A1644

| | |
|---|---|
| Brief in Opposition to Motion in Limine *to Exclude Plaintiffs' Expert David Sharp* ECF 181 | A1553 |
| • Declaration of D.C. Sharp | A1589 |
| • Exhibit 1: Subaru of America's May 2018 press release | A1599 |
| • Exhibit 2: The Expert Rebuttal Report of D.C. Sharp, Ph. D. (June 24, 2022) | A1604 |

## Volume XII (Filed Under Seal)

## A1645 – A1920

| | |
|---|---|
| Brief in Opposition to Motion in Limine to Exclude Plaintiff's Expert Glenn R. Bower 182 | A1645 |
| • Declaration of Thomas Sobran | A1680 |

| | |
|---|---|
| • Exhibit 1: Expert Report of Glenn R. Bower, Ph.D., P.E. Concerning 2009 Through and Including 2018 Model Year Subaru Impreza WRX And WRX STi EJ255, EJ257 And FA20 Engine Piston Ring Land Failures | A1682 |
| • Exhibit 2: deposition transcript excerpts of Glenn R. Bower which was conducted in conformity with Fed. R. Civ. P. 26 | A1718 |
| • Exhibit 3: deposition transcript of Seven Muhammad which was conducted in conformity with Fed. R. Civ. P. 26 | A1734 |

## Volume XIII (Filed Under Seal)

### A1921 – A2069

| | |
|---|---|
| • Exhibit 4: Subaru Service Program Bulletin WQW-58R | A1921 |
| • Exhibit 5: Subaru Service Program Bulletin WVE-15 | A1933 |
| • Exhibit 6: 2019 Subaru WRX STi Press Kit | A1939 |
| • Exhibit 7: January 2016 Subaru of America Product Planning Analysis Manager Garrick Goh email to fellow employee Linda Scott | A1943 |
| • Exhibit 8: deposition transcript of John Gray, pp. 1-2, 37-38, 41, 59-60, 71-72 which was conducted in conformity with Fed. R. Civ. P. 26 | A1945 |
| • Exhibit 9: Piston Damage – recognising and rectifying | A1956 |
| • Exhibit 10: Automotive News article entitled "Total Recall; Despite quality improvements, costly safety issues continue to dog automakers" | A2049 |
| • Exhibit 11: pp. 20-21 excerpted from Self-study Programme 522 for the Volkswagen/Audi 2009+ EA888 engine | A2054 |
| • Exhibit 12: depiction of a Subaru oil separator marked as Exhibit 14 of Subaru Corporation's Rule 30(b)(6) designee Ryutatsu Seki | A2056 |

| | |
|---|---|
| • Exhibit 13: Rebuttal Expert Report of Glenn R. Bower, Ph.D., P.E. Concerning 2009 Through and Including 2018 Model Year Subaru Impreza WRX And WRX STi EJ255, EJ257 And FA20 Engine Piston Ring Land Failures | A2065 |
| • Declaration of Glenn R. Bower, Ph.D., P.E. | A2059 |

### Volume XIV (Filed Under Seal)

### A2070 – A2142

| | |
|---|---|
| Motion in Limine to Exclude the Undisclosed Expert Testimony of Seven Muhammad ECF 184 | A2070 |
| Response in Opposition filed by All Defendants re Motion to Certify Class And Appoint Class Representatives ECF 185 | A2087 |
| • Declaration of Neal Walters in Support of Defendants Opposition to Plaintiffs' Motion for Class Certification | A2140 |

### Volume XV (Filed Under Seal)

### A2143 – A2397

| | |
|---|---|
| • Exhibit 1: Expert Report of Mark Gustafson | A2143 |
| • Exhibit 3: Report of Robert Kuhn | A2237 |
| • Exhibit 6: Warranty Data Summary | A2292 |
| • Exhibit 17.C: Ricard Aquino Facebook posts | A2295 |
| • Exhibit 17.D: Ricard Aquino Facebook posts | A2297 |
| • Exhibit 17.E: Ricard Aquino Vehicle Report | A2299 |
| • Exhibit 18.B: Excerpts from the Deposition Transcript of Ian Connolly dated October 15, 2021 | A2348 |
| • Exhibit 18.C: Instagram Post from Ian Connolly | A2355 |
| • Exhibit 18.D: Complete Service Request Report of Ian Connolly's Vehicle | A2357 |
| • Exhibit 19.B: Declaration of Itsvan Klag | A2363 |
| • Exhibit 20.B: Excerpts from the Deposition Transcript of George Crumpecker dated October 19, 2022 | A2368 |

| | |
|---|---|
| • Exhibit 20.C: Response of George Crumpecker to Subaru's Interrogatories | A2376 |
| • Exhibit 21.B: Email from T. Sobran to M. Thornton dated November 11, 2021 | A2382 |
| • Exhibit 22.C: Field Report of Christopher Lall's Vehicle | A2386 |

## Volume XVI (Filed Under Seal)

### A2398 – A2634

| | |
|---|---|
| Reply to Response to Motion re Motion to Certify Class and Appoint Class Representatives in Further Support of Class Certification ECF 188 | A2398 |
| • Reply Declaration of Gary S. Graifman | A2436 |
| • Exhibit 1: excerpts of the deposition transcript of Subaru's 30(b)(6) marketing witness, William Stokes | A2440 |
| • Exhibit 2: excerpts of the deposition transcript of Field Quality Assurance Director, John Gray's 30(b)(6) deposition for Subaru of America Inc. | A2449 |
| • Exhibit 3: excerpts of the deposition transcript of Robert Kuhn, P.E. | A2454 |
| • Exhibit 4: Declaration of David Sharp in Opposition to Defendants' Daubert Motion To Exclude Plaintiff's Expert David Sharp | A2458 |
| • Exhibit 5: Opinion in *Nuwer v. FCA US LLC*, Case No. 20-60432-civ- Singhal (S.D. Fla. July 22, 2024) | A2469 |
| • Exhibit 6: claims forms from Salcedo v. Subaru of Am., Inc. Civ. Action 17-8173 (D.N.J.) | A2478 |
| • Exhibit 7: 2009 WRX STi Marketing Brochure | A2485 |
| • Exhibit 8: 2010 WRX STi Marketing Brochure | A2506 |
| • Exhibit 9: 2011 WRX STi Marketing Brochure | A2572 |
| • Exhibit 10: 2012 WRX STi Marketing Brochure | A2541 |
| • Exhibit 11: 2013 WRX STi Marketing Brochure | A2555 |
| • Exhibit 12: 2014 WRX STi Marketing Brochure | A2569 |
| • Exhibit 13: 2015 WRX STi Marketing Brochure | A2583 |
| • Exhibit 14: 2016 WRX STi Marketing Brochure | A2596 |

| | |
|---|---|
| • Exhibit 15: 2017 WRX STi Marketing Brochure | A2609 |
| • Exhibit 16: 2018 WRX STi Marketing Brochure | A2622 |

## Volume XVII (Filed Under Seal)

### A2635 - A2884

| | |
|---|---|
| Response in Opposition re Motion in Limine to Exclude the Undisclosed Expert Testimony of Seven Muhammad ECF 189 | A2635 |
| • Declaration of Gary S. Graifman | A2663 |
| • Exhibit A: transcript of the Deposition of Seven Muhammad, ("Muhammad Tr.") the owner of DDA | A2665 |
| • Exhibit B: Responses of Steven Tresco To Subaru of America, Inc.'s First Set of Requests For Admission | A2852 |
| • Exhibit C: Stephen Tresco's repair invoices, bates stamped numbers TRESCO000001-04; TRESCO0065-71 | A2860 |
| • Exhibit D: Defendants' Subpoena To Produce Documents to Seven Muhammad, bates stamp numbers SUBARU056720-25 | A2872 |

## Volume XVIII (Filed Under Seal)

### A2885 – A3154

| | |
|---|---|
| Reply Brief to Opposition to Motion re Motion in Limine to Exclude Plaintiffs' Expert David Sharp ECF 191 | A2885 |
| Reply Brief to Opposition to Motion in Limine to Exclude Plaintiff's Expert Glenn R. Bower ECF 192 | A2901 |
| Reply Brief to Opposition to Motion in Limine to Exclude the Undisclosed Expert Testimony of Seven Muhammad ECF 195 | A2916 |
| Motion to Certify Class (Brief in Support as Per Court Order Dated March 26, 2025) ECF 216 | A2932 |
| • Redlined Version | A2994 |
| • Declaration of Cameron R. Azari, Esq. Regarding Class Identification and Noticing | A3057 |

| | |
|---|---|
| • Attachment 1: *curriculum vitae* of Cameron R. Azari, Esq. | A3074 |
| • Class Counsel Letter | A3154 |

## Volume XIX

## A3155 – A3223

| | |
|---|---|
| Petition for Leave to Appeal pursuant to Fed. R. Civ. P. 23(f) Case No. 25-8041; ECF 1 | A3155 |
| Response to original proceeding Petition pursuant to FRCP 23(f) Case No. 25-8041; ECF 8 | A3193 |

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

BCO-041

No. 25-8041

JOSEPH AMATO; JAMES B. MOORE; GEORGE SANDOVAL; IAN CONNOLLY; ANDREW HINSHAW, individually and on behalf of all others similarly situated

v.

SUBARU OF AMERICA, INC.; SUBARU CORP.

(D.N.J. No. 1:18-cv-16118)

RICARDO AQUINO; GEORGE CRUMPECKER; JONATHAN PIPERATO; STEPHEN TRESCO, individually and on behalf of all others similarly situated

v.

SUBARU OF AMERICA, INC.; SUBARU CORP.

(D.N.J. No. 1:22-cv-00990)

Subaru of America, Inc.; Subaru Corp.,
Petitioners

Present:  SHWARTZ, BOVE and SMITH , *Circuit Judges*

1.  Petition for Leave to Appeal pursuant to Fed. R. Civ. P. 23(f) filed by Petitioners.

2.  Unopposed Motion to Seal Volume III of the Appendix filed by Petitioners.

3.  Response filed by Respondents to Petition.

4.  Unopposed Motion to Seal Appendix filed by Respondents.

5.  Unopposed Motion filed by Petitioners for Leave to file a Reply to Response with Proposed Reply attached.

A1

Respectfully,
Clerk/kr

_____ORDER_____

The petition for leave to appeal under Rule 23(f) is granted.  The foregoing unopposed
motion to seal Volume III of the Appendix filed by Petitioners and unopposed motion to
seal Appendix filed by Respondents are granted.  Nothing herein constitutes a ruling
concerning future requests to seal these materials.  The motion for leave to file a reply
brief is denied.

By the Court,

s/Patty Shwartz
Circuit Judge

Dated: January 27, 2026
Amr/Cc: All counsel of record

**A True Copy:**

Patricia S. Dodszuweit, Clerk

A2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| JOSEPH AMATO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SUBARU OF AMERICA, INC., et al.,<br><br>Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Case No. 18-cv-16118 (KMW-AMD)<br><br>(ECF No. 216) |
| RICARDO AQUINO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SUBARU OF AMERICA, INC., et al.,<br><br>Defendants. | Case No. 22-cv-990 (KMW-AMD)<br><br>(ECF No. 94)<br><br>**ORDER** |

THIS MATTER having come before the Court by way of Plaintiffs' motions seeking class certification (Case No. 18-cv-16118, ECF No. 216; Case No. 22-cv-990, ECF No. 94), which Defendants opposed (Case No. 18-cv-16118, ECF No. 217; Case No. 22-cv-990, ECF No. 95), and Plaintiffs replied (Case No. 18-cv-16118, ECF No. 218; Case No. 22-cv-990, ECF No. 96); and the Court having read the submissions and heard the arguments of counsel during a hearing held on the Motions on November 21, 2025; and the Court having noted the appearances of counsel: Gary S. Graifman, Esquire, appearing on behalf of the Plaintiffs; and Neal D. Walters, Esquire and Casey G. Watkins, Esquire, appearing on behalf of the defendants; for the reasons set forth on the record, and for the reasons discussed below;

On this _____ day of November 2025, **It is hereby ORDERED** as follows:

A3

Plaintiffs' Motion for Class Certification is **GRANTED IN PART** and **DENIED IN PART:**

- The Court CERTIFIES four statewide subclasses (NY, AZ, IN, MI) as to the statutory consumer protection claims; and

- The Court CERTIFIES the negligent misrepresentation claims for the NY, AZ and IN subclasses only; and

- The Court DENIES certification of the negligent misrepresentation claim for the MI subclass.

Additionally, the Court finds that Plaintiffs have met their burden to demonstrate ascertainability. Specifically, the Court finds as follows:

- Plaintiffs have shown that the vast majority of vehicle purchasers retain documentary proof (due to title transfer, registration, and insurance requirements), and that such proof typically identifies the seller;

- Defendants have not demonstrated that resolving seller type would, in most cases, require credibility determinations or contested fact-finding, rather than a ministerial document review;

- The possibility that some claims will lack adequate documentation does not defeat ascertainability; such claims can be rejected without burdening the process, consistent with *Byrd v. Aaron's*, 784 F.3d 154 (3rd Cir. 2015);

- Given the nature of the product, the available databases, and the expected uniformity of purchase documentation, the Court finds the proposed process distinguishable from the unverified affidavit schemes projected in *Marcus v. BMW*, 687 F.3d 583 (3rd Cir. 2012), *Carrera v. Bayer*, 727 F.3d 300 (3rd Cir. 2013) and *Hayes v. Walmart*, 725 F.3d 349 (3rd Cir. 2013).

A4

Based upon all of the foregoing reasons, the Court finds that the class is defined with objective criteria, and Plaintiffs have proposed a reliable, administratively feasible method to identify members using VIN/DMV/insurance/manufacturer data, supplemented by verifiable proof of purchase. While some individual submissions may be excluded for lack of adequate documentation, this does not create the type of individualized mini-trials that the Third Circuit's ascertainability precedents prohibit.

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| JOSEPH AMATO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SUBARU OF AMERICA, INC., et al.,<br><br>Defendants.<br>──────────────────<br>RICARDO AQUINO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>SUBARU OF AMERICA, INC., et al.,<br><br>Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Case No. 18-cv-16118 (KMW-AMD)<br><br>(ECF No. 216)<br><br><br><br>Case No. 22-cv-990 (KMW-AMD)<br><br>(ECF No. 94)<br><br><br>**ORDER** |

THIS MATTER having come before the Court by way of Plaintiffs' motions seeking class certification (Case No. 18-cv-16118, ECF No. 216; Case No. 22-cv-990, ECF No. 94), which Defendants opposed (Case No. 18-cv-16118, ECF No. 217; Case No. 22-cv-990, ECF No. 95), and Plaintiffs replied (Case No. 18-cv-16118, ECF No. 218; Case No. 22-cv-990, ECF No. 96); and the Court having read the submissions and heard the arguments of counsel during a hearing held on the Motions on November 21, 2025; and the Court having noted the appearances of counsel: Gary S. Graifman, Esquire, appearing on behalf of the Plaintiffs; and Neal D. Walters, Esquire and Casey G. Watkins, Esquire, appearing on behalf of the defendants; for the reasons set forth on the record, and for the reasons discussed below;

On this _____ day of November 2025, **It is hereby ORDERED** as follows:

A6

Plaintiffs' Motion for Class Certification is **GRANTED IN PART** and **DENIED IN PART:**

- The Court CERTIFIES four statewide subclasses (NY, AZ, IN, MI) as to the statutory consumer protection claims; and

- The Court CERTIFIES the negligent misrepresentation claims for the NY, AZ and IN subclasses only; and

- The Court DENIES certification of the negligent misrepresentation claim for the MI subclass.

Additionally, the Court finds that Plaintiffs have met their burden to demonstrate ascertainability. Specifically, the Court finds as follows:

- Plaintiffs have shown that the vast majority of vehicle purchasers retain documentary proof (due to title transfer, registration, and insurance requirements), and that such proof typically identifies the seller;

- Defendants have not demonstrated that resolving seller type would, in most cases, require credibility determinations or contested fact-finding, rather than a ministerial document review;

- The possibility that some claims will lack adequate documentation does not defeat ascertainability; such claims can be rejected without burdening the process, consistent with *Byrd v. Aaron's*, 784 F.3d 154 (3rd Cir. 2015);

- Given the nature of the product, the available databases, and the expected uniformity of purchase documentation, the Court finds the proposed process distinguishable from the unverified affidavit schemes projected in *Marcus v. BMW*, 687 F.3d 583 (3rd Cir. 2012), *Carrera v. Bayer*, 727 F.3d 300 (3rd Cir. 2013) and *Hayes v. Walmart*, 725 F.3rd 349 (3rd Cir. 2013).

A7

Based upon all of the foregoing reasons, the Court finds that the class is defined with objective criteria, and Plaintiffs have proposed a reliable, administratively feasible method to identify members using VIN/DMV/insurance/manufacturer data, supplemented by verifiable proof of purchase. While some individual submissions may be excluded for lack of adequate documentation, this does not create the type of individualized mini-trials that the Third Circuit's ascertainability precedents prohibit.

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____

JOSEPH AMATO, et al.,individually          CIVIL ACTION NUMBER:
and on behalf of all others similarly      18-16118
situated

       **Plaintiffs**                     **(KMW)**

   **v.**                                   **MOTION FOR
                                              CLASS CERTIFICATION**

SUBARU OF AMERICA, INC. and
SUBARU CORPORATION

      **Defendants.**
_____
RICARDO AQUINO, et al., individually       CIVIL ACTION NUMBER:
and on behalf of all others similarly      22-990
situated,

      **Plaintiffs,**                    **(KMW)**


   **v.**
SUBARU OF AMERICA, INC. and
SUBARU CORPORATION,


      **Defendants.**

_____

MITCHELL H. COHEN Building & U.S. Courthouse
4th & Cooper Streets
Camden, New Jersey 08101
Friday, November 21, 2025
Commencing at 11:00 a.m.


**B E F O R E:    THE HONORABLE KAREN M. WILLIAMS,
                 UNITED STATES DISTRICT JUDGE**

Sherri Benson, Official Court Reporter
sherri_benson@njd.uscourts.gov
856-576-7014
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

United States District Court
District of New Jersey

A9

2

**A P P E A R A N C E S:**

KRANTROWITZ GOLDHAMER & GRAIFMAN, P.C.
BY: GARY GRAIFMAN, ESQUIRE
135 CHESTNUT RIDGE ROAD
SUITE 200
MONTVALE, NEW JERSEY 07645
For the Plaintiffs

BALLARD SPAHR
BY:  NEAL WALTERS, ESQUIRE
BY:  CASEY WATKINS, ESQUIRE
700 EAST GATE DRIVE - SUITE 330
MOUNT LAUREL,  NEW JERSEY 08054
For the Defendants

United States District Court
District of New Jersey

A10

(PROCEEDINGS held in open court before The Honorable Karen M. Williams, United States District Judge, at 11:00 a.m.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Good morning.  Everyone please be seated. We're here this morning in the matter Amato and Aquino versus Subaru America, Inc. and Subaru Corporation.  Civil Action Numbers 18-16118 and 22-990.  I do believe these cases have been consolidated under 18-16118.

May I have appearances of Counsel, please.

MR. GRAIFMAN:  Good morning, Your Honor.  Gary Graifman from Kantrowitz, Goldhamer & Graifman for plaintiffs.

THE COURT:  Thank you.

MR. WALTERS:  Good morning, Your Honor.  For the Subaru defendants from The Law Firm of Ballard Spahr, Neal Walters and Casey Watkins.

THE COURT:  Let me start by saying, I have personally dedicated tons of time to these motions.  Because, as you all know, Judge Rodriguez was originally assigned to this case or to the consolidated cases.  Over the summer, I had previewed the cases to see whether I could get them done sooner than he could.  And I guess you all know the answer to that was no.

So I then turned my attention back to the motion to certify class, began writing, as you all know because you've read these motions to certify class, in order to be done well in writing, they are a lot of pages.  So efforts were made to

United States District Court
District of New Jersey

A11

4

get a written product filed, and I decided to rely or revert to Rule 1, which as most of you should know, stands for efficiency.  The notion the Court and the parties should proceed to efficiently address issues pending before the Court.

So that's why I decided to have everyone in.  We had a few scheduling snafus, and I ended up rescheduling this until today so everybody could be here and still enjoy Thanksgiving.

So we're here on the motion to certify class.  I am very clear about what the appropriate course of action is, or to be stated more succinctly, my decision with respect to the motion to certify class is clear to me what it should be.

I have you all here to see if there's anything you want to add to the motions, particularly in light of the defendants' positions with respect to the motions for summary judgment that were pending, and the desire to have those heard prior to the motion to certify class, rendering the motion to certify class, I'll call it moot.

So there were a lot of things happening with this case, that I thought, again, Rule 1 -- efficiency.  Let's get to it and get the case moving forward, especially since one of the cases is a 2018 case, and here we are in 2025, about to be 2026.  So let's get cracking.

Mr. Graifman, your motion.

MR. GRAIFMAN:  Thank you, Judge.  So this case at its core and with respect to the class certification motion is

United States District Court
District of New Jersey

A12

based on defendants' material omission or omissions. Defendants aggressively and relentlessly marketed these vehicles as racing, rally vehicles, the pinnacle of Subaru engineering. One of their representatives called it a halo vehicle. And when asked what that mean, he said it's the pinnacle of Subaru engineering.

They tuned the motors, the ECU aspect of the motors to be very aggressive to get every bit of horsepower out of those engines.

All of that was marketed as aggressive racing history for WRX. That stands for World Rally Cross racing, something to that effect.

There was only one problem, there was a severe mismatch between the aggressive tuning of these vehicles and the high, powerful engines and the very weak pistons, in particular the piston ringlands that hold these pistons together.

In this case the pistons themselves were made of a composite metal called sintered metal, rather than forged metal, which made it weaker. The ringlands themselves were not cooled. There's a mechanism to cool the pistons which are oil sprayers, which these vehicles didn't have.

Basically the defect here is a common defect. It's a weak ringland, piston ringlands. If that ringland breaks down, the entire engine goes and you have to rebuild the engine, or

at least parts of the engine.  It's called a partial engine block.

So what we have here is what we contend, and we say the evidence demonstrates, is a clear defect that is material and would be material to a purchaser of this vehicle, particularly because of the fact that they market it as a, again, the pinnacle of their engineering, highly tuned, very aggressive, powerful engine with a weak piston, which is its Achilles heel, that they don't tell the purchasers about.

So in this case, we intend to prove that it is a defect.  And we contend that the liability issues in this case are all common issues.  What are those issues?  That the class engine piston ringlands have a defect which we think we are very confident we can prove because the defendants' own witnesses have admitted it --

THE COURT:  Can you slow down a tad?

MR. GRAIFMAN:  Certainly, Judge.  The second issue is that the defendants knew about the piston ringlands issue, and that again is common evidence that we would demonstrate to a jury.

The third issue is whether the information would be material to a consumer who is thinking of purchasing one of these vehicles.  And that is something that is -- materiality is based on an objective, reasonable consumer standard because what we're dealing with here are three consumer fraud statutes

which all indicate or require that the materiality issue be deemed to be material to the reasonable consumer. It's an objective standard. New York (GBL)349 says that it's the ordinary consumer standard that it would be demonstrated to.

So, the liability issue we think is -- or we will present common evidence to demonstrate that.

The next issue would be defendants' knowledge of the defect. That we can also prove through common evidence. And, in fact, if one goes back and looks at Judge Rodriguez's original decision in Amato in 2019, he lists all of those items that we alleged at the time would be demonstrated, and he found that those demonstrate that we have alleged knowledge. So that was the pleading.

Now we're at the proof stage, and we do have the proof that we allege in the complaint. What is that proof? The proof is, first of all, there were NHTSA or National Highway Traffic Safety Administration complaints early on, 2009 and 2010, demonstrating that there's a defect.

There's consumer complaints to Subaru, showing that they knew about it. And under the TREAD Act, which is a Federal Act, if they, as a manufacturer and a seller, know of a defect that could implicate safety issues, they are required to report it. So they monitor these complaints. They're not just out there in the atmosphere. They have to know these complaints in order to comply with the TREAD Act.

United States District Court
District of New Jersey

A15

The third thing is internal documents that they were attempting to fix this problem.  How were they attempting to fix it?  We have evidence that they had design drawings that show how they were trying to make the ringlands thicker on these class vehicles so that they would be stronger.

In fact, in 2019 model, which is the model year after the last class vehicle year, they did make them stronger, and that's when they announced that they were making -- they were improving the vehicles by making the pistons stronger and by retuning the ECU.  So they knew about the problem.

The other thing is that they had internal documents where they were trying to figure out what to do.  One of the documents we have, for example, Exhibit-8, is an email from one of the administrators who said, "Can you please do me a favor?  We are trying to justify improving the design of the STi engine.  Can you tell me how many broken piston claims there were for each of the model years of the cars."  And he goes through the STis and the WRX models.

And the answer from his assistant is, "I can pull claims with piston fail codes, but most of these failures would be a short block replacement.  In those cases, I wouldn't be able to determine which short blocks were due to broken pistons.  I think we can come up with a number, if that's what you're looking for."

So they knew there was a problem and they were trying

to figure out how to fix the problem.  So knowledge in this case is going to be a common issue, which is based on the defendants' knowledge, that's clear.

With regard to materiality, as I mentioned, in each of these jurisdictions, materiality is the objective reasonable consumer standard, so a jury would have to just determine if a reasonable consumer would have found this to be material, this omission.  So materiality is another issue.

With regard to reliance, we don't allege reliance, obviously, because it's an omission, but defendants have raised it.  Reliance is not an issue for a number of reasons.  First of all in New York, under the New York (GBL) 349, the law is very clear, reliance is not an issue.  It's not Part 1 of the elements of the claim in New York.  There's plenty of case law on that that we cite to.

One is a Second Circuit case, *Eidelman v. Sun Products*, 2022 Westlaw 1929250, (Second Circuit June 6th, 2022).  And it cites in there New York cases that support that.

With regard to Arizona, under the Arizona Consumer Fraud Act, reliance is presumed if it's an omission, and it is a material omission that a consumer would rely on.  And the cases that support that that we cite to are the *In Re: Theranos*, which was the fake blood case, an analysis case where the Court said that the standard is, if it's an omission claim, would -- a claim as stated under the Arizona Consumer Fraud Act

United States District Court
District of New Jersey

A17

if it's a material and the consumer would not have purchased the product had they known of the misrepresentation.

And the same thing is true with the Indiana case, a Consumer Fraud Act. So we have no issue with reliance.

The other issue that I think the defendants raised was that they claim it's a low manifestation rate of 0.76. That is not an issue that is dispositive in this case. Because first of all, they're talking about the in-warranty repairs that people brought their vehicles in during the warranty, and the case is primarily about those vehicles that are outside of the warranty. If they were covered under the warranty, obviously, we wouldn't be here. But the cases of failure that are post-warranty is something they don't keep track of.

In addition to that, we have Seven Muhammad who owns a shop who specializes in WRX and WRX STi vehicles, that's what he repairs. And he said he sees hundreds of these a year, that was his testimony.

And by the way, that testimony, we didn't depose him. Defendants subpoenaed him. They questioned him. They asked him his opinion as to what he thought was the problem, and he told them that it was the ringland gaps, in his opinion. They questioned him as to how many he sees a year, and he told them hundreds. So he was really, in a sense, their witness in that setting.

Their 30(b)(6) witness, John Gray, testified that he

United States District Court
District of New Jersey

A18

can't enumerate how many vehicles after the warranty are repaired because he realizes many people go to independent shops, and he can't tell you.

So the manifestation rate is not an issue. But it's not an issue for another very important reason. We're asking for damages in this case based on two theories. One theory is what we call the diminution of value or the price premium theory. And under the price premium theory, when somebody goes to buy the car, they are paying a premium for this high pinnacle of engineering, halo, muscle-engined car. And had they known of the defect, they would have paid less.

Now we have an expert, Dr. Sharp, who did an analysis under hedonic regression analysis, which he describes in his opinion, and which has been approved where he has done it, in fact, in a case called *Hamm v. Mercedes Benz*, which we cite in our brief. And another case called *Aberin v. Honda*, he's used it, and it's been approved as a hedonic regression method to demonstrate diminution of value at the point of purchase.

So if we're talking about an overpayment, it doesn't matter what happens after the fact, if there's a high rate or they don't keep track of the rate, as it turns out. What matters is that the person at the point of purchase is overpaying for the vehicle, and that's a class-wide damage, we allege.

He has even been able to, through this methodology,

formulate that the amount per person would be approximately $2,000. I think he said $2,094 per vehicle is the overpayment based on the hedonic regressions analysis. So with regard to the damages, there's a common methodology to demonstrate the damages.

The other method of damages that we allege and we have in our motion and he has opined on is the cost of repair. In other words, everybody obviously who has had the problem is going to pay for the repair and how much did those people pay.

Now, in that setting, there's two ways to do it. One is the average cost of repair, which he has determined. The other way is to just, at the end of the case, say we're going to have a special master who looks at each of the claims where people have had the problem and determine how much each of those claims are going to be.

So in that regard, it's interesting, I was making myself reacquainted with the Regina Little versus Kia case, which the defendants cite and we cite also, and that was a New Jersey case that was actually tried as a class action. The Judge certified it as a class action. It was tried in front of a jury. There were two methods of damages, the same that we're alleging, the diminution of value and the cost of repair.

In that case the defect was brakes, brake defect. So the case was tried and the jury rejected the diminution of value damages. But it's not really surprising because you're

United States District Court
District of New Jersey

A20

talking about brakes, which everybody -- it's a wear and tear item that people have to replace anyway. So they found no diminution of damages.

But in our case, we have a component that's central to the engine that breaks and the engine breaks. So we think that we have a good diminution of value damages case. The jury did find that the cost of repair was a valid basis for damages for the class. And the expert, Scott King, opined that it was $750 per brake damage.

The Judge, after the trial, said, you know what, I think that a better way to determine damages is to have a -- appoint a special master and have him look at the claims and determine the claims. The defendants appealed it, it went to the appellate division, the appellate division said, no, the better way to do it was to have Scott King's $750 analysis, and a reverse.

It went to the Supreme Court, New Jersey Supreme Court, and New Jersey Supreme Court said no, no, no, the trial Judge got it right. The best way to do this is to have a special master determine the damages.

So from this, what do we take? We take that a class can be certified and the issues can be tried on a common basis. The jury can determine and understand what a diminution of value damage is. They can understand what a cost of repair damage is. Or the case can be tried on liability and we can do

a cost of repair analysis after which the case law says the fact that damages might be individualized does not destroy class certification if common issues are there and can be tried and the case can go forward and we can get a determination and a finalization on whether the defendant is liable or not.  If they are, then we can go to the damages phase.

That's what a lot of the case law in New Jersey, including the Third Circuit says.  We do discuss that further extensively in our brief as well.

So there's -- I guess the point being there's a methodology to determine damages on a class-wide basis here either under the diminution of value or under the cost of repair damages.

I know that Your Honor also had a question about ascertainability.  I'd be glad to answer that.  I know that we put it in our brief and extended our discussion of it, but if Your Honor wants to hear any more on that, I'm glad to discuss it.

THE COURT:  Not yet.  And the reason, quite frankly, is after getting counsel's responses to the ascertainability issue, I really didn't have any questions about it.

MR. GRAIFMAN:  I appreciate that.  Thank you.  And by the way, thank you for having this hearing.  We don't have a lot of oral argument these days.  We do appreciate Her Honor doing that, and the work you put in.

United States District Court
District of New Jersey

Unless Your Honor has questions, that would be my --

THE COURT: No. No questions at this time. Thank you, Mr. Graifman.

Mr. Walters.

MR. WALTERS: Good morning, Your Honor.

THE COURT: Good morning.

MR. WALTERS: Well, I agree with Mr. Graifman on one thing, it's nice to be here in front of Your Honor in person. We don't do that enough these days.

The *Little versus Kia* case is what I want to start with because I was lead counsel on that case for 20 years --

THE COURT: This is not going to go on for 20 years, promise me that.

MR. WALTERS: That is part of the reason it shouldn't be certified, but I'll get to that. It is a bit of a misrepresentation with respect to the trial Court's finding in that case. Defendants moved to decertify damages once the verdict came in with the idea that diminution had been rejected by the jury. The only remaining damages finding by the jury was out-of-pocket costs.

Defendants moved, and the trial agreed with the defendants that out-of-pocket costs cannot be a common damages finding because it cannot be presumed that everybody suffered something more than zero. And that is why there were claims proceedings.

The claims proceedings focused on, to a large extent, whether many of the eight thousand class members suffered any damages at all. It wasn't just a handout numbers and differentiate and recovery. That was an important distinction and in a moment I'll explain how that applies to an alternative theory that the plaintiffs have in this case.

Your Honor, attorney argument is not evidence. There is no credible evidence of a design defect in the engines in the Subaru vehicles alleged to be involved in this case. To establish such a defect, in an individual case, for that matter, but particularly in a far-reaching class action, one needs an expert. One needs a very competent expert who needs to follow a very disciplined methodology. That was not done here.

What Mr. Graifman failed to share is they originally hired Dr. Bowers to do that. But when Dr. Bowers did not test a single vehicle, did not inspect a single vehicle or even look at any of the pistons that are involved in this case, when he stated opinions that were incredibly speculative, when he admitted that people who modified their vehicles are out of the class. That, of course, prompted defendants to file a *Daubert* motion to preclude him.

Well, there was a tremendous pivot in the case when that happened because for the first time class counsel decided they were going to try to use Mr. Muhammad as their expert in

United States District Court
District of New Jersey

A24

that regard, because they could see the writing on the wall with respect to Dr. Bowers.

Now, Mr. Muhammad had never been identified as an expert. They blew that deadline. They did not produce a report on behalf of Mr. Muhammad. When we deposed Mr. Muhammad, it was as a fact witness to understand his relationship to the named plaintiff, Tresco.

So both of those witnesses in our mind were precluded for similar and different reasons.

THE COURT: So let's talk a little bit about Seven Muhammad, right, because I found the factual -- the dispute between the parties relating to Seven Muhammad interesting.

Defense counsel deposed him. And in response to your questions, you elicit information that is quite, I'll say, interesting with respected to these ringland defects, piston ringland defects. And I say that because, yes, Dr. Bowers may not have done it, but why doesn't Seven Muhammad do it?

And the fact that the testimony is in the record, why can't that go to the jury? So he doesn't have to be an expert. He can give -- remember, an expert is offered under the rules as someone who, without having, we'll say, personal knowledge, has a scientific background where they can give an opinion.

Seven Muhammad is actually giving experiential testimony. And if in his experiential testimony he, through that testimony, can assist the trier of fact in understanding,

so why is that precluded?  You preclude an expert because they haven't met skills, method, scientific background, and you want them to avoid net opinion, et cetera.

Seven Muhammad poses a very different proposition for testimony.

MR. WALTERS:  Mr. Muhammad is interesting, I would admit, but improper.  First of all, he worked on Mr. Tresco's vehicle.  He doesn't speak to any of the other vehicles involved in the case.  When class counsel was talking about the vehicles or the vehicle, there are four different types of vehicles involved in this case, Your Honor.  By name, we have WRX and STi.  We have different engines and different iterations of those vehicles which perform very differently.

Mr. Muhammad is only speaking to that.  The notion that Mr. Muhammad's testimony would be used in a manner that it is side-by-side and as a substitute for Mr. Bowers is extremely questionable, particularly since experts matter in terms of their cumulative contribution to the case.

We have a situation which they're both speaking to the same issue and Muhammad is only speaking to his experience with Tresco.  In addition, he makes references that have no substantiation.  He speaks of dealing with hundreds of these vehicles.

Why didn't class counsel go out and put into the record what those hundreds of vehicles would be?  They did not.

United States District Court
District of New Jersey

A26

And it's to be questioned very substantially on that basis.

Your Honor, I'd like to very briefly address a couple of the other points that Mr. Graifman made. But then, I'd like to proceed with a disciplined review of the elements that they have to prove.

The NHTSA complaints, every manufacturer has VOQs existing on a government website where complaints are collected about vehicles. There's not a single manufacturer that doesn't have them with respect to every vehicle. That's not telling at all, and it's usurped by the idea that they haven't done the work to show that there is a design defect here. It goes without saying that a .76 manifestation rate, warranty rate is small when it comes to vehicles actually manifesting a problem.

And the important thing to note about that and it ties into what Mr. Graifman was saying in that email, that's not just piston failures. Subaru doesn't do it that way. They can't always trace it. That's a more general collection of engine failures. So in that instance you have 99 percent of the vehicle population that has not manifested a concern.

Mr. Graifman said, well, that doesn't capture the people who are recovered. Fine. Let's triple it. Give the benefit of the doubt. Let's just assume, that's 97 percent of the class that has never experienced a problem.

Your Honor, courts invariability deny class treatment to consumer fraud claims based on alleged automobile defects

United States District Court
District of New Jersey

A27

because individual issues predominate over common ones.  And they do that fiercely for two reasons.  One is the manifestation issue that I mentioned.  Why should it ever matter that we would ever proceed in court or pay attention or look at anything if someone did not experience a problem with a particular feature of the vehicle, here the engine and the pistons.  It's no harm, no foul, right?  You have to look at that individually one at a time with inspections and understand what was happening.

The second is a consumer fraud claims as Mr. Graifman mentioned, there's allegations of misrepresentations and omissions and the issue of reliance.  And in this case, we have to follow the approach that plaintiffs took.  They are actually alleging factually, at least the lawyers are because the clients did not confirm this, that the owner's manual and the ancillary information like a maintenance schedule has a certain amount of miles at which you have to get oil changes and things of that nature.  They somehow take that to mean that the vehicle is going to last that long when everybody knows that every reasonable consumer can only rely on the Powertrain Warranty as related to coverage, that's five years and 60 thousand miles.

We learned during the case, incredibly, that almost every leading class representative of the four remaining, nobody even looked at the owner's manual.  Nobody looked at

anything that could have possibly caused them to be misled or anything like that.

THE COURT: So you think that the only way a consumer can be misled is by reading the manual? So what about when you go to the dealership, I'll leave it at dealership right now, whether it be a used car dealership or a manufacturer dealership, you're talking to -- look, I've bought a couple of cars in my life -- you're talking to the sales rep and they make representations to you.

Is it your position that a consumer is not entitled to rely on that representation unless they read the manual?

MR. WALTERS: So we have to look at the evidence of record in this case, Your Honor. We don't have that. That is not in the case.

THE COURT: We do have the marketing material representations about what these vehicles could do. And I'm not, again, I am not making a definitive determination about whether or not ultimately the case can be proven, that's for a later date.

But the question now before the Court, at least with respect to this, is class certification. And when we talk about things, and you've mentioned the 0.76 percent of piston failure issues where plaintiffs point to the defect existing and presale knowledge and materiality.

And so, query, and I caution, as I do most, sometimes

my tone is very finite.  It's a job hazard.  So I am truly questioning, if I go to a dealership and they tell me, oh, this is a halo vehicle.  It can do X, Y and Z.  As a consumer, you don't get to rely on that because you haven't read the manual?  I'm trying to --

MR. WALTERS:  That information is only misleading or false if you end up having experience that it's inconsistent with it for the reasons stated.

And, Your Honor, I was going to address this in due course, but I'll jump to a really important part of this case.

THE COURT:  Sure.

MR. WALTERS:  There's no question an overwhelming majority of the folks who bought these vehicles -- over ten years, by the way, they continue to be driven every day -- there's no question that they have not experienced engine problems.

Among the very few who have, the next important element that is critical when you look at each individual case and which cannot be common, what is it that caused the engine problem that they had.  We know from common sense that engine problems can be caused by abuse, they can be caused by modifications, they can be caused by failure to maintain the vehicle, that's a regular thing that happens.  But you know, the record in this case actually confirms that.  And the most striking thing of all is that two-thirds of the original named

United States District Court
District of New Jersey

A30

class representatives in this case voluntarily dismissed themselves from the cases when they initially said they didn't do modifications, but we caught them redhanded during discovery, usually during their depositions, usually because we looked at their social media feeds.

All of them or at least most of them had modified their vehicles for purposes of increasing their performance characteristics, to make them go faster, to increase the horsepower, the sound.

Plaintiffs' own expert, Dr. Bowers, clearly says if any of these owners modified their vehicles, and I quote, they're out. The plaintiffs themselves have already recognized that it is a palpable consideration when we look at each of these tens of thousands of owners. We have to ask individually have they, too, modified their engines. Another one -- by the way, this is the second New York plaintiff that they tried because the first one withdrew. And the reason he withdrew, was we made a record that the dismissed plaintiff, Mr. Lowell had botched an oil change. And he readily acknowledged when that was brought up during the case that he could not continue as a plaintiff.

So we know that in addition to whether or not you've experienced any problem at all, would be very few people. Among those very few people, a lot of them were tinkering with their cars or not taking care of them and had nothing to do

24

with the alleged design defect.  That in and of itself is a basis on which to deny class treatment.  There is not one answer, there is not a common proof to that question of causation in every case.

Now I got a little ahead of myself because I think that is one of the most important issues in the case.  I want to go back, however, because this theory, this legal theory of plaintiffs deserves some examination.  So I'd like to walk through a few of these steps to show Your Honor or share with Your Honor how these elements fall apart and cannot be subject to class treatment.

So the first element is that you own one of the class vehicles, right?  And it's ten years of vehicles.  But it's more specific than that because plaintiff's were really not able to come up with any evidence of knowledge of consumer fraud, except the allegation that in May of 2018 there was a press release issued by Subaru, and that press release provided that we were going to provide new improved pistons for the STi vehicle only.

So plaintiffs' counsel devised that this diminution class that he talked about could only apply to people -- and this is awkward -- who owned their vehicles before the press release came out and somehow allegedly experienced diminution in their vehicle's value when the market went down and they learned that these new pistons were coming out.

United States District Court
District of New Jersey

Now, I'm putting aside the merits where the press release doesn't say the prior pistons were bad.  The fact that we improved a part doesn't mean the prior parts were defective.  Otherwise, we'd all be plaintiffs in a class action against Apple with our iPhones every day because we get upgrades, right.

So for the reason I really re-up, Judge, is with respect to that diminution class, the -- first because the new class representatives, Tresco and Henshaw, did not own their STi vehicles before May of 2018.  They purchased them after.  So those two new class representatives, they can't satisfy plaintiffs' own legal damages theory.  They're out with respect to that and class treatment has to be denied because they're not common proofs.

The second and perhaps even more significant fact, because again, that press release, I mean they go all in on it as the mean basis for the consumer product, that's 2018, eight years after we started selling the vehicles.  The other significant fact is it doesn't cover three quarters of the vehicles in the class because these were WRX vehicles that were not subject to that improvement in the pistons or that press release.

So you've got one named class representative, and you'll forgive me for a second, that's James Moore in Indiana who had a WRX.  So he's not in a diminution class, either.  And

all those states that those plaintiffs seek to represent,

Indiana, Tresco is in New York and Henshaw is in Michigan.

None of those people in those states consisting in a claim.

THE COURT:  What about Arizona?

MR. WALTERS:  Well, Arizona, Sandavol actually bought

an STi beforehand, but I'll get to him in a moment.  He's

particularly interesting for a different reason.  Your Honor --

THE COURT:  Let me make sure I capture this

correctly.  So your argument relative to this point is that

these plaintiffs cannot be good class representatives or

illustrate that class certification, one of the elements of

class certification is missing?  So is it adequacy or

commonality, which --

MR. WALTERS:  That's a great question.  Adequacy is a

good start, but the main concerns are standing and adequacy of

representation.  But they're also indicative of the idea that

people have different types of vehicles, particularly WRX,

which can't be included, that just gets cut right out of the

class, Judge, on that theory.

So the crafty way that class counsel want to deal

with this, this is where this out-of-pocket class comes from.

First of all, class counsel did not move for a subclass with

out-of-pocket plaintiffs.  That's not part of the motion.  It

came up during the briefing.  But right there, they're estopped

from doing so.

The other thing is, as we just saw from Mr. Graifman's discussion of Little, out-of-pocket costs are not subject to common proofs. By the way, to have out of pocket costs, you absolutely must have an engine failure and you absolutely have to have an engine failure due to the alleged design defect, and you have to incur actual costs above zero to prevail. That is as inherently individualized as it gets.

So for those reasons, plaintiffs should not be heard to even contend that there is this alternative class. Just give me a moment, Judge. So, we talked at length about the common sense notion that somebody have actually had to experience problems with their engine, right. There lots of people out there that have been driving these cars for ten years, have never had a problem.

This also affects one of the main class representatives, and that's where I'm getting to Mr. Sandavol. And this is particularly interesting, right, because Mr. Sandoval from Arizona has never experienced a problem with his engine as one of the last four named class representatives. That is startling to me. What is particularly startling, wait for it, Mr. Sandoval owns two other class vehicles before this one and had no problems with those, didn't identify them as part of the complaint, doesn't say that he had problems with them. Who in their right mind has two vehicles in the class

United States District Court
District of New Jersey

A35

and they decide, I hate this so much, I'm going to buy another one, and has problems again.  Your Honor, that's not just improper, it's insulting.  And Mr. Sandoval cannot stand for any of those theories, nor can the Arizona class members that he seeks to represent.

I guess it's important that I share Subaru's position on the pending summary judgment and *Daubert* motions, Your Honor.  Certainly cannot be fun to take over that class of motions from another judge.  I'm very cognizant of that.  Our feeling, Your Honor, is that Your Honor can deny class certification without formerly deciding summary judgment and the *Daubert* motions, but the Court cannot grant class certification without deciding at least the *Daubert* motions.

It doesn't make sense to skip summary judgment here. But the Third Circuit is among a majority of circuits in recognizing that if a plaintiff relies on expert testimony, and here plaintiffs have squarely relied on experts to support class certification, and the defendant mounts facial challenges that are credible, and we have in these motions, that will defeat class certification, if those experts are precluded, they can't support the defect theory and they can't support the damages theory, then the *Daubert* motions would have to be decided if class cert is granted.

Summary judgment doesn't make any sense if Your Honor is going to grant class certification because there's so many

United States District Court
District of New Jersey

A36

substantive causes of action that would be dismissed by the summary judgment motion that your work on class cert would be, if not completely moot, extremely limited.

Now, one other point on that, Your, Honor, the reason I say that Your Honor can deny class certification without formerly deciding those other motions including the *Daubert* is because Your Honor can review that information. You can review the extensive records set forth with respect to the class certification opposition. And what other courts have, Your Honor can make certain observations about the poor quality of evidence that have been put forth in support of the plaintiff in support of class certification. A Court can do that without actually deciding those motions.

And those, I'll give you a couple of citations: *In re Tropicana Orange Juice Marketing and Sales Litigation* 2019 U.S. District Lexis 102566 at 30 to 40, District of New Jersey June 18, 2019. That's relying on the grand daddy of all class certifications in *In re Hydrogen Peroxide*. The other decision that found that a Court could question the quality of plaintiffs' proofs and deny class certification without actually deciding *Daubert* was *Kotsur, K-O-T-S-U-R, versus Goodman Global*, 216 U.S. District Lexis.

THE COURT: Slow down a moment. Slow down a little to make sure that my court reporter captures the citations.

MR. WALTERS: Thank you, Your Honor. The citation

for the Kotsur case is 2016 U.S. District Lexis 111-258 at Note 2 from the Eastern District of Pennsylvania dated August 22, 2016.  By the way, while I'm at it because I very much value the work of the associates who I work with and gathered this information, I'm ready to provide the citations for -- in support of the notion that a Court can look at dismissed named class representatives and the record that has been created on their behalf and finding it relevant in denying class certification.

There's two decisions there on this *Wilson versus Wings Over Happy Valley*, 2020 West Law 869889 from the Middle District of Pennsylvania, February 21st, 2020.  And the other decision is *TR School District of Philadelphia*, 2019 West Law 174-5737 from the Eastern District of Pennsylvania, April 18, 2019.

Another point with respect to Mr. Muhammad, Your Honor, is that ironically Mr. Muhammad makes his living modifying Subaru vehicles.  And in the process has likely resulted in many people being out of the class.  He makes the ridiculous contention in this case when we caught Mr. Tresco modifying his engine that he was modifying the engine to reduce the power, which is not a thing.  One could question that on its face.

Just give me a moment, Your Honor.  I would like to conclude by connecting a couple of dots in the argument that

United States District Court
District of New Jersey

I've already made.  Mr. Graifman started by saying there's this history of Subaru marketing a culture of modifications and how that somehow could allow plaintiffs to modify their vehicles, damage them, cause their engines to fail.  Your Honor, again, plaintiffs' own expert, Dr. Bowers acknowledge that if there were modifications to a vehicle's engine on a class vehicle, they would be out of the class, that's number one.

Number two, I'll just repeat, class counsel and the plaintiffs already acknowledged by dismissing two-thirds of the class reps, most of whom made modifications to their engines, they acknowledged by dismissing them that they know that they cannot state a claim, so that is compelling evidence that that is a big factor one would have to check on individually with respect to each owner, common proofs do not predominate.

Thank you, Your Honor.

THE COURT:  Mr. Graifman.

MR. GRAIFMAN:  Yes, thank you, Judge.  Starting with the issue of Dr. Bower, Dr. Bower is our automotive expert, not our damages expert.  I don't know what Mr. Walters is referring to in his testimony.  He didn't cite it, but he's not our damages expert.  He would be incorrect, obviously, based on the diminution of value damage theory because, again, it's the point of purchase that somebody overpays.  With regard to the two damages classes -- or two damages theories, we're not required to create two subclasses on the class certification

motion because we can try both of those just like Mr. Walters did in the *Little v. Kia* case, and it's not that uncommon to try both theories at the same time.

With regard to Mr. Sandoval, it's kind of an interesting situation because he is the epitome of having suffered diminution of damages damages. He goes to Subaru. He buys the vehicle from a salesperson who sells him the car for a certain amount of money. He then wants to sell it after it becomes known through this press release that these vehicles have a piston restructure because of the fact that they had weaker pistons. He tries to sell it online and the response from people is, I really don't want -- it's in the record, but I don't want a 2018 because the pistons are stronger in the 2019 vehicle.

Then he goes back to the Subaru dealer and says I want to trade it in. Now, when he bought the vehicle, he had a Subaru guarantee that they would buy it back for a certain price, which was $32,000. The same salesperson that sold him the vehicle says I can't give you the $32,000 because it has this problem. So I've got to cut some of that off. It's right in the record, his trade-in and his purchase. They gave him $29,000, $3,000 less. Subaru gives him $3,000 less because of this problem. So diminution of damages is clearly an issue here and Mr. Sandoval is an example of a class representative who could represent that diminution of value class.

They don't say he did any modification.  He did put something called a cat-back on his vehicle, but that just makes the exhaust sound louder, which by the way, Subaru sells, they sell a cat-back.  And their witness testified that that doesn't affect the vehicle.  With regards to --

THE COURT:  So, the argument as to Sandoval that has just been crystalized for me is that he hasn't had a problem with the vehicles.

MR. GRAIFMAN:  But he suffered monetary damages on a diminution of value, that's the theory.

THE COURT:  What is his role in the class?  Who is he representing?

MR. GRAIFMAN:  He's representing purchasers of the vehicle in Arizona, Arizona purchasers and lessees.

THE COURT:  That what?

MR. GRAIFMAN:  Purchased the vehicle for, according to our expert, $2,094 more than they should have.  In this case he actually got $3,000 less when he went to sell it.  And the people he went to sell it to were the same people that sold it to him, Subaru.  So people in Arizona have paid --

THE COURT:  So here's why this all starts to fall apart for class certification -- I'm a straightforward-type -- and why I had the parties supplement with ascertainability.  And perhaps rather than make a statement, I'll ask a question.  You have four representatives here.  You have two theories of

34

damages with subcategories of damages.  Tell me how each of these class reps satisfy 23(a), and then ascertainability, right, because this is an issue that may preclude class certification.  These are the issues that may preclude because of what I think defendants were very deft at demonstrating was the individualized analysis that has to happen and how these class plaintiffs don't actually reflect members of the class if you go with the design defect theory, and then how it impacted them.

MR. GRAIFMAN:  So, let's take them one at a time with Sandoval.  So he buys a vehicle for a certain amount of money.  Then when this becomes known that there's a problem in May of 2018, he goes to try to sell the vehicle after that and he ends up getting less money.  Our expert has determined that --

THE COURT:  Which expert?  You have two.  You have Bowers and what's the other guy?  Sharp.

MR. GRAIFMAN:  Dr. Sharp is our damages expert who says that one way of determining the damages is by looking at this vehicle before the press release comes out, and its comparative value to other vehicles with regard to this issue.  And he opines that it's 4.7 percent higher than the other vehicle.  In other words, people are paying somewhat of a premium for this vehicle.  After the press release he says that it goes down 2.1 percent, below the comparative vehicle meaning that there's a spread of approximately seven percent difference

United States District Court
District of New Jersey

A42

between buying the vehicle before the fact becomes admitted by Subaru, if you will, and after the fact is admitted.

So there's a spread of seven percent of people who bought it before suffered, based on diminution of value. Mr. Sandoval is one of those people. And in his case it's not theoretical, it's actually practical because he did actually try to sell it and he did suffer damages. But you don't have to sell it in order to suffer the damages that you overpaid. The case law is very clear on that. Diminution of value is a methodology of class one damages where everybody overpays because defendant made a material omission.

What was the omission? The omission is that there's a defect in the pistons of these vehicles that will cause it to have significant damage if it manifests. But it doesn't have to manifest for diminution of value damage to occur because damages, as I said before, you pay at the time you purchase the vehicle, you overpay.

THE COURT: See, so that statement there, is it your contention that they don't have to actually experience the defect in order to be part of the class?

MR. GRAIFMAN: Yes, and case law is clear on it. If you have a price premium that you've paid for the product, that you've suffered your damages at the point of sale. And as I think we cited before, the Eidelman case in the Second Circuit. There are Third Circuit cases as well that we cited in our

36

brief for the proposition that diminution of damages occurs where there's a material omission.  And the person buys the product and wouldn't have had they known or wouldn't have done it at that price had they known of the issue.  And people would not have bought this vehicle at that price if they knew that there was a weak ringlands piston that would be affected if the horsepower spiked because of the aggressive ECU engine tuning and the general horsepower that these vehicles have.

THE COURT:  What about the fact that 0.76 percent of the vehicles had the piston failure?  What's the Court to do with that and how does it bolster or suggest that class certification is appropriate?  And this goes to commonality.

So on top of that ascertainability, I think the focus, what I've distilled out of the 23(a) factors is the commonality perspective given the slight experience that consumers have had with this piston failure.

What do we do with that?

MR. GRAIFMAN:  First of all, we contest that it's a slight failure because as testified to by their own people, yes, we have warranty information, but most people will go to somebody else to have it repaired after the warranty.  So these are after warranty failures that they don't have records of.  I think they've admitted that in their testimony of their 30(b)(6) witness, that's first of all.

Second of all, the manifestation failure is at odds

United States District Court
District of New Jersey

A44

with the experiential testimony, as Your Honor pointed out, of Seven Muhammad who says he sees hundreds of these every year, and that's a problem.

Third of all, the fact that the rate is 0.76 doesn't necessarily make it a small rate as effective with regards to what is considered material from a consumer or an automotive standpoint. And car experts, like Mr. Bowers, for example testified the failure rate of piston, piston range in Subaru class engines shown in the table below is above any acceptable automotive failure rate. A rate failure of one in one hundred, the uniformed process used to validate the piston and piston ringlands was inadequate. So you don't need a very large percentage in automotive. There's a case we cite to and I put as an exhibit in our reply papers to Your Honor called Neuer(ph.) where the Judge there tried a class automotive vehicle defect case. And afterwards, the defendant made the same argument, well, we had a 0.3 percent manifestation rate. And the judge said, well, that's not dispositive because that doesn't tell me what vehicles were failing after the warranty. You're just giving me the warranty rate, and that's not dispositive of the case. We attached that. I would invite Your Honor to read it. It's one of the exhibits in the reply attached.

So the failure rate is kind of a red herring and it's kind of a false argument in a case like this. Of course, the

United States District Court
District of New Jersey

final argument is in a diminution of value or price premium payment, it doesn't matter what the failure rate is because the damage is done when you buy the vehicle for more than you would have or should have because of the misleading, lying statement from the company that is omitting the fact that, hey, you might have this problem and it's going to cost you $8,000 to fix if you do.

These are not small problems.  It's not like your brakes go bad and you have to repair them for a couple hundred dollars.  This is an engine replacement problem.  So it is a material problem.

With regard to ascertainability, I know Your Honor raised that just now.  So in the automotive world, as I'm sure Your Honor is familiar with, there's lots of documentation demonstrating how much somebody paid for the vehicle, where they bought it, when they bought it, if they had a problem there's usually a record from either the dealer or an independent shop.  There's lots of ways to ascertain who is in the class.  We do this all the time in settlements, and it's the same theory.  We put in Mr. Azari's declaration explaining it.  Basically there's entities that will go and pull all the registration records, both current and historical.  And those records will demonstrate who purchased the vehicle in that state.  If those don't do it, everybody has purchase contract for a vehicle.  I mean, this is the largest purchase you're

going to make other than your home.  So they can demonstrate where they bought the vehicle and when they bought the vehicle.

The record of the injury is usually pretty easy to get because people usually keep it.  They can go to the dealer for it.  The independent shop usually keeps records for a period of time.  So the ascertainability issue shouldn't be a problem in this case.  If somebody buys it from one of the out-of-state entities, such as Carvana, which I think Your Honor mentioned.  There's actually a couple of cases in New Jersey that were involving Carvana, and the Courts in New Jersey have used New Jersey law when the purchaser was in New Jersey regardless of where Carvana may have shipped the car from.  So it's the state in which you purchase the car.  Plus you presumably pay your vehicle sales tax within the state that you're purchasing it as well.  So ascertainability would not be an issue in the case, particularly with the diminution of value damages.

With regard to Tresco, we submit he, too, has suffered diminution of damages because in his case he actually went to a Subaru dealer, and Mr. Tresco says in his deposition he wasn't actually looking for a WRX STi, but the dealer calls him up says I've got one, this is a really good car.  He said to the dealer, I've heard that there's a problem.  The dealer said, no, there's no problem.  This is a really reliable car.  You're going to love the car.  I mean, it's pretty clear in his

United States District Court
District of New Jersey

A47

testimony that he also is subjected and a victim of a material omission because had the dealer told him about the defect at the time, he wouldn't have bought his vehicle and he so states in his deposition and his declaration.  So he also suffered a diminution of value for his vehicle because of the material omission.

So we would contend that he is an adequate representative for that diminution of value damage class.  And, of course, he is also cost-of-repair adequate because he had the vehicle injury and he did have to pay for it, a substantial amount in his case.

With regard to Seven Muhammad, they make the ridiculous statement that you can't tune down a vehicle.  Of course you can do that.  He's an expert doing that, that's what he did.  He testified that's what he did in Mr. Tresco's vehicle and they didn't ask him for any proof of that.  They had a chance to --

THE COURT:  This Seven Muhammad issue, let's just get past that because I have to deal with him and the experts in a different way, and I'm prepared to do that.

MR. GRAIFMAN:  So with regard to their statement that the engines are different and that the manifestation of the injury is different, that's not the testimony of their own Japanese expert.  He testified, Question:  "Is the chemical composition for the piston material for the RA engine the same

as the chemical composition for the 2017 EJ 257?"  Answer, "The materials were the same."  Next.  Witness, "Because of the piston land braking occurs when the large combustion pressure is applied onto the piston rings."  Question, "Are there any other causes of ringland failures that you're aware of?"  Answer, "No there aren't."

Next, Page 57.  Question, "Do you know the casting method used by Hitachi to form the EJ255 and EJ257 pistons?"  Answer, "Yes."  Question, "Is it sintered material?"  Then there's some discussion.  The witness says, "So when we use the word 'sintered material', that will be sintered and bound material?"  "Yes, sintered metal is a familiar term to me.  So even when I don't speak much English, I understand the term because it's in the powder form and it's pressed to form and then it is burned or sintered and made into a -- into a, make hard."

So they're all sintered.  All of these are the same.  The method of injury is the same.  Yes, engines do fail for many reasons, but we're talking about the piston ringlands, a specific part with a specific problem, and that's what this case is about.  If it was just about engine failures, then the defendant would be correct.  There are many reasons engines fail, but we're not talking about that.  We're talking about one part that is the same in all of these vehicles.  So that argument should not pass muster.

With regard to Bower, Mr. Walters is making some fictional story up that we somehow positioned away from Mr. Bowers and we thought -- no, no.  We just identified Mr. Muhammad as a fact witness.  They're the ones who decided to go out and started asking his opinion.  They opened the door to that.  I know Your Honor doesn't want to talk about Seven Mr. Muhammad anymore, so I'll just leave it at that.  But no, we didn't position away from Mr. Bowers.  Mr. Bowers testified very clearly that there's an issue here with the composition of the piston, an issue with the design of the piston, an issue with the fact that there's no oil sprayers which would cool them and, therefore, they would get overheated and break the ringlands.

In sum, I think we have a common defect.  We can demonstrate that there's common evidence that there was an omission and that they never told people, that had people learned of it, it would have been material, which is a jury question based on a reasonable consumer standard in all these states.  And that there's a methodology to prove class-wide damages.  But again, I would stress the class-wise damage proof is not dispositive of whether a class should be certified on the liability issues.  And we do brief that, so I'll leave it at that.

Thank you, Your Honor, again for the time and if you have any questions, I'll be glad to answer.

United States District Court
District of New Jersey

A50

43

THE COURT:  Mr. Walters.

MR. WALTERS:  Your Honor, very briefly a couple of additions to the record.  First of all, with respect to Mr. Sandoval, the guaranteed purchase program that Mr. Sandavol participated in does not apply to modified vehicles. Mr. Sandavol had a modified aftermarket exhaust.  He was also over the mileage for the program, that's why he was dinged at 3,000 miles.  It had nothing to do with the other issue.

Briefly, Your Honor, I did want to speak to the manifestation issue which we've briefed, I'd like to highlight. So at the start of the class certification process plaintiffs relied almost exclusively on the Speerly decision at the District Court level, and in the midst of awaiting a decision, Speerly was overturned by the Sixth Circuit.  And one of the primary basis on which it was overturned to find the class certification was inappropriate to that case in which automotive design defects were alleged to be common was that determining which vehicle owners actually experienced either the shutter or the hard shift amended member-by-member inquiry. So that's one of the most recent pronouncements on that.  Of course, the Court also realized that individualized reliance determinations were relevant.

I say this was an anomaly because there are numerous cases, the majority, in fact, that we cited in our class certification opposition brief, I just want to make brief

United States District Court
District of New Jersey

A51

mention of them. I won't provide the citations because they're in the brief, but *Marcus versus BMW* from the Third Circuit, 2012, alleging defects involving motor vehicles often involve complicated issues of individual causation that predominate over common questions regarding the existence of a defect.

*Estate of Pilgrim versus GM*, at base a fatal problem for plaintiffs is that they are alleging the existence of multiple defects which may or may not be uniformly present in all class vehicles. Again, they're focusing on actual presence.

*Payne versus Fuji Film* rejecting certification based on a four percent total failure rate because individual issues of damages predominate over common issues because most members of the class had not experienced a defect.

*Johnannessohn versus Polaris* in the Eighth Circuit in '21, certification denied where evidence showed many products had not manifested the alleged defect. That is a common thing and among the many other issues that we have identified as obstacles to class treatment, common issues cannot predominate, this would require thousands and thousands of mini trials before the jury. The time consumption alone would be many, many years beyond what an individual might experience if they were to pursue their individual claims on their own.

That's all I have, Your Honor.

THE COURT: Thank you.

United States District Court
District of New Jersey

A52

MR. GRAIFMAN:  Can I just respond?

THE COURT:  Sure.

MR. GRAIFMAN:  So with regard to *Marcus v. BMW*, that's an interesting case that demonstrates the difference between that type of case and our type of case.  So Marcus was dealing with run flat tires.  And run flat tires are wear and tear items, and they are replaced commonly.  Sometimes they're replaced at the BMW dealers, sometimes they're replaced elsewhere.  And the Court found that the evidence demonstrated that there was no way to know who had a run flat tire and who didn't have a run flat tire because people just go off and get run flat tires from other than the dealers.  And the dealers testified in that case that they don't keep track of whether the person's vehicle has run flat tires or not, they didn't have records.  I don't know why that was the case, but that was the testimony in Marcus.

So Marcus dealt with tires that are not an engine. It's not part of the vehicle.  It's something you add onto the vehicle as tires.  You can replace them at Mavis.  You can replace them anywhere.

So what we're dealing with here is an engine component that's central to the engine.  And it's clear evidence when somebody has a ringlands problem that they had that problem and that they had to fix it and what it cost them as opposed to just getting new tires.

With regards to Speerly, in Speerly, I don't remember if it was 21 or 27 state classes, but there were more than 20 classes. And what the Court and panel in Speerly found was that it was not manageable and, therefore, couldn't be certified. There were just too many states with too many different elements. Here we're just dealing with essentially three or four states, so that's not really an issue. Speerly reasoning for overturning doesn't affect this case.

With Pilgrim, there were multiple defects alleged, so that was the issue. Here as I think said earlier in my presentation, that we're dealing with just the ringlands defect. This is not like an engine failure, per se. It's a ringlands defect engine.

In *Payne v. Fuji*, percentage, there we're dealing with defective cameras, which is a different industry. A four percent failure rate for an automotive vehicle would be a recall mandated by the National Highway Traffic Association. And a camera of four percent is probably not that high.

So I just wanted to point those out.

THE COURT: All right. So as indicated, the Court has been going through these submissions and the motion for class certification, briefly reviewed the motion for summary judgment and actually took some time reviewing the Motions in Limine with respect to the expert reports of Bowers, Sharp and then the testimony of Seven Muhammad.

United States District Court
District of New Jersey

A54

After having reviewed the motion for class certification, the Court requested that the parties provide supplemental briefing with respect to ascertainability and the threshold requirement there.

So let me start here with the legal standard pursuant to Rule 23(a)(2) and just go through, as it were, the requirements under Rule 23(a).  So 23(a)(1), so let me start -- backup a little bit.  Under Rule 23(a), a plaintiff must establish, one, numerosity; two, commonality; three, typicality; and four, adequacy of representation.  In addition, because plaintiffs seeks certification under Rule 23(b)(3), they must show that common questions predominate over individual ones and that class action is superior to other methods.  The Court must conduct a rigorous analysis to determine whether these prerequisites are met.

As for numerosity, in fact, defendants don't even contest numerosity from what I can see, so I move straight to commonality.  Plaintiffs' position is common questions include whether the defect exists in all class vehicles.  Subaru's presale knowledge, materiality to a reasonable consumer and Subaru's duty to disclose.  Plaintiffs contend these questions are capable of resolution with common proof, including expert testimony and internal Subaru documents.

Defendants' position is that only 0.76 percent of class vehicles experienced piston issues, many caused by

individualized factors such as aftermarket modifications, abusive driving, poor maintenance or fuel quality.  They also emphasized the differences in the various models, EJ255, EJ257, FA20 engine designs requiring separate analysis.

Because plaintiffs have identified at least one question central to each cause of action that is capable of class-wide resolution, to note, whether the pistons in each engine type share materially similar design characteristics that render them prone to premature ringland failure under normal use.

Plaintiffs' expert opines that the engines share critical common attributes causing the same defect.  While individualized causation will be relevant to damages for certain members, the existence and concealment of the defect are common questions, so that commonality is satisfied.

As for typicality, plaintiffs' position is all named plaintiffs purchased class vehicles with the same defect and suffered economic injury in the form of diminution in value or cost of repair.

Defendants' position is that certain plaintiffs purchased after Subaru's May 2018 press release about the piston redesign while others modified or raced their vehicles creating unique defenses.

Typicality does not require identical circumstances. It requires that the claims arise from the same course of

United States District Court
District of New Jersey

conduct and are based on the same legal theories.  Here all named plaintiffs allege injury from the same omission.  The possibility of unique defenses such as post-announcement purchases or modifications does not defeat typicality, given the overarching uniform omission claim.  Therefore, typicality is satisfied.

Adequacy, plaintiffs' interest are aligned with the subclass and counsel is experienced in class litigation, defendants' argument that unique defenses undermine adequacy is unpersuasive at this stage.  No conflict exists that would prevent vigorous representation.  Adequacy is satisfied.

Predominance.  Plaintiffs' position is that liability issues -- existence of defect, knowledge, materiality, reliance, presumed on omission cases and duty to disclose can be proven with common evidence.  Damages can be calculated on a class-wide basis using a price premium model or a cost of repair model.

Defendants' position is that individualized in-court inquiries predominate including whether the defect manifested, cause of any failure and the impact of modifications, maintenance or misuse.  Defendants contend plaintiffs' damages models are unreliable under *Comcast versus Behrend* 1569 U.S. 27 (2013).

The central liability issues here are susceptible to common proof.  However, proof of manifestation and causation

may vary significantly for certain claims, particularly negligent misrepresentation, which under some state laws may require individual reliance.

Given plaintiffs' omission-base theories and the statutory frameworks invoked, the Court finds that common questions predominate for the statutory consumer protection claims under New York, Arizona and Indiana law.

For negligent misrepresentation, predominance is a closer question.  In Michigan, individualized reliance could not predominate.  So the Court will certify the statutory claim for all four states and the negligent misrepresentation claim for New York, Arizona, and Indiana only.

Superiority, the class action device is superior given the relatively modest individual damages, the uniformed alleged omission and the inefficiency of multiple individual suits.

Defendants manageability arguments premised on *Speerly versus GM, LLC* are inapposite.  Here there are only four states and two related models.

Having requested that the parties submit additional supplemental briefing on ascertainability, the Court addresses only this threshold requirement next, and that dispute centers on whether members of the proposed four statewide classes, New York, Arizona, Indiana and Michigan, can be identified in an administratively feasible and reliable manner without resort to

individualized mini trials.  In the Third Circuit, ascertainability is an independent requirement for Rule 23 (b)(3) classes, see *Marcus versus BMW* 687 F.3d 583.  Plaintiffs must show by a preponderance of the evidence that the class is defined with reference to objective criteria and there is reliable and an administratively feasible mechanism for determining whether putative members fall within the class definition, *Hayes versus Walmart* 725 F.3d 349.  A plaintiff cannot satisfy this requirement by relying solely on say-so affidavits, see *Carrera v. Bayer Corp* 727 F.3d 300; however, ascertainability is a narrow inquiry that should not be conflated with other Rule 23 requirements, *Byrd versus Aaron's, Incorporated* 784 F.3d 154.

Plaintiffs' position with respect to ascertainability is that motor vehicles are large ticket items whose ownership is well-documented.  They proposed to identify current and former owner, lesses of class vehicles using VIN numbers, linked data from state's DMVs, insurance carriers, manufacturer records, and commercial databases.  The request for proof of purchase, sales contracts, bill of sale, financing agreement from identified owners to confirm class eligibility including purchase date, location and seller date.  Plaintiffs emphasized that similar VIN-based methods were approved and implemented in the Takata Airbag MDL, and in Subaru's own Powell, P-O-W-E-L-L, settlement, and that this distinguishes Marcus and Carrera as

involving inexpensive, fungible products without VINs, registration or insurance cards.

Defendants respond that the plaintiffs' method fails the Third Circuit's heightened ascertainability standard, indicating that while VIN and DMV records identify owners, they do not reveal whether the vehicle was purchased from an authorized Subaru dealer, private seller or non-Subaru dealer.

Plaintiffs' reliance on owner-supplied affidavits and documents to establish seller type is, in defendants' view, precisely the say-so method rejected in Marcus, Carrera and Hayes.

The proposed class definitions limited by VIN ranges, model years 2009 to 2018, WRX and STi state of purchase and statutory cause of action are objectively ascertainable. This prong is undisputed. The dispute lies in whether plaintiffs' two-step process meets the requirements for a reliable and administratively feasible mechanism under Marcus, Carrera, Byrd and Hayes. So the Court first address availability of records.

Unlike Marcus' run flat tires or Carrera's OTC supplements, over-the-counter supplements, the product here is a registered motor vehicle with a unique VIN, state DMV title and registration records, mandatory insurance documentation and manufacturer warranty and sales records. These data sources can generate an initial list of owners/lessees within the class definition parameters. This step is both reliable and

administratively feasible satisfying Byrd's narrow inquiry for the first phase.

Second, determining seller type. This is a more difficult question necessary under plaintiffs' class definition can be accomplished without impermissible individualized inquiries. Then DMV, insurance and manufacturer records generally do not identify seller type. Plaintiffs' propose to solicit proof of purchase from owners to confirm that element. If the submitted documentation is a standard dealer bill of sale or finance agreement, verification is straightforward. But for private transactions or older vehicles, documentation may vary in form or completeness and may require follow-up to resolve ambiguities.

The Third Circuit has rejected methods that depend solely on self-identification without verification, that's the premise for Marcus and Carrera and has cautioned against methods that would devolve into mini trials, see Hayes.

However, it has not barred owner submissions altogether provided they are objectively verifiable by reliable records.

On this record plaintiffs have shown that the vast majority of vehicle purchasers retain documentary proof due to title transfer, registration and insurance requirements and that such proof typically identifies the seller.

Defendants have not demonstrated that resolving

seller type would in most cases require credibility determinations or contested fact finding rather than ministerial document review.  The possibility that some claims will lack adequate documentation does not defeat ascertainability.  Such claims can be rejected without burdening the process, that would be consistent with Byrd.

Given the nature of the product, the available databases and the expected uniformity of purchase documentation, the Court finds the proposed process distinguishable from the unverified affidavit schemes rejected in Marcus, Carrera and Hayes.  At the core of the Court's determination is the fact that this is a vehicle.  This is a motor vehicle purchase and the purported design defect is the engine, not the tires, not the windshield, not these other things -- windshield is probably not a good example -- the door handles, things that are habitually used.  We're talking about an engine and the tracking of a vehicle.  The only vehicles that are not tracked in this Court's estimation are ones that are illegally or unlawfully exchanged.  Vehicles require, have a VIN number.  This Court is very familiar that cars' VIN numbers are obliterated illegally, those folks aren't coming forward.  Every car has to be insured.  Cars have to be registered with DMV.  These issues of ascertainability are very distinct from Marcus, Carrera and Hayes because of the nature of the product, a vehicle engine.

United States District Court
District of New Jersey

So the Court holds that plaintiffs have met their burden and demonstrate ascertainability, the class is defined with objective criteria. And plaintiff's have proposed a reliable, administratively feasible method to identify members using VIN, DMV, insurance, manufacturer data supplemented by verifiable proof of purchase.

While some individual submissions may be excluded for lack of adequate documentation, this does not create the type of individualized mini trials that the Third Circuit's ascertainability precedence prohibits.

That concludes the Court's determination. Class certification will be granted for those reasons. I do not intend, obviously, on issuing a separate written opinion. I will have an order commensurate with what has been decided here. And the transcript, of course, will be available to the parties.

And note that I will review this transcript and provide the citations to the cases. I know I just kind of glossed over them, primarily because you all know these cases better than I do, but I will make sure that I indicate in the transcript the appropriate citations for the cases.

MR. WALTERS: Your Honor, will you issue the order alongside the opinion when that comes out together?

THE COURT: So I'll probably do the order -- actually the order will probably come out either today or probably

Monday.  The transcript will be available.  I'm not issuing a separate opinion.

MR. WALTERS:  Okay.  Thank you, Judge.

THE COURT:  Let's talk about these other issues because I have to tell you, Mr. Walters makes some excellent points, which are not lost on the Court.  However, based on the papers and the cases as I reviewed, I thought class certification, at the end of the day, is the correct result here.  To be clear, I think plaintiffs do have some obstacles here that may, in fact, rear their heads as we proceed.

Two other issues, and Mr. Walters addressed these, the Motions in Limine regarding the experts and the motion for summary judgment.  So clearly the motion for summary judgment, what do you want to do with that, Mr. Walters?

MR. WALTERS:  Your Honor, I think we need to huddle on our team about the prospects of the 23(f) in light of the *Daubert* motions.  And I do know we can take a position as to those.

THE COURT:  All right, so that is exactly what I thought needs to happen now.  Again, why I had you all come in so I could hear a little more directly from counsel.  Sometimes when you hear things, they land a little differently than the written page.  And I do think this is an issue.  So hopefully I have distilled to what I will be looking for with respect to 23(f) and the motion for summary judgment and how that goes

United States District Court
District of New Jersey

forward at this juncture.

So that will -- the motion for summary judgment and the Motions in Limine, I think they're administratively terminated already?

MR. GRAIFMAN:  I believe so, yes.

THE COURT:  And you all know administratively termination just means it's not actively being considered by the Court, but as you also should have recognized, based on part of the comments that I made with respect to Bowers, Sharp and Seven Muhammad, I have reviewed these motions, and in some respects relied on what I read in the expert testimony as to one of the prongs for 23(a), which I must, so it's going forward.  But now given the fact that the class cert has been granted, how you move from here is up to you all.  So I'm not reinstating.  I leave it to Counsel how you want to address 23(f) and motions for summary judgment.  I think you need to recast it, motion for summary judgment.  But I will leave it to you to, as you say, huddle with your team.  Tell me what you want to do.

MR. WALTERS:  Thank you, Your Honor.

THE COURT:  You're welcome.

Anything further for the Court this afternoon?

MR. GRAIFMAN:  No, Your Honor.  Thank you.

THE COURT:  All right.  You all have a good afternoon and good weekend and happy Thanksgiving.

United States District Court
District of New Jersey

58

(Proceedings concluded at 12:48 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - -
**FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
- - - - - - - - - - - - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.


<u>/S/ Sherri Benson</u>, Official Court Reporter
<u>11/25/2025</u>
*Court Reporter/Transcriber*

United States District Court
District of New Jersey

A66