**26-1277, 26-1328**

IN THE

# United States Court of Appeals

FOR THE THIRD CIRCUIT

————— ➤➤◄◄ —————

JOSEPH AMATO; ET AL.,

*Plaintiffs-Appellees.*

*v.*

SUBARU OF AMERICA, INC.; SUBARU CORP.,

*Defendants-Appellants.*

———————

RICARDO AQUINO; ET AL.,

*Plaintiffs-Appellees.*

*v.*

SUBARU OF AMERICA, INC.; SUBARU CORP.,

*Defendants-Appellants.*

———————

*On Appeal from the United States District Court*
*for the District of New Jersey*

## PLAINTIFFS-APPELLEES' BRIEF

Gary S. Graifman
KANTROWITZ, GOLDHAMER
& GRAIFMAN P.C.
*Attorneys for Plaintiffs-Appellees*
135 Chestnut Ridge Road, Suite 200
Montvale, New Jersey 07645
201-391-7000


PHP   (212) 719-0990
appeals@phpny.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION................................................................................. 1

    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ......................2

    CONCISE STATEMENT OF THE CASE...................................................3

        A.   Procedural and Factual History ...............................................3

        B.   Plaintiffs' Expert and Fact Witness Testimony Was
           Clearly Qualified and Admissible .......................................8

           1.   Dr. Bower's Report was considered by the district
               court and satisfied *Daubert* ............................................8

           2.   Muhammad's non-expert testimony based on his
               extensive personal experience was admissible as
               Judge Williams held .......................................................9

        C.   After Reviewing the Evidence and Oral Argument the
           District Court Correctly Granted Class Certification.........................12

    STANDARD OF REVIEW ...................................................................16

    ARGUMENT ...................................................................................18

        A.   THE DISTRICT COURT IMPLICITLY ADDRESSED
           PLAINTIFFS' ARTICLE III STANDING CONCERNING
           REPRESENTATION OF ABSENT OWNERS OF CLASS
           VEHICLES EQUIPPED WITH FA-SERIES ENGINES.........................18

           1.   Plaintiffs who own class vehicles equipped with EJ-
               series engines have standing to represent absent owners
               of class vehicles equipped with FA-series engines ............................19

           2.   Defendants improperly conflate standing with typicality ...................23

i

B.  THE DISTRICT COURT DID NOT ABDICATE ITS
GATEKEEPING FUNCTION IN ITS REVIEW OF
BOWER, SHARP AND MUHAMMAD'S TESTIMONY ........................26

C.  THE CERTIFICATION ORDERS COMPLY WITH
RULE 23(c)(1)(B) ...............................................................................29

D.  THE DISTRICT COURT CONDUCTED A RIGOROUS
RULE 23 ANALYSIS..............................................................................33

1.  The district court adequately considered the
differences in the EJ and FA-series class engines............................33

2.  The district court adequately analyzed causation
and defect manifestation as common issues.....................................34

3.  The district court properly analyzed material differences
in state law prior to certifying the four state subclasses ....................36

4.  Defendants' reliance on *Speerly* is fatally flawed and
should be rejected and notwithstanding that, Plaintiffs
did an element-by-element analysis of the claims
while Defendants failed to do so ........................................................37

E.  PLAINTIFFS HAVE PROPERLY ASSERTED
METHODOLOGIES TO DETERMINE CLASSWIDE
DAMAGES ............................................................................................43

1.  The price premium or diminution of value damages
model presents a methodology to determine
classwide damages ............................................................................44

2.  The cost of repair model has also been adopted by courts.................47

3.  Courts universally acknowledge that individual Damages
issues do not defeat predominance and can be addressed
separately............................................................................................50

CONCLUSION .................................................................................................51

COMBINED CERTIFICATIONS.....................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aberin v. Am. Honda Motor Co., Inc.*,
2021 WL 1320773 (N.D. Cal. Mar. 23, 2021) ....................................................43

*Allegra v. Luxottica Retail N. Am.*,
341 F.R.D. 373 (E.D.N.Y. 2022)........................................................................29

*Allen v. Ollie's Bargain Outlet, Inc.*,
2021 WL 1152981 (W.D. PA Mar. 26, 2021) *overruled on other
grounds Allen v. Ollie's Bargain, Inc.*, 37 F.4th 890 (3d Cir. 2022) .................13

*Amato, et al. v. Subaru of America, Inc., et al.*,
United States District Court for the District of New Jersey Civil
Action No. 1:18-cv-16118-JHR-KMW ......................................................1, 2, 40

*Aquino, et al. v. Subaru of America, Inc., et al.*,
United States District Court for the District of New Jersey Civil
Action No. 1:22-cv-00990-JHR-AMD.................................................1, 2, 9, 40

*Bogosian v. Gulf Oil Corp.*,
561 F.2d 434 (3d Cir. 1977) ...............................................................................50

*Chapman v. GM, LLC*,
2023 WL 2746780 (E.D. Mich. Mar. 31, 2023)..................................................47

*Chiulli v. Am. Honda Motor Co., Inc.*,
690 F.Supp.3d 1038 (N.D. Cal. 2023).................................................................19

*Daffin v. Ford Company*,
458 F.3d 549 (6th Cir. 2006) .........................................................................42, 43

*Dial Corp. v. News Corp.*,
314 F.R.D. 108 (S.D.N.Y. 2015)........................................................................45

*Eidelman v. Sun Products Corp.*,
2022 WL 1929250 (2d Cir. 2022) ......................................................................44

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ........................................................................17

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ........................................................18

*Falco v. Nissan N. Am., Inc.*,
  2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) ...............................48

*Frank v. Gaos*,
  586 U.S. 485 (2019) ........................................................................22

*Garcia v. E.J. Amusements of N.H., Inc.*,
  98 F. Supp. 3d 277 (D. Mass. 2015) .............................................24

*General Telephone Co. of Southwest v. Falcon*,
  457 U.S. 147 (1982) ........................................................................23

*Haas v. Pittsburgh Natl. Bank*,
  526 F.2d 1083 (3d Cir. 1975) ...............................................19, 26

*Hamm v. Mercedes Benz USA*,
  2021 WL 1238304 (N.D. Cal. April 2, 2021)...............................43

*Heward v. Thahab*,
  2021 WL 1947508 (D.Ariz. May 14, 2021) ................................45

*Holmes v. Pension Plan of Bethlehem Steel Corp.*,
  213 F.3d 124 (3rd Cir. 2000) ........................................................50

*In re Arizona Theranos Inc., Litig.*,
  256 F.Supp.3d 1009, 1028 (D. Ariz. 2017) ................................45

*In re Blood Reagents Antitrust Litigation*,
  783 F.3d 183 (3d Cir. 2015) ...................................................27, 34

*In re Bridgestone/Firestone, Inc.*,
  288 F.3d 1012 (7th Cir. 2002) ......................................................39

*In re Cmty. Bank of N. Virginia*,
  418 F.3d 277 (3d Cir. 2005) ........................................................50

iv

*In re Fedex Ground Package Sys., Inc., Emp. Pracs. Litig.*,
74 Fed. R. Serv. 1079 (N.D. Ind. 2007)...................................................................50

*In re: Ford Motor Co.*,
86 F. 4th 723 (6th Cir. 2023) .......................................................................34

*In re Front Loading Washing Mach. Class Action Litig.*,
2013 WL 3466821 (D.N.J. July 10, 2013) ........................................................14

*In re Humana*,
163 F.4th 376 (6th Cir. 2025)...................................................................39

*In re: Hydrogen Peroxide Antitrust Litig*,
552 F.3d 305 (3d Cir. 2008), *as amended* (Jan. 16, 2009) ...........................17, 28

*In re Linerboard Antitrust Litig.*,
*305 F.3d 145 (3d Cir. 2002)* .......................................................................51

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008)...................................................................44

*In re Nissan N.A., Inc. Litig.*,
122 F.4th 239 (6th Cir. 2024) ...................................................................42

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone)
Antitrust Litig.*,
421 F. Supp. 3d 12 (E.D. Pa. 2019), *aff'd sub nom.*
*In re Suboxone (Buprenorphine Hydrochlorine & Naloxone)
Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020)........................................................43

*In re Tropicana Orange Juice Mktg. and Sales Prac. Litig.*,
2019 WL 2521958 (D.N.J. June 18, 2019)........................................................11

*In re Visa Check/ MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001)*, abrogated in part on other grounds
by In re IPO Sec. Litig.,* 471 F.3d 24 (2d Cir. 2006)...................................50, 51

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
644 F.3d 604 (8th Cir. 2011) .......................................................................28

*Kavon v. BMW of North America, LLC*,
605 F.Supp.3d 622 (D.N.J. 2022)...................................................................18

*Little v. Kia Motors Am., Inc.*,
   242 N.J. 557 (2020) .................................................................48, 50

*Marcus v. BMW of North America, LLC*,
   687 F.3d 583 (3d Cir. 2012) ....................................................31, 36

*McNair v. Synapse Grp. Inc.*,
   672 F.3d 213 (3d Cir. 2012) ....................................................18, 22

*Neale v. Volvo Cars of North America, LLC*,
   794 F.3d 353 (3d Cir. 2015) ....................................................17, 51

*Nguyen v. Nissan N.A.*,
   932 F.3d 811 (9th Cir. 2019) .........................................................48

*Packer v. Glenn O. Hawbaker, Inc.*,
   699 F.Supp.3d 333 (M.D. Pa 2023) ..............................................14

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ......................................................................17

*Prado-Steiman ex rel. Prado v. Bush*,
   221 F.3d 1266 (11th Cir. 2000) ....................................................25

*Reinig v. RBS Citizens, N.A.*,
   912 F.3d 115 (3d Cir. 2018) ..........................................................32

*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) .........................................................29

*Sauer v. Subaru of Am., Inc.*,
   2020 U.S. Dist. LEXIS 55592 (D.N.J. Mar. 31, 2020) .............21, 33

*Simmons v. Ford Motor Company*,
   592 F.Supp.3d 1262 (S.D. Fla. 2022) ......................................25, 26

*Specter v. Tex. Turbine Conversions, Inc.*,
   519 F. Supp. 3d 576 (D. Alaska 2021) ............................................9

*Speerly, et al. v. General Motors, LLC*,
   143 F.4th 306 (6th Cir. 2025) ................................................*passim*

*Stewart v. Abraham*,
  275 F.3d 220 (3d Cir. 2001) .................................................................23

*Swack v. Credit Suisse First Boston*,
  230 F.R.D. 250 (D. Mass. 2005).........................................................23

*Thorogood v. Sears, Roebuck & Co.*,
  547 F.3d 742 (7th Cir. 2008) .............................................................39

*Wachtel v. Guardian Life Ins. Co. of America*,
  453 F.3d 179 (3d Cir. 2006) .........................................................31, 32

**Statutes**

New York GBL § 349 ..............................................................37, 40, 44, 45

New York GBL § 350 ............................................................................45

**Rules**

Fed. R. Civ. P. 26(a)(2) ......................................................................10

Fed. R. Civ. P. 60 ..............................................................................33

Fed. R. Evid. 701 ..............................................................................10

Fed. R. Evid. 702 .............................................................................9, 13

Rule 23 ...................................................................................*passim*

Rule 23(a)..............................................................................24, 26, 38

Rule 23(a)(3) ....................................................................................23

Rule 23(b)......................................................................................14, 38

Rule 23(b)(2)....................................................................................22

Rule 23(b)(3)..........................................................................14, 22, 39, 51

Rule 23(c)(1)(B)...............................................................................29, 32

Rule 26(a).........................................................................................11

Rule 30(b)(6)..............................................................................4, 8, 21

vii

**INTRODUCTION**

Defendants Subaru of America, Inc. ("SoA") and Subaru Corporation (collectively "Defendants") aggressively marketed class vehicles as precisely tuned high horsepower output vehicles for track and rally enthusiasts. In reality, class vehicles possessed weak pistons which were mismatched to the engine horsepower, a fact Defendants concealed from class vehicle purchasers for years while they worked on improving and "strengthening" the pistons and retuning the engine. Plaintiffs paid a price premium for class vehicles. Defendants' own witnesses admitted these vehicles were marketed as "halo" cars, the pinnacle of design, and the bestower of "street cred" for those who were willing to pay for it. A855-57. When Defendants finally announced the strengthening of engine pistons for the 2019 model year STi vehicles, the value of 2009 through 2018 model year WRX and STi class vehicles diminished classwide.

Plaintiffs-Appellees ("Plaintiffs") in these two related consolidated proposed class actions captioned *Amato, et al. v. Subaru of America, Inc., et al.*, United States District Court for the District of New Jersey Civil Action No. 1:18-cv-16118-JHR-KMW ("*Amato*") and *Aquino, et al. v. Subaru of America, Inc., et al.*, United States District Court for the District of New Jersey Civil Action No. 1:22-cv-00990-JHR-AMD ("*Aquino*") sought class certification based on Defendants'

1

material omissions concerning defective engine pistons.[1]  More particularly, Plaintiffs James B. Moore ("Moore"), George Sandoval ("Sandoval"), Andrew Hinshaw ("Hinshaw") and Stephen Tresco ("Tresco")[2] requested certification of four statewide subclasses for consumers economically injured by the failure of Defendants to disclose class vehicle uniform engine defects.[3]  Class vehicles had a uniform defect in the engine pistons across EJ255, EJ257 and FA20 series engines resulting in premature failure of the piston ringlands caused by improper design and fabrication.  Class engine piston failures were further exacerbated by other design factors described *infra* at § B causing combustion pre-ignition/detonation.

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

Whether the district court acted within its discretion in certifying four state subclasses where the court carefully analyzed all of Defendants' criticisms of Plaintiffs' experts, found those experts to be reliable and capable of proving Plaintiffs' claims on a classwide basis, and determined that any individualized

---

[1] The two proposed class actions were consolidated by court order on July 6, 2022. *See Aquino* (ECF # 28) and *Amato* at A79 (ECF # 111).

[2] Moore, Sandoval, Hinshaw and Tresco are proposed subclass representatives for Indiana, Arizona, Michigan and New York, respectively. Definitions of the proposed subclasses are set forth *infra* at p. 30.

[3] "Class vehicles" include purchased or leased 2009 through and including 2018 model year Subaru Impreza WRX and WRX STi passenger vehicles sold in the United States.

evidence would not defeat the predominance of common issues.

## CONCISE STATEMENT OF THE CASE

### A.    Procedural and Factual History

The district court granted class certification after reviewing a fully developed record.    A9-66.    Plaintiffs' motion for class certification consisted of thirty evidentiary exhibits including deposition testimony, Defendants' marketing materials highlighting the aggressive "rally/racing" bona fides of the class vehicles, internal documents, engineering drawings and communications demonstrating Defendants' non-public internal efforts to correct premature engine piston failures. A684-1357.    Plaintiffs submitted in-depth briefing focusing on Rule 23 class certification requirements and the manner in which each of their claims would be proven *vel non.* A686-739. Requested supplemental briefing on ascertainability was also submitted (A2957-2965), and a class certification hearing convened on November 21, 2025. A9-66.  The resulting decision granting class certification was the culmination of a rigorous analysis of the relevant facts and law.  *Id.*

As noted, Defendants aggressively marketed their 2009 through 2018 model year WRX and WRX STi vehicles as precisely tuned, high horsepower muscle cars for track and rally enthusiasts. *See e.g.,* A875-895.   In reality, class vehicles possessed pistons that were constructed of cast aluminum rather than forged metal (A1094-96, A1099-1100), making an inferior manufacturing process resulting in

3

weaker, more brittle pistons than earlier model Subaru vehicles manufactured with forged pistons. Although SoA's Field Quality Assurance Director, John Gray, testified at his 30(b)(6) deposition that pistons should last the lifetime of the engine (*e.g.* well in excess of 100,000 miles) (A-860:10-A861:3), the resulting forces created by the aggressively tuned engines exceeded the brittle pistons' tolerance, resulting in premature and catastrophic engine failure. A1096-97

Despite Defendants' claim that Plaintiffs "shift[ed] their theories of causation" (Appellants' Brief at 6)[4], there has been only one simple theory susceptible to class treatment—class engine pistons were exceedingly weak and prematurely failed due to a confluence of factors well known to Defendants prior to sales of class vehicles. Class engine pistons were constructed of aluminum casting rather than stronger forged metal (A702-703) and paired with engines that were tuned too aggressively for the cast aluminum pistons to support. A701-702. Excessive turbocharger boost pressure together with other management operating parameters and engine components created a combustion condition known as pre-ignition/detonation. These conditions create excessive combustion forces acting on weak pistons causing premature failure. Subaru Corporation's Rule 30(b)(6) witness Ryutatsu Seki testified that engineering investigations of field-returned engine parts verified that

---

[4] Appellants' Brief is referred to herein as "App. Br.".

class engine pistons broke "in one time with a great input" and that analysis reflected a consistent "pattern" tied to pre-ignition/detonation.  A702-703.

Defendants were aware that class vehicle engine pistons were prone to premature failure.   As early as 2017, a confidential document produced by Subaru Corporation (the class vehicle designer and manufacturer) demonstrates that it had been testing redesign of the piston ringlands noting in schematics that the change was a "***strength countermeasure***" and included a "Crown obverse ***strength countermeasure***" and a "***Second [ring]land strength countermeasure***" followed by an adjustment to the "third [ring]land width." It noted "***Due to second [ring]land strength countermeasure,***" certain of the oil grooves in the third ringland "cannot be changed."  A863 (emphasis added).

Defendants concealed the overmatched pistons and hyper-tuned engine from class vehicle purchasers for years while they worked on improving and "strengthening" the pistons and re-tuning class vehicle engines.  When class engine pistons failed shortly after the expiration of the 5-year/60,000 warranty, SoA refused to repair or replace the engine for class members.  In its May 2018 Press Release, SoA finally announced the strengthening of pistons for the 2019 model year STi vehicles, resulting in the value of class vehicles without the "strengthened" pistons, (*e.g.* 2009 through 2018 model year class vehicles), diminishing.

5

Defendants' attempts to differentiate between their EJ255, EJ257 and FA20 class vehicle engines are similarly belied by their 30(b)(6) witnesses and the record evidence. Their testimony concedes that the composition of all engine pistons for the class vehicles was the same (A1088); they concede that these very components at issue here needed to be strengthened, as disclosed in SoA's May 2018 press release (A1600-1603); they admitted that their own internal records could not indicate how many piston failures have occurred because they were internally mischaracterizing piston failures as generic "short block" replacements rather than piston failure (A1084); that the internal report prepared to determine the number of damaged pistons was destroyed by Defendants (A858-59); that pre-ignition/detonation was a significant issue with the WRX and WRX STi class vehicle engines and a signature symptom of the defect which caused damage to piston ringlands; that the pistons were made of baked "sintered" metal rather than *forged* metal and that the former is weaker (A1094-96, A1099-1100) (which was subsequently strengthened for the 2019 WRX STi model year vehicles).[5]

Additionally, Defendants' discussion of the voluntary dismissal of prior plaintiffs is inaccurate, misleading and ultimately, irrelevant. In long-running

---

[5] Defendants' counsel at oral argument admitted on the record that Subaru failed to keep separate track of piston failures, stating "Subaru doesn't do it that way. They can't always trace it. That's a more general collection of engine failures." A27:14-18.

automotive defect litigation, it is hardly novel for claims to evolve through dispositive motion practice, discovery and the narrowing of parties and issues. Defendants offer no authority for the proposition that voluntary dismissal of some named Plaintiffs affects commonality or predominance where the remaining class representatives and absent class members present common proof of the Defendants' offending conduct and the alleged defect. Rather, Defendants take the illogical leap of imputing engine failures in class vehicles to "owner abuse and modification—not a uniform design defect," suggesting that modifications performed by the dismissed Plaintiffs are representative of the entire class, and exculpates class vehicle engine pistons. App. Br. at 7. Not only does Defendants' theory ignore the evidence submitted by the *actual* Plaintiffs herein, it also ignores, among other things, the myriad complaints of class members cataloged in the database maintained by the National Highway Traffic Safety Administration's ("NHTSA") Office of Defects Investigation concerning the piston ringlands failures at issue. *See e.g.,* A864-874. Defendants further ignore the testimony of Seven Muhammad ("Muhammad"), the automobile technician who testified that, at his shop alone (which specializes in Subaru vehicles including class vehicles) "we see hundreds of failed Subarus a year" and "we do at least 40 to 50 rebuilds a year… that's not even counting the ones that we see that people decide not to go with us." A927.

**B.    PLAINTIFFS' EXPERT AND FACT WITNESS TESTIMONY WAS CLEARLY QUALIFIED AND ADMISSIBLE**

**1. Dr. Bower's Report was considered by the district court and satisfied *Daubert***

Plaintiffs' automotive combustion engine design expert Dr. Glenn R. Bower opined class engines (EJ255, EJ257 and FA20) were defective with respect to the following four common interconnected issues: (1) improperly designed and manufactured pistons; (2) an engine management system that fails to properly manage fuel, turbocharger boost and other engine parameters; (3) a PCV (positive crankcase ventilation) system that allows engine oil, oil vapors and other gases from the crankcase to be recirculated to the combustion chamber resulting in pre-ignition and/or detonation; and, (4) improper owner's manual operation instructions/warnings which fail to instruct/warn class members not to apply full throttle while the engine is at low RPMs and the transmission is in 5th or 6th gear. A1285. Each of these conditions independently or acting in concert cause premature engine piston ringlands failure. *Id*. As part of his investigation of Subaru class vehicle engine piston ringlands failures, Dr. Bower reviewed hundreds of pages of technical publications and other scientific literature, class engine parts (including exemplar Subaru class and non-class engine pistons and PCV components), after-market and competitor vehicle PCV components and literature, class vehicle owner's manuals, deposition transcripts (including Plaintiffs and Defendants' Rule 30(b)(6)

8

designees), discovery responses together with a myriad of other materials. Dr. Bower's analytical techniques, evaluation methodology and protocols are accepted as standard practice by industry automotive engineers. A2059. As part of his investigation and analysis, Dr. Bower also consulted with mechanic Muhammad.

Despite Defendants' misrepresentation of Dr. Bower's investigation of class vehicles and resulting analysis, Dr. Bower's methodology and opinions are sufficiently reliable and fully satisfy the requirements of both *Daubert* and Fed. R. Evid. 702 governing the admissibility of expert witness testimony.[6] Dr. Bower is eminently qualified to render expert testimony in this matter and his opinions have sufficient reliability and fit.[7]

### 2. Muhammad's non-expert testimony based on his extensive personal experience was admissible as Judge Williams held

Despite Defendants' contentions, the identity of Muhammad as a percipient fact witness in this class action was properly disclosed during discovery in *Aquino* and listed as a witness relied upon by Plaintiffs' expert Dr. Bower in the subject

---

[6] Defendants' argument Dr. Bower should have performed some sort of testing is both wrong and an issue of weight. *Specter v. Tex. Turbine Conversions, Inc.*, 519 F. Supp. 3d 576, 590 (D. Alaska 2021) (argument that expert "should have done more—such as flight testing—and that his analysis is not sufficiently rigorous . . . go to the weight of [expert's] opinions, not their admissibility").

[7] Dr. Bower is a professor of mechanical engineering at the University of Wisconsin at Madison and has been involved in teaching automotive engineering and researching internal combustion engines for more than 20 years.

matter of Subaru engine design. There was no "ambush" with respect to Muhammad's involvement in this case and his anticipated testimony. Muhammad is an automobile mechanic and the owner and operator of DDA Tuned, an automotive repair and diagnostic shop specializing in Subaru vehicles. Muhammad is expected to testify as a percipient fact witness pursuant to Fed. R. Evid. 701.

In fact, Defendants subpoenaed Muhammad for a deposition (A473-78) and conducted the deposition on December 16, 2022. A897-1042  Defendants had a full and fair opportunity to explore his testimony. Defendants' questions to Muhammad opened the door to his testimony about what he learned from his extensive experience repairing Subaru class vehicles. After Defendants realized the impact of Muhammad's damning testimony (which they adduced in questioning) concerning engine piston ringland failure that destroyed hundreds of class engines repaired by Muhammad's shop (including Plaintiff Tresco's), Defendants attempted to preclude Muhammad's testimony by falsely arguing he was an undisclosed expert witness who failed to comply with Fed. R. Civ. P. 26(a)(2). A2070.

Muhammad's testimony is based on his personal experience and observations as the mechanic who serviced Tresco's class vehicle engine (both prior to its catastrophic engine failure and after) together with hundreds of other class vehicle engine failures he repaired. During the deposition of Muhammad, Defendants' counsel repeatedly asked his opinions concerning the causes of class vehicle engine

10

piston ringland failure, not only in Tresco's vehicle, but in the hundreds of class vehicle engines that Muhammad personally inspected, diagnosed and repaired. A1764-5.

Because they didn't receive the answers they hoped for, Defendants desperately attempted to preclude Muhammad's testimony that they are responsible for eliciting on the record. A2070. Defendants' motion to exclude Muhammad's testimony represents nothing more than buyer's remorse for deposing Muhammad beyond the scope of a fact witness concerning Tresco's vehicle, and repeatedly seeking his opinion based on his personal experience regarding the failed class engine pistons he regularly repairs at his shop. That Defendants repeatedly sought Muhammad's opinions, and deposed him as if he was a testifying expert, does not convert him into an expert witness. *See generally* A2665-2851.

Nor does Defendants' argument they were somehow surprised by him as a witness hold water, as Muhammad was timely disclosed and was subpoenaed by Defendants who deposed him. In *In re Tropicana Orange Juice Mktg. and Sales Prac. Litig.*, 2019 WL 2521958 at *8 (D.N.J. June 18, 2019) the court rejected a similar argument where there was sufficient witness disclosure, noting "there is no Rule 26(a) or 26 (e) violation since Defendant disclosed Spudie in its initial disclosures and in response to interrogatories . . . [and] Plaintiffs deposed Spudie in 2025." Similarly, here, Muhammad was disclosed and deposed.

As the district court noted during the class certification hearing (A25), Muhammad is a percipient witness—not only as to the cause of Tresco's class engine failure, but also for the hundreds of other EJ and FA class engines he repaired after suffering piston ringland failure caused by engine defects at issue in this litigation. The district court considered and rejected Defendants' motion to exclude Muhammad's testimony on the cause of class engine failure.  A25-26; A54-56.

This testimony was *in addition* to the direct causation testimony of Dr. Bower, not as Defendants falsely posit, in lieu of it.

### C.     After Reviewing the Evidence and Oral Argument the District Court Correctly Granted Class Certification

The district court reviewed Defendants' *Daubert* motions concerning the proffered class certification testimony of Plaintiffs' liability expert Dr. Glenn Bower, damages expert Dr. Sharp, and lay witness Muhammad, and Judge Williams acknowledged during the class certification hearing that she "dedicated tons of time to these [*Daubert*] motions" (A11:16-17) and that she "reviewed the motion for summary judgment and actually took some time reviewing the Motions in Limine with respect to the expert reports of Bowers, Sharp and then the testimony of Seven Muhammad." (A54).   In her review of Defendants' *Daubert* motions, Judge Williams was clearly persuaded that Bower and Sharp's opinions were the product of reliable principles and methods that fit the allegations at issue sufficient to inform the Court's decision that common questions could be resolved with common proof,

including expert testimony.  A65; Fed. R. Evid. 702.   There is no indication Judge Williams abandoned the court's *Daubert* gatekeeping function.  She reviewed the *Daubert* motions and determined that Bower and Sharp's testimony was admissible in determining class certification. *Id.*

With respect to Muhammad's testimony, the Court observed: "Defense counsel deposed him.  And in response to your questions, you elicit information that is quite, I'll say, interesting with respected [sic] to these ringland defects, piston ringland defects."   (A25).   Defendants understood Muhammad's experience repairing hundreds of WRX and WRX STi class engines (including Tresco's) gave him relevant personal and experiential knowledge.  Defendants' grousing about Muhammad's experience, observations, and testing/repair of engines is testimony Defendants themselves elicited.   During the class certification hearing, Judge Williams concluded that Muhammad's testimony should not be stricken, as it was wholly "experiential" and based upon his personal knowledge and could assist the trier of fact. A25-26.

Moreover, at the class certification stage, admissibility of Muhammad's non-expert testimony need not be determined. A district court is not limited to considering only admissible non-expert class certification evidence in evaluating class certification.  *See*, *Allen v. Ollie's Bargain Outlet, Inc.,* 2021 WL 1152981 at *5 n.5 (W.D. PA Mar. 26, 2021) *overruled on other grounds Allen v. Ollie's Bargain, Inc.,*

13

37 F.4th 890, 899 (3d Cir. 2022); *In re Front Loading Washing Mach. Class Action Litig.,* 2013 WL 3466821, at *10 (D.N.J. July 10, 2013) ("The Federal Rules of Evidence are not stringently applied during class certification and courts may consider evidence that might later be ruled inadmissible at trial.") (collecting cases); *Packer v. Glenn O. Hawbaker, Inc.,* 699 F.Supp.3d 333, 338 (M.D. Pa Oct. 25, 2023) (noting that while the Third Circuit has not addressed the issue of admissibility of nonexpert evidence at class certification, the Sixth, Eighth, and Ninth Circuits have held that "evidentiary proof required to satisfy Rule 23(b) need not amount to admissible evidence, at least with respect to not [sic] expert evidence.")(internal quotation marks omitted).

The district court here also concluded that Plaintiffs satisfied the predominance inquiry of Rule 23(b)(3) and that the liability issues can be proved with common evidence. "Given plaintiffs' omission-based theories and the statutory frameworks invoked, the Court finds that common questions of fact predominate..." A58.  The district court implicitly determined Plaintiffs have standing to represent the owners of all class vehicles.  Each class member overpaid for a defective vehicle, constituting economic injury at the point of sale which confers Article III standing. A40-41.  Despite the existence of minor and irrelevant variations between the EJ255, EJ 257 and FA20 class engines, Plaintiffs have standing to represent the class given the substantial similarity of the specific defective piston components incorporated in

14

each class engine including but not limited to, defective piston construction lacking piston oil cooling jets; inadequate air/oil separators causing the classwide signature symptom of piston damaging pre-ignition/detonation; and pistons manufactured using inferior aluminum casting, resulting in weaker, more brittle pistons. A48-49; A1094-97.

The district court also heard arguments regarding failure manifestation and causation. A43-48. Contrary to SoA's representation that only 0.76% of class engines failed, their claimed in-warranty repair rates were highly unreliable, as Defendants' counsel admitted at oral argument (*see*, n.6, *supra*). Defendants did not keep records of piston failures. Moreover, given there was a wide chasm between disclosed in-warranty failure rates and post-warranty failures which were not reported to Defendants. The vast majority of class vehicle engine failures occur after the applicable powertrain warranty expired and were not included in Defendants' manifestation rate since class members migrate from authorized Subaru dealerships to less expensive independent service once their vehicle's warranty expires. The 0.76% figure Defendants rely upon does not reflect the actual percentage of post-warranty piston failures. Muhammad's independent Subaru specialty repair facility alone repaired hundreds of class vehicles not included in SoA's engine failure count. A1764. Defendants knew there was a piston ringlands problem. In January 2016, SoA's Product Manager, Garrick Goh, asked his assistant to come up with a

15

justification for increasing engine piston strength, stating "We are trying to justify improving the design of the STi engine.  Can you tell me how many broken piston claims there were for each of these model years of these cars?"  A1944.  The email request included model year vehicles for both WRX STi and WRX models.  *Id.*  The response from his assistant, Linda Scott (A1944) was ***SoA never categorized WRX and STi piston failures as such, but instead categorized failures within the generic "short block replacement" category*** and that it would, therefore, be impossible to identify how many failures involved broken pistons.  (Scott: "I don't think we could come up with the numbers that you're looking for").  (emphasis added).  To add insult to that, SoA admitted through its 30(b)(6) witness, John Gray, that the internal report prepared to determine the number of damaged pistons was destroyed by Defendants. A858-59.  Defendants' underhanded attempt to inject a phony failure number of 0.76% into the record is outrageous when Defendants and their counsel admitted it never kept track of the information even for warranty repairs (it also concedes it has no information for out-of-warranty repairs).  To the extent it did have some information in a report, Subaru says that was destroyed.

## STANDARD OF REVIEW

The district court has broad discretion to certify a class or subclass under Rule 23.  Class actions "permit the plaintiffs to pool claims which would be uneconomical to litigate individually" and allow plaintiffs redress for wrongful conduct that would

otherwise "have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (internal quotations omitted).

The Third Circuit reviews class certification orders under an abuse of discretion standard. Such abuse occurs if the district court's decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re: Hydrogen Peroxide Antitrust Litig*, 552 F.3d 305, 310 (3d Cir. 2008), *as amended* (Jan. 16, 2009) (citation omitted) (holding that "[t]he trial court, well-positioned to decide which facts and legal arguments are most important to each Rule 23 requirement, possesses broad discretion to control proceedings and frame issues for consideration under Rule 23"). The Third Circuit reviews *de novo* legal standards applied by the district court. *See Neale v. Volvo Cars of North America, LLC*, 794 F.3d 353 (3d Cir. 2015) (citation omitted).

Here, the district court employed a rigorous analysis on all issues, determining that a class action is the proper mechanism under the facts presented. Affording the district court the broad discretion to which it is entitled, this Court should affirm class certification on all issues.

17

## ARGUMENT

### A.   THE DISTRICT COURT IMPLICITLY ADDRESSED PLAINTIFFS' ARTICLE III STANDING CONCERNING REPRESENTATION OF ABSENT OWNERS OF CLASS VEHICLES EQUIPPED WITH FA-SERIES ENGINES.

Defendants argue the district court abused its discretion in certifying this class action because it did not assess whether Plaintiffs had standing to sue on behalf of class vehicle models they did not own. "In order to have Article III standing to sue, a plaintiff bears the burden of establishing "(1) [an] injury-in-fact . . . that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) [a likelihood] . . . that the injury will be redressed by a favorable decision." *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (citations omitted). In a class action setting, Article III standing "exists if at least one named plaintiff meets these three requirements." *Id.* (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011)).

Plaintiffs have standing to represent owners of WRX and WRX STi class vehicles that they did not personally purchase where, as here, "(1) the basis of the claims is the same, (2) the products are closely related, and (3) the claims are against the same defendants." *Kavon v. BMW of North America, LLC,* 605 F.Supp.3d 622, 630 (D.N.J. 2022) (describing the three-part test developed by the Third Circuit, analyzing a named plaintiff's standing to bring claims on behalf of class purchasers

18

of different models.  *See Haas v. Pittsburgh Natl. Bank,* 526 F.2d 1083, 1088-89 (3d

Cir. 1975) (the "*Haas* Test") (collecting cases); *see also Chiulli v. Am. Honda Motor

Co., Inc.,* 690 F.Supp.3d 1038, 1048 (N.D. Cal. Sept. 6, 2023).  There is no dispute

all three of the *Haas* factors favor Plaintiffs here.  For the reasons argued in the

district court and that follow herein, FA-series class engines are closely related and

substantially similar to the EJ-series class engines purchased by Plaintiffs to confer

standing for all class vehicles.  Significantly, the defective components are

substantially similar across all three class vehicle engines as discussed by Dr. Bower

and Muhammad.

> **1.  Plaintiffs who own class vehicles equipped with EJ-series engines have standing to represent absent owners of class vehicles equipped with FA-series engines**

In determining class vehicle certification, Judge Williams reviewed all papers

submitted including the Bower Rebuttal Report (A1323-4) which addressed FA20

class engine standing issues raised by Defendants.  There is a sufficient basis to

include proposed class FA20 engines (WRX model years 2015 through and

including 2018) with the proposed WRX state subclasses utilizing the EJ255 engine

since the FA20 shares the key component defect attributes with the predecessor

EJ255 engine incorporated in the 2009-2014 WRX as well as the 2009-2018 WRX

STI with the EJ257 engine.  The Bower Rebuttal Report succinctly states the

common overlapping class engine defects of the EJ255, EJ257 and FA20 series class

19

engines incorporate similar defects.  The Bower Rebuttal Report summarized the

commonality of the relevant defective components:

> One of the incorrect opinions expressed in the Kuhn Report [SoA's expert] is that piston ring land failures experienced by EJ255, EJ257 and FA20 class vehicle engines are dissimilar because the engines are different. This opinion is incorrect because although there are some specification differences in the engines, ***piston construction, piston failure mode and other contributing engine failure factors are sufficiently similar to allow for a common analysis.  For example, all class engines use cast pistons manufactured from the identical aluminum alloy utilizing common methods by the same component part supplier.***  None of the class vehicle owner manuals have any instructions or warning concerning throttle application at low engine RPMs while operating the vehicle in high gears which subjects the engine pistons to destructive pressures and temperatures that predispose the engines to pre-ignition and/or end-gas detonation misfires that can cause piston damage.  If a hot spot is located in the center of the piston, it is common to use piston oilers that cool the piston crowns which reduce the incidence of pre-ignition and end-gas detonation; ***all Subaru class engines DO NOT have piston oilers. These engines also share a substantially similar PCV (positive crankcase ventilation) and crankcase/valve cover ventilation systems that allow excessive oil vapor into the cylinders thereby facilitating engine pre-ignition and/or end-gas detonation***. Class vehicle engines do not have [adequate] oil pan windage trays which are known to reduce excessive crankcase oil droplets and vapor from being generated. If the engine PVC system is not sufficient, these droplets are ingested into the engine's intake system. These oil droplets, in sufficient quantities, lower the overall octane rating of the cylinder charge and can facilitate pre-ignition and/or end-gas detonation.
>
> *Id.* (emphasis added).

As discussed by Dr. Bower, piston oil squirters (absent from all class vehicles)

play a crucial function in cooling high performance engine pistons by spraying oil

on the reverse side of the piston crown which reduces piston crown temperature and

lowers the incidence of damaging combustion preignition and end gas detonation together with ringland failure. *Id.*

*Sauer v. Subaru of Am., Inc*., 2020 U.S. Dist. LEXIS 55592, at *8–11 (D.N.J. Mar. 31, 2020) cited by Defendants (App. Br. 25, 36), is inapposite. *Sauer* held that an owner of a leased 2014 Subaru Forester XT equipped with a FA20 series engine lacked standing to assert claims on behalf of 2014-2016 Subaru WRX and STI owners whose vehicles were equipped with FA20, EJ255 and EJ257 series engines because the plaintiff failed to "allege sufficiently that the basis for her claims, relating to all Class vehicles, is the same or that the vehicle's engines are closely related." *Id*. The opposite circumstance exists here, as Subaru Corporation's Rule 30(b)(6) designee testified the piston chemical composition and method of manufacture (i.e., cast pistons) are identical as is the signature symptom relating to the piston ringland failure.　A1323-4 (Bower Rebuttal Report).　Dr. Bower also testified as to class engine defect similarities contributing to piston ringland failure, *supra*.

The district court acknowledged and directly considered the differences between the EJ255, EJ257 and FA20 class engines in determining class engine commonality and certification.　A48:11-15.　Judge Williams had more than an adequate basis for her certification decision.

21

The caselaw cited by Defendants is easily distinguished. In *McNair*, the named plaintiffs were former customers of a marketer of magazine subscriptions who lacked standing to represent current customers in an action seeking *only injunctive relief*, because the former customers lacked a likelihood of future injury. *McNair* is thus distinguished because the named plaintiffs were seeking injunctive relief pursuant to Rule 23(b)(2), not damages pursuant to 23(b)(3) and the court held that the injunctive relief sought would likely not affect them. Plaintiffs here suffered concrete monetary injury caused by Defendants' concealment of its defective class engines, and seek a Rule 23(b)(3) class for monetary damages to redress their injury.

*Frank v. Gaos*, 586 U.S. 485 (2019), cited by Defendants, considered whether *cy pres*-only class action plaintiffs suffered a concrete and particularized injury, as required for the injury-in-fact element for Article III standing. In the case of the *cy pres* action, any fund recovered would be distributed not to individuals but instead to nonprofit organizations. In contrast, the class representatives herein seek monetary damages to redress a concrete and particularized economic injury stemming from their purchase of class vehicles with an undisclosed defect. As summarized in Plaintiffs' motion to certify the class, "Plaintiffs each overpaid for defective vehicles, constituting an economic injury which confers Article III standing." A716. Alternatively, Plaintiffs seek reimbursement of repair costs for class members who suffered a ringlands failure.

### 2.    Defendants improperly conflate standing with typicality

Defendants also conflate the law on standing with Rule 23 typicality by arguing each subclass must be limited to models owned by their respective class representatives. Rule 23(a)(3) requires "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality exists where class members sustained injury resulting from the same conduct. To meet the typicality requirement, the representative plaintiffs must show their claims are "based on the same legal theory and arise from the same practice or course of conduct as the other class members." *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 259 (D. Mass. Sept. 14, 2005). "The central inquiry . . . is whether the class representatives' claims have the same essential characteristics as the claims of the other members of the class." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001) ("The typicality inquiry centers on whether the interests of the named plaintiffs align with the interests of the absent members.").

Plaintiffs argued below "[c]lass vehicles have a uniform defect in the engine pistons across EJ255, EJ257 and FA20 engines resulting in premature failure of the piston ringlands caused by the improper design and materials." A697. The claims of all Plaintiffs and state subclass members are based on Defendants' common course of wrongful conduct concerning marketing and selling of class vehicles with

common engine piston defects that are class-wide while omitting to disclose this material information. Each Plaintiff/class representative owned a class vehicle (all except one were purchased from an authorized Subaru dealer); each Plaintiff/class representative paid an inflated price for their respective class vehicle based on Defendants' concealment of defects. Defendants also knew engines incorporated in class vehicles were defective and that the accompanying owner manuals were inadequate. Yet, Defendants uniformly failed to disclose the engine defects and acted to conceal the defects from Plaintiffs and the proposed state subclasses. Defendants' knowledge of the engine and manual defects and concealment of that information will be proven with evidence applicable class-wide. The legal theories Plaintiffs assert are identical to those available to the class and/or members within each state subclass. Each of the Plaintiffs and class members allege economic damages as a result of Defendants' uniform course of wrongful conduct. Consequently, the district court correctly held typicality was satisfied. A56-57.

"Minor differences in how defendants treated different plaintiffs (or putative class members) does not render the claims atypical." A716 (citing *Garcia v. E.J. Amusements of N.H., Inc.*, 98 F. Supp. 3d 277, 288 (D. Mass. April 13, 2015)). In finding that the Rule 23(a) requirement of typicality was satisfied, the district court necessarily determined that standing was also met.

24

As the Eleventh Circuit stated in *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (a case cited by Defendants at App. Br. 26):

> Neither of these requirements [i.e. typicality or commonality] requires that all putative class members share identical claims. Previously, we have explained that these requirements may be satisfied *even if some factual differences exist between the claims of the named representatives and the claims of the class at large.* However, we do require that the named representatives' claims share the same essential characteristics as the claims of the class at large. In making this determination, we have concluded that a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences.

*Id.* at 1279 n. 14. (internal quotation marks and citations omitted) (emphasis added).

*Simmons v. Ford Motor Company,* 592 F.Supp.3d 1262 (S.D. Fla. 2022), cited by Defendants (App. Br. 27), is distinguishable on the facts and law. In *Simmons,* the alleged defect concerned corrosion of aluminum panels and exterior paint that allegedly bubbled and peeled off 2013-2016 Ford Mustangs, 2013-2017 Ford Expeditions, and 2013-2018 Ford Explorers. *Id.,* at 1271, 1275. The *Simmons* court noted "the Mustang and Explorer are not remotely similar vehicles. The Mustang is a two-door compact car while the Explorer is a midsize SUV." *Id.,* at 1279. In addition to having vastly different body styles and hood shapes in *Simmons*, those vehicles also used different corrosion protection systems. *Id.* Here, the WRX STi and WRX are both sedans, as the WRX STi is a variant of the WRX. Moreover, regardless of model year and engine series, all class engines incorporated the same aluminum casting manufacturing process for their pistons.

25

*Simmons* is further distinguishable in its application of Article III standing. Contrary to this Court's holding in *Haas* and its progeny, *Simmons* held that plaintiff lacked standing because the "wide array of models and model years" were not "identical," applying a more restrictive standard than *Haas'* requirement of "closely related" products. *Id.,* at 1279.

The district court implicitly determined that Plaintiffs possess Article III standing, and that the claims of Plaintiffs and the putative class members aligned and satisfied the Rule 23(a) typicality requirement.

### B. THE DISTRICT COURT DID NOT ABDICATE ITS GATEKEEPING FUNCTION IN ITS REVIEW OF BOWER, SHARP AND MUHAMMAD'S TESTIMONY

The district court fully reviewed the *Daubert* motions concerning the proffered class certification testimony of Plaintiffs' experts Bower (automotive engineering), Sharp (economic damages) and lay witness Muhammad (Subaru mechanic and percipient fact witness). As part of the process, Judge Williams "personally dedicated tons of time to these motions." A-3:16-17. This contention is further demonstrated by the oral argument convened to allow all parties to be heard on the issue of class certification:

> THE COURT: All right. So as I indicated, the Court has been going through these submissions and the motion for class certification, briefly reviewed the motion for summary judgment and actually took some time reviewing the Motions in Limine with respect to the expert reports of Bowers, Sharp and then the testimony of Seven Muhammad.

After having reviewed the motion for class certification, the Court requested that the parties provide supplemental briefing with respect to ascertainability and the threshold requirement there.

THE COURT: And you all know administratively termination just means it's not actively being considered by the Court, but as you also should have recognized, based on part of the comments that I made with respect to Bowers, Sharp and Seven Muhammad, I have reviewed these [*Daubert*] motions, and in some respects relied on what I read in the expert testimony as to one of the prongs for 23(a), which I must, so it's going forward.

A-46:20-25; A-57:6-14.

Although the district court did not draft formal *Daubert* decisions, it met its

burden under *In re Blood Reagents Antitrust Litigation*, 783 F.3d 183 (3d Cir. 2015),

which held that a district court must scrutinize and resolve *Daubert* challenges to

demonstrate conformity with Rule 23. *Id.* at 185. Here, the district court reviewed

the *Daubert* motions and credited the expert testimony that Plaintiffs proffered.

Judge Williams expressed no reservation or caveat that Bower, Sharp or

Muhammad's testimony was unripe or lacked admissibility. By contrast, in *In re*

*Blood Reagents*, the court evaluated the expert testimony and held that it "could

evolve to become admissible evidence." *Id.* at 188.

Here, the district court was acutely aware of evidentiary admissibility issues

raised in Defendants' *Daubert* motions. These objections were addressed and

implicitly rejected by the court. A106-67. Judge Williams' grant of class

certification was not an abuse of discretion because it did not "rest[] upon a clearly

27

erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 312 (3d Cir.2008) (citation omitted).

The Third Circuit should consider the logic and reasoned approach utilized by the Eighth and Ninth Circuits, where analyses of the expert at the class certification stage is cabined by the class certification issues and therefore utilize a limited *Daubert* assessment. In *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 614–15 (8th Cir. 2011), the Eighth Circuit acknowledged that "[c]lass certification is inherently tentative, and may require revisiting upon completion of full discovery. Zurn's desire for an exhaustive and conclusive *Daubert* inquiry before the completion of merits discovery cannot be reconciled with the inherently preliminary nature of pretrial evidentiary and class certification rulings." *Id.* at 613 (internal quotation marks and citations omitted). In holding that a "focused *Daubert* analysis" that was not "full and conclusive" was sufficient in the class certification context – much like the circumstances in the instant case – the *Zurn* court made clear that:

> The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated at the class certification stage where the judge is the decision maker. The district court's gatekeeping function under *Daubert* ensures that expert evidence submitted to the jury is sufficiently relevant and reliable, but there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.

28

*Id.* at 613 (internal quotation marks and citations omitted); *see also Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1003–06 (9th Cir. 2018) (finding this analysis persuasive, and stating that "admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage.  This approach accords with our prior guidance that a district court should analyze the persuasiveness of the evidence presented at the Rule 23 stage.") (internal quotation marks and citation omitted). *See also Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 394 (E.D.N.Y. 2022) (inquiry into expert's applicability at class action stage is cabined by the requirements of Rule 23) (collecting cases).

In sum, the district court fully considered the respective motions in limine and while it did not issue a separate, formal decision, its consideration of the issues raised in those motions in coming to its reasoned opinion is sufficient.

## C.  THE CERTIFICATION ORDERS COMPLY WITH RULE 23(c)(1)(B)

The Class Certification Orders in these consolidated cases state as follows:

- The Court CERTIFIES four statewide subclasses (NY, AZ, IN, MI) as statutory consumer protection claims; and

- The Court CERTIFIES the negligent misrepresentation claims for the NY, AZ and IN subclasses only; and

- The Court DENIES certification of the negligent    misrepresentation claim for the MI subclass.

A2-A8.   The Court noted that "[w]hile some individual submissions may be excluded for lack of adequate documentation, this does not create the type of individualized mini-trials that the Third Circuit's ascertainability precedents prohibit." A5, A8.

Plaintiffs defined the NY, IN, AZ, and MI subclasses in their class certification motion papers as follows:

1. **New York Subclass:** All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in the State of New York ("proposed New York subclass members"). Excluded from any diminution of value class are class members who sold their vehicles prior to the SoA May 2018 press release.

2. **Indiana Subclass:** All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in the State of Indiana ("proposed Indiana subclass members"). Excluded from any diminution of value class are class members who sold their vehicles prior to the SoA May 2018 press release.

3. **Arizona Subclass:** All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in the State of Arizona ("proposed Arizona subclass members"). Excluded from any

30

diminution of value class are class members who sold their vehicles prior to the SoA May 2018 press release.

4. **Michigan Subclass:** All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in the State of Michigan ("proposed Michigan subclass members"). Excluded from any diminution of value class are class members who sold their vehicles prior to the SoA May 2018 press release.

A709.

The class definition carve-out of the "diminution of value class" for class members who sold their vehicles prior to the May 2018 Press Release is neither difficult to understand nor "fraught with ambiguity." App. Br. at 39. The exclusion of class members who sold their vehicles prior to Defendants' May 2018 Press Release accounts for class members who were able to recover their price premium prior to market corrections (*e.g.* reduction of class vehicle value) stemming from Defendants' disclosure of its inferior pistons, and is designed to prevent the "windfall" that Defendants wrongly speculate. *See* App. Br. at 48.

In *Wachtel v. Guardian Life Ins. Co. of America*, 453 F.3d 179 (3d Cir. 2006), the Third Circuit held that the classes must be "readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion. *Id*. at 185. This standard is met here. Despite Defendants' contention, *Marcus v.*

31

*BMW of North America, LLC*, 687 F.3d 583 (3d Cir. 2012) (App.Br. 26 *et seq.*) does not require a remand merely due to a cross-reference to the motion papers. Rather, the class definition in that case was "not clear and precise." The court indicated that the "parameters of Marcus's class definition are far from clear" and contained an "ambiguity." *Id.* at 592. Likewise, the class definition in *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115 (3d Cir. 2018) (App. Br. 20, 24) had more egregious issues than a mere cross-reference. In that case, the court held, "Although we have declined to impose a strict format necessary to meet Rule 23(c)(1)(B)'s requirements, we have explicitly rejected orders that force us to 'cobble together ... various statements' and 'comb the entirety of its text' in search of 'isolated statements that may add up to a partial list of class claims, issues, or defenses.' *Wachtel*, 453 F.3d at 188 n.10, 189. The district court's order here requires us to do just that, and thus remand is warranted."

In contrast, the subclasses here are clear and easy to decipher and do not warrant remand. Defendants' claim class definitions fail to address modifications of class engines lack merit. App. Br. at 39. As argued class certification hearing, Plaintiffs and the class's economic injury occurred at the point of sale, regardless of whether any modifications were performed on class vehicles after purchase. A19, A43-44, A46.

The next step of this proceeding, notwithstanding this appellate detour, would have been to put together the class notice at which stage Defendant would have had ample opportunity to propose additions, edits or deletions to the definition that was put forth in the Motion for Class Certification and accepted by the Court.  To the extent Defendants had a concern, the concern could have been raised directly with the district court during that process and any reasonable adjustments made.

Finally, to the extent the district court inadvertently certified the dismissed Michigan statutory consumer protection claim (A4, A7), this Court can directly correct the district court's scrivener's error by removing Michigan from the other statutory consumer protection claim subclasses rather than requiring remand to the district court. *See* Fed. R. Civ. P. 60.

### D.  THE DISTRICT COURT CONDUCTED A RIGOROUS RULE 23 ANALYSIS

#### 1.    The district court adequately considered the differences in the EJ and FA-series class engines

As discussed *supra*, *Sauer* has no procedural or substantive relevance here. Plaintiffs' automotive engine expert Dr. Bower and lay witness Muhammad's testimony demonstrated the commonality of defects incorporated in the EJ and FA class engines in detail with respect to the individual overlapping design defects. *See supra* at § A.1.  Defendants' own admissions acknowledging weak class engine pistons were also presented to the court in class certification papers.  A702.  As

33

discussed *supra*, in January 2016, SoA's Product Manager, Garrick Goh, asked his assistant to provide a justification for increasing piston strength, stating "We are trying to justify improving the design of the STi engine. Can you tell me how many broken piston claims there were for each of these model years of these cars?" A1944. This informational request included model year vehicles for both the WRX STi and WRX class engines. *Id*.

Here, Defendants acknowledged the piston defect affected all three class engines in the same manner. "That weighing expert opinions is proper does not make it necessary in every case or unlimited in scope.... In its sound discretion, a district court may find it unnecessary to consider certain expert opinion with respect to a certification requirement, but it may not decline to resolve a genuine legal or factual dispute because of concern for an overlap with the merits." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187-188 (3rd Cir. 2014). *Compare In re: Ford Motor Co.,* 86 F. 4th 723, 728 (6th Cir. 2023) (district court failed to consider two "key" interim design modifications which Ford claimed cured the brake defect in certain class vehicle models). All class engines incorporated the same aluminum manufacturing process resulting in brittle, weak pistons.

### 2. The district court adequately analyzed causation and defect manifestation as common issues

All automotive product liability class actions require a certain level of individual inquiry during the post-settlement administrative stage where vehicle

34

ownership, maintenance and service receipts are scrutinized for purposes of repair reimbursement or future warranty coverage. Given the cost of an automobile and the extensive records generated during its ownership and use, there are adequate records to determine causation and defect manifestation.[8] This scrutiny weeds out claims failing to satisfy the settlement agreement requirements. For instance, most automotive class action settlements require proof of ownership, repair and payment together with maintenance records and other validation documentation. The district court fully considered causation and defect manifestation as demonstrated by its request for supplemental briefing on the issue of ascertainability and discussion during the class certification hearing. A22:19-21. That there is an infinitely administratively feasible methodology to administer any class relief is clear from the many automotive class actions which have been settled and utilize a claims administrator to review the ownership, repair and expense documentation and make deliberate decisions thereon. Indeed, Defendants use this same methodology in those class action settlements (*See Salceda* Settlement documents reprinted at A2478-

---

[8] Given the multitude of vehicle electronic sensors and engine operational parameters stored by class vehicle engine management computers, most claims of "abuse" and "product modification" are readily detectable via max value downloads routinely performed at authorized Subaru dealerships. Here, several proposed class representatives withdrew their claims not because they were not class members who were injured when they overpaid for their vehicles, but because product modification would have caused unique defenses to those claims, making them inadequate as class representatives in class counsel's respective opinion.

2484, which outline the administratively feasible payment proceeding instituted by SoA through a claim administration entity for class members' out-of-pocket payments for repairs resulting from the stated defect).

Although Defendants cite *Marcus,* 687 F.3d 583 as controlling precedent, this analysis is incorrect. *Marcus* concerned vehicles equipped with run-flat tires. As the Third Circuit panel noted, tires are wear and tear items which will deteriorate and, because they directly interface with the road, they encounter all kinds of external reasons to become flat. Here, the alleged defect concerns an internal engine part (engine piston) that is expected to last the life of the vehicle and not normally subject to maintenance or repair if properly designed. A860:10-15. Under the causation interpretation advanced by Defendants, no automotive product liability class action is class certifiable unless the defendant assents to certification.

### 3. The district court properly analyzed material differences in state law prior to certifying the four state subclasses

The transcript of the class certification hearing demonstrates the district court properly analyzed the material differences in the four state subclasses prior to certifying those classes. A57-9. With respect to the four state subclasses, the district court ruled:

> The central liability issues here are susceptible to common proof. However, proof of manifestation and causation may vary significantly for certain claims, particularly

negligent misrepresentation, which under some state laws may require individual reliance.

Given plaintiffs' omission-base theories and the statutory frameworks invoked, the Court finds that common questions predominate for the statutory consumer protection claims under New York, Arizona and Indiana law.

For negligent misrepresentation, predominance is a closer question. In Michigan, individualized reliance could not predominate. So the Court will certify the statutory claim for all four states and the negligent misrepresentation claim for New York, Arizona, and Indiana only.

*Id.* at A57-8.

Other than the Michigan statutory consumer protection claim (*see* Argument Section C *supra*), this Court should not disturb the certification of these claims.

### 4. Defendants' reliance on *Speerly* is fatally flawed and should be rejected and notwithstanding that, Plaintiffs did an element-by-element analysis of the claims while Defendants failed to do so

Defendants' argument that the Sixth Circuit *Speerly* opinion[9] is controlling is fatally flawed for a number of reasons.

As the Court is aware, this action asserts claims for purchasers and lessees of class vehicles in four (4) states: New York, Arizona, Indiana and Michigan and seeks to certify classes based on the consumer fraud statutes of three of the states (New

---

[9] *Speerly, et al. v. General Motors, LLC*, 143 F.4th 306 (6th Cir. 2025) ("*Speerly*").

York GBL § 349, Arizona AFCA and the Indiana IDCSA) and common law claims of negligent misrepresentation for four states.

In contrast, the overriding issue in *Speerly*—one which the Sixth Circuit continually referenced throughout the opinion—was that the multi-state classes certified by the district court were sprawling and unmanageable. Those claims involved 26 state-wide subclasses and a total of 59 state-law claims which consisted of an amalgam of claims for express warranty, implied warranty, consumer protection laws and fraudulent omission.

The Sixth Circuit expressed its concern that the claims were simply too diverse and wide-ranging for a jury to determine the issues of law and fact on a class-wide basis.[10] The court noted in starting out its predominance analysis at 320 that:

> *First*, there are high costs to a legal system that asks one district court to understand and apply nearly 60 causes of action across 26 states. In taking on that task, the court must follow the decisions of the state's highest court when that court has addressed the relevant issue. [internal citation omitted].

The court again noted the logistical predicament involving 59 claims from 26 states *(Id*. at 320-21):

> A bulky multi-state class action forces a federal court to play "central planner" to 26 state economies under "one case, one court, one set of

---

[10]Significantly, the court held that ***all of the other Rule 23(a) and (b) factors were present***: "[A]t this stage, we have no reason to dwell on many of the district court's class-action determinations: numerosity, typicality, adequacy of representation, and superiority. No one challenges the district court's handling of them in this interlocutory appeal." *Id*. at 316.

rules," and "one settlement price for all involved." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002).

*　　　　*　　　　*

Would the court use hundreds of citizens to form 26 juries, one for each state? If it did, how would it demarcate subtle differences in state laws to comply with the Seventh Amendment's command that "no fact tried by a jury, shall be otherwise reexamined"? More complicated still, would the court empanel one jury to crown the winner, what amounts to empowering six Michigan citizens to predict 59 rules of the road for 26 state commercial and consumer norms? If the court took this approach, must it face head-on the "impossible task of instructing a jury on the relevant law" and provide 59 pages of verdict forms? . . . . Rule 23(b)(3)'s mandate that we consider "the likely difficulties in managing a class action" in assessing predominance, and the reality that "federal class action[s] based on state law" "undermine federalism," *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 745 (7th Cir. 2008)—deserve serious consideration before certifying such a large class.

Another court expressly confined *Speerly* to that ilk of sprawling unmanageable cases. That court was — none other than the Sixth Circuit. In *In re Humana*, 163 F.4th 376 (6th Cir. 2025), a mere six months after *Speerly*, the Sixth Circuit refused to apply *Speerly* to a class certification decision. It rejected applying *Speerly* to the more manageable *Humana* case, noting it did so because *Speerly* involved 26 state subclasses and 59 state law claims and *Humana* was streamlined. *Id*. at 382.

The overriding concerns of the *Speerly* court, clearly expressed as "the likely difficulties in managing" the class action (*id*. at 320) are simply not present here. This case involves only three state consumer protection statutes and the common law claim of negligent misrepresentation. In addition, the class vehicles are inter-

39

related vehicle models—the WRX and the WRX STi.   Thus, the issues of determining whether a "defect" existed with regard to the engine pistons and whether there was a material omission by Defendants in withholding that information from purchasers and lessees are simple questions, which a jury can determine in an efficient manner in the context of a class action trial.

In their motion to consolidate the *Amato* and *Aquino* actions, defense counsel acknowledged that "[g]iven the nearly perfect overlap between these two cases, consolidation, if implemented appropriately, would serve as a particularly effective means of promoting judicial economy."  *Amato* ECF # 85-1 at 12.

In contrast to *Speerly*, this litigation is comprised of only three consumer protection claims and one negligent misrepresentation claim.  Plaintiffs' Class Cert Memo, starting at A2982, addressed in detail the elements of each of the three consumer fraud claims and then, for each, addressed the commonality of evidence with respect to determining classwide liability and damages.   The memorandum analyzes common evidence supporting each claim.  *Id*. at A2982. The New York § 349 claim is analyzed at A2982-83.  The Indiana IDCSA is analyzed at A2983-84.  The Arizona Consumer Fraud Act elements are analyzed at A2984-86. Negligent misrepresentation claims are analyzed at A2986-91.

The Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (starting at A2391) ("Reply Memo") at A2421 (p. 17) analyzes "The

Liability Issues For Each Claim May be Established with Common Evidence." In addition, the Reply Memo analyzes the evidence as it relates to each element of each claim.

Ironically, while Plaintiffs' Cert. Memo and Reply Memo followed the same analysis as suggested by the non-binding Sixth Circuit *Speerly* opinion, ***Defendants failed to do so in opposition to the class certification motion***. Plaintiffs' Reply Memo even took notice and singled this important deficiency out to the Court:

> Defendants have failed to analyze the proof which would be required for each element of the asserted claims and whether proof of that element is susceptible to classwide evidence. Defendants also fail to address the elements for these claims. . ..

Reply Memo at A2420.

Thus, it is Defendants who failed to follow the analysis suggested by the court in *Speerly*, not Plaintiffs.

Notably Judge Williams had the element-by-element analysis by Plaintiffs but none by Defendants who conceded the argument in that regard below, and thereby waived any such argument which was not preserved. Hence, the district court was well within its bounds to rely on the in-depth analysis by Plaintiffs to the exclusion of Defendants' failures to actually do *any* such analysis.

In sum, the *Speerly* court was concerned with the absence of an element-by-element analysis. However, this was in fact performed here by Plaintiffs. Given that this litigation includes two related vehicle models, three state consumer law

41

claims and one negligent misrepresentation claim, it is respectfully submitted that the Court reject the Defendants' proffer of the interlocutory *Speerly* decision as controlling law and certify the proposed classes here.

Notably, the other cases cited in support of Defendants' *Speerly* argument are wholly inapposite. *In re Nissan N.A., Inc. Litig.*, 122 F.4th 239 (6th Cir. 2024) highlights this contention as it involved claims asserted on behalf of classes from ten states and involved 14 different model vehicles, which were alleged to have a defective automatic braking system, but some of the models involved had received up to two software updates which fully resolved the issue. *Id*. at 245, 248. This case, in contrast, involves engine pistons in all class vehicles, only the WRX chassis-vehicles and only the consumer fraud and negligent misrepresentation claims for a maximum of four states. The issues are exceedingly more confined than in either *Nissan* or *Speerly*. The *Nissan* decision is helpful to Plaintiffs because the court distinguished the *Nissan* facts from its prior decision in *Daffin v. Ford Company*, 458 F.3d 549 (6th Cir. 2006) where certification was affirmed. The court noted that in its prior *Daffin* decision:

> We approved and certified the class because a single product - an identical throttle body in each car—presented a common question of defect amenable to classwide resolution.

*Id*. at 552.

42

The facts of *Daffin* resemble those in the present appeal: One chassis; one component (e.g., ringlands); one defect; which is material and essential to the functioning of the engine as a whole; and one knowing material omission by Defendants about that component.

### E. PLAINTIFFS HAVE PROPERLY ASSERTED METHODOLOGIES TO DETERMINE CLASSWIDE DAMAGES

Plaintiffs presented two benefit-of-the-bargain models which have been readily accepted by courts: the price premium model and the cost-of-repair model. Defendants did not contest the qualification or methodology of Plaintiffs' damages expert, Dr. Sharp, who utilized a well-established hedonic regression model, approved in other class actions.[11] At the class certification stage, Plaintiffs need only demonstrate that there is a methodology to determine classwide damages. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.,* 421 F. Supp. 3d 12, 40 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020) ("[A]t the class certification stage, district courts need not search for 'hard factual proof, but [instead] for a more thorough explanation of *how* the pivotal evidence behind

---

[11] Dr. Sharp's hedonic regression damages analysis has been accepted in other automotive defect class actions. *See Hamm v. Mercedes Benz USA*, 2021 WL 1238304, at *9-10 (N.D. Cal. April 2, 2021) and *Aberin v. Am. Honda Motor Co., Inc.,* 2021 WL 1320773, at *12-15 (N.D. Cal. Mar. 23, 2021).

plaintiff's theory can be established'") *quoting In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008) (emphasis in original).

Defendants improperly attempt to frame Plaintiffs' theory of damages offered by economic expert D.C. Sharp, Ph.D., ("Dr. Sharp") which was not limited to repair-cost injury for owners whose engines catastrophically failed. As explained by Dr. Sharp, Plaintiffs are also pursuing economic injury based on (1) an inflated price premium for class vehicles sold without disclosure of a known material defect and (2) diminution in value following SoA's 2018 announcement that it strengthened pistons and retuned the engine.[12] These economic injuries do not require every class member's engine to prematurely fail, particularly where evidence demonstrates the engine defect is internal, latent, and present at time of sale. A1102-1145; *see also,* A1553-1644.

### 1. The price premium or diminution of value damages model presents a methodology to determine classwide damages

The damages for each claim are easily demonstrated here. Damages under GBL § 349 can be demonstrated by showing that a plaintiff paid a price premium attributable to defendant's false statement or concealment. *Eidelman v. Sun Products Corp.*, 2022 WL 1929250 (2d Cir. 2022) ("[A] reasonable jury could conclude that

---

[12] Class vehicle engine pistons are critical internal engine components expected to last the life of the vehicle which is well in excess of 100,000 miles. A1676.

44

some of the price premium which [plaintiff] paid was attributable to Defendants' alleged deception and [plaintiff] was therefore injured within the meaning of §349 and 350).

Dr. Sharp's price premium model is based precisely on the material omission central to this case and demonstrates a price premium was paid due to a material omission.[13]  In *Dial Corp. v. News Corp.,* 314 F.R.D. 108 (S.D.N.Y. June 18, 2015) the court approved a hedonic regression model designed to isolate and calculate the damages, similar to the one presented here by Dr. Sharp. *Id*., at 115-16 ("The real question . . . is whether the plaintiffs have established a workable multiple regression equation, not whether plaintiffs' model actually works.").

In *Heward v. Thahab*, 2021 WL 1947508 (D.Ariz. May 14, 2021) the Arizona district court held defendant violated the ACFA and damages were determined based upon the difference between the price plaintiff paid for the vehicle and the actual value of the vehicle had plaintiff been aware of the material facts which were concealed.  *Id. at *6-7*; *see also In re Arizona Theranos Inc., Litig.,* 256 F.Supp.3d at 1028 (holding plaintiffs asserted a cognizable claim for damages by alleging "that

---

[13] Each Plaintiff testified had he known of the engine defect he would not have purchased his class vehicle or would have paid less. A1218; A1230; A1243-44; A1266. In the case of Sandoval, payment of a price premium was graphically acted out when he actually attempted, post-disclosure, to sell his 2018 STI vehicle for the price Subaru had **guaranteed** he would get on a trade-in, and even Subaru refused to pay that "guaranteed" price because of the engine defect in 2018 vehicles. A1244.

they would not have purchased Theranos blood tests if they had known that defendants were using their blood samples for research and product development.”). The court used the artificially inflated price as the measure of damages under the ACFA.

The injury in a price premium case occurs at the point of sale. Whether the defect manifests or whether the WRX or STI owner subsequently modifies the class vehicle is not relevant to the damages model. Accordingly, the price premium model should be relevant for each jurisdiction here.

Defendants' claim Dr. Sharp's models calculate damages for uninjured owners, like Plaintiffs Hinshaw and Tresco who purchased their vehicles after Defendants' May 2018 Press Release lacks merit. App. Br. at 48. Hinshaw purchased his class vehicle in October 2018—five months after SoA's May 2018 disclosure of the piston defect. A1265. Dr. Sharp opined that class vehicle prices may not have fully adjusted immediately following SoA's May 2018 disclosure, such that there was a price adjustment period in the months immediately following, including at the time when Hinshaw purchased his class vehicle in October 2018. A2466 at ¶ 24. One of the advantages of using the January-to-January data that Dr. Sharp's regressions incorporate, is it accounts for the price adjustment period between May 2018 to January 2019, to include class members, such as Hinshaw, who purchased or sold their class vehicles during this period. *Id.* Alternatively,

Hinshaw's damages can also be measured by the cost of repair model.  A2466-67 at ¶¶ 25-27.

Tresco purchased his class vehicle in 2020 and shortly after experienced piston failure requiring out-of-pocket repair costs, his damages are adequately measured by Dr. Sharp's cost of repair model.  *See* A2467 at ¶ 27.

Under either or both -- the diminution of value model or the cost of repair -- Plaintiffs demonstrated economic models capable of calculating class-wide damages consistent with their theories of liability, which "fit" the facts attendant to each of the named Plaintiffs.

### 2.  The cost of repair model has also been adopted by courts

The damages repair model has been adopted by some courts in recognition class members who were required to make repairs have already suffered discernable injury.  In *Chapman v. GM, LLC*, the court found two models appropriate: a repair model and an overpayment model. 2023 WL 2746780, at *20 (E.D. Mich. Mar. 31, 2023) (finding "[t]he repair model is designed to calculate the damages class members had to pay out of pocket to repair their vehicles if they experienced catastrophic failure.  This accords with plaintiffs' theory that certain class members suffered damages in the form of repair cost . . .." and that the overpayment model was designed to compensate class members who "were damaged by overpaying for defective vehicles").  The liability theory was not that class members viewed false

advertising ***but that defendants failed to disclose a known material design defect***.

*Id*. at \*10; *see also Falco v. Nissan N. Am., Inc.*, 2016 WL 1327474, at \*11-12 (C.D. Cal. Apr. 5, 2016). The Ninth Circuit expressly approved the cost-of-repair approach in *Nguyen v. Nissan N.A.*, 932 F.3d 811, 821 (9th Cir. 2019), noting plaintiff's average-cost-of-repair method was used, not for any actual repair that occurred, but as "***a proxy for [his] overpayment of the vehicle at the point of sale***." (emphasis added). *Id*. The court then held that whether the "proposed calculation of the replacement cost is accurate. . . are merits inquiries unrelated to class certification." *Id.* As Defendants concede, Plaintiffs Tresco and Hinshaw paid for repairs out-of-pocket and were clearly damaged under the cost-of-repair methodology. Those class members who purchased class vehicles prior to the May 2018 Press Release all suffered benefit-of-the-bargain damages in the form of payment of a price premium at the point of sale.

*Little v. Kia Motors Am., Inc.*, 242 N.J. 557 (2020), which proceeded through trial, demonstrates the flexibility afforded in class action litigation to the determination of damages. Damages for repairs were subsequently determined by a Special Master.

In *Little*, the plaintiffs asserted two theories of damages, diminution damages and average-cost-of-repair. *Id.* at 564-5. At trial, the jury rejected diminution damages, but found an average-cost-of-repair for the class members of $750. *Id.*

48

After trial, the court determined that rather than the average-cost-of-repair, a more appropriate method would be to appoint a Special Master and have class members submit claims for their paid repairs if they, in fact, had paid for repairs. *Id.* at 565.

After that process occurred and class members with qualified claims were approved for payment, the parties appealed. The Appellate Division reversed and found the trial court should have reverted to the jury's cost-of-repair damages. *Id.* Defendant was given leave to appeal the Supreme Court. The New Jersey Supreme Court reversed and upheld the trial court's original methodology of allowing a Special Master to determine the actual repair amounts. *Id.* at 566, 594. The Supreme Court remanded for finalizing the class distribution process. *Id.* at 594-95. A similar methodology is workable here.

Defendants are well-familiar with the submission-of-repair-claims process which is easily manageable and done in every auto defect class action settlement. In the *Salceda v. Subaru* settlement, SoA and class counsel retained a claims administrator to do just that (reprinted at A2478-2484). Determination of qualified repair claims in an auto defect class action is ministerial, eminently manageable and commonly done.

Accordingly, to the extent a subclass of class members do not fall within the diminution of value category because of when they may have purchased their vehicle, a subclass of class members who purchased post-May 2018 is a viable

alternative either within the repair subclass or in connection with assessing damages through a process occurring after a trial on the merits of the claims (either as a bifurcation of damages or in a process similar to *Little*).

### 3. Courts universally acknowledge that individual damages issues do not defeat predominance and can be addressed   separately

While individual issues may exist in determining damages suffered, "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate." *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 137 (3rd Cir. 2000) (*quoting Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (3d Cir. 1977)). "Although the calculation of individual damages is necessarily an individual inquiry, the courts have consistently held that the necessity of this inquiry does not preclude class action treatment where class issues predominate." *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 305–06 (3d Cir. 2005); *see also In re Fedex Ground Package Sys., Inc., Emp. Pracs. Litig.*, 74 Fed. R. Serv. 1079 (N.D. Ind. 2007).  As stated in an oft-cited passage from *Visa Check*:

> There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed

50

to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*Visa Check*, *supra*, 280 F.3d at 140-41.

The cases are legion holding the need to determine individual damages does not defeat predominance if the primary liability issues can be determined on a classwide basis. *In re Linerboard Antitrust Litig., 305 F.3d 145 (3d Cir. 2002)* ("[M]any courts faced with similar circumstances have certified class status with the expectation that individual questions concerning fraudulent concealment can be resolved at a later damages phase."); *Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 374–75 (3d Cir. 2015)* ("[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well-nigh universal . . .. Had the District Court ruled as Volvo requested, denying certification on that basis alone would have amounted to an abuse of discretion.") (internal citations omitted) (cleaned up); *In re Visa Check/ MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir. 2001), abrogated in part on other grounds by In re IPO Sec. Litig., 471 F.3d 24 (2d Cir. 2006) ("Visa Check").*

## CONCLUSION

It is respectfully submitted the district court got it right and conducted the rigorous analysis required in reviewing the evidence and certification motion. The court correctly looked at the streamlined issues in the case and the element-by-element analysis provided by Plaintiffs' briefing prior to granting certification. The

class definitions were evident in the certification motion. Any adjustments to the definition of the classes, if any, can be crafted by counsel with the district court's approval during the class notification process. This Court should affirm the order below.

Dated: June 26, 2026

**KANTROWITZ,**
**GOLDHAMER &**
**GRAIFMAN, P.C.**

 **/s/ Gary S. Graifman**
By: Gary S. Graifman
Daniel C. Edelman
135 Chestnut Ridge, Suite 200
Montvale, New Jersey 07645
Tel: (201) 391-7000
ggraifman@kgglaw.com
dedelman@kgglaw.com

**THOMAS P. SOBRAN, P.C.**
Thomas P. Sobran
7 Evergreen Lane
Hingham, MA 02043
Tel: (781) 741-6075
tsobran@sobranlaw.com
(admitted *pro hac vice below*)

***Counsel for Plaintiffs-Appellees***

## COMBINED CERTIFICATIONS

### STATEMENT OF BAR MEMBERSHIP

I, Gary S. Graifman am duly admitted to practice law before the United States Court of Appeals for the Third Circuit.

/s/ Gary S. Graifman
Gary S. Graifman

### STATEMENT OF COMPLIANCE WITH FRAP 32(a)(7)(b)

This brief was prepared on a computer using Microsoft Word. The font is Times New Roman, 14-point, double spaced. The word count of the body of the brief, including footnotes and point headings, as calculated by Microsoft Word, is 12,094 words.

/s/ Gary S. Graifman
Gary S. Graifman

### STATEMENT OF SERVICE AND ECF FILING

I, Gary S. Graifman, hereby certify that this brief was filed using the Court's electronic case filing system, which will automatically send a notice of docket activity on all counsel of record.

/s/ Gary S. Graifman
Gary S. Graifman

### STATEMENT OF IDENTICAL COMPLIANCE BRIEFS

I, Gary S. Graifman, hereby certify that the briefs are filed in compliance with the Court's rules and identical to one another and the electronic PDF version.

/s/ Gary S. Graifman
Gary S. Graifman

**STATEMENT OF VIRUS CHECK**

I, Gary S. Graifman, hereby certify that a virus check was performed on this brief and that it is free from viruses. The check was performed with SentinelOne, version 25.2.6.442.

/s/ Gary S. Graifman
Gary S. Graifman